1  Mark H. Meyerhoff, Bar No. 180414
   mmeyerhoff@lcwlegal.com
2  Elizabeth T. Arce, Bar No. 216687
   earce@lcwlegal.com
3  LIEBERT CASSIDY WHITMORE
   A Professional Law Corporation
4  6033 W. Century Boulevard, Suite 500
   Los Angeles, CA 90045
5
   Telephone: (310) 981-2000
6  Facsimile: (310) 337-0837
7  Attorneys for Defendants
   CITY OF BARSTOW, HECTOR
8  RODRIGUEZ, CALEB LEE
   GIBSON, RUDY ALCANTARA
9  and MICHAEL P. HUNTER

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13  RAY WARREN,                        Case No. EDCV 08-0405-DDD (OPx)

14            Plaintiff,               **DEFENDANTS' APPENDIX OF**
                                       **EVIDENCE IN SUPPORT OF**
15        v.                           **MOTION FOR SUMMARY**
                                       **JUDGMENT (Part II)**
16  CITY OF BARTSTOW, HECTOR
    RODRIGUEZ, in his capacity as the  [Fed. R. Civ. P. 56]
17  City Manager for the City of Barstow,
    CALEB LEE GIBSON, individually
18  and in his capacity as Chief of Police
    for the City of Barstow; RUDY
19  ALCANTARA individually and in his
    capacity as Lieutenant for the City of
20  Barstow Police Department;
    MICHAEL P. HUNTER, individually
21  and in his capacity as Sergeant for the
    City of Barstow; and DOES 1 through
22  9 inclusive,
23
              Defendants.
24
25
26
27
28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Exhibit 17

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RAY WARREN,

    Plaintiff,

    vs.

CITY OF BARSTOW, HECTOR RODRIGUEZ, in his capacity as the City Manager for the City of Barstow; CALEB LEE GIBSON, individually and in his capacity as Chief of Police for the City of Barstow; RUDY ALCANTARA, individually and in his capacity as Lieutenant for the City of Barstow Police Department; MICHAEL P. HUNTER, individually and in his capacity as Sergeant for the City of Barstow; and DOES through 9, Inclusive,

    Defendants.

ORIGINAL

Case No. EDCV08-0405-SGL (OPx)

DEPOSITION OF RAY WARREN

Tuesday, January 19, 2010

Los Angeles, California

REPORTED BY:

KELLY V. CHARLES
CSR No. 12164

IMHOF AND ASSOCIATES
COURT REPORTERS & VIDEOGRAPHERS

7720 Painter Ave
Suite A
Whittier, CA  90602

20650 Adam Circle
Yorba Linda, CA
    92886

1

**Exhibit 17 - 1**

003

Page 10

1    that's the same oath that you would take in court and you

2    would be subject to the same penalties of perjury as if you

3    were in a court of law.  Do you understand that?

4            A      Yes, I do.

5            Q      Okay.  Have you discussed your deposition

6    today with anybody other than your attorney?

7            A      No.

8            Q      Have you reviewed anything in preparing for

9    your deposition today?

10           A      No.

11           Q      Prior to working for the Barstow Police

12   Department, did you hold any other law enforcement

13   positions prior to -- I believe it was 1986 when you

14   started working for the police department?

15           A      Yes, I did.

16           Q      What other law enforcement positions did

17   you hold?

18           A      U.S. Air Force and San Bernardino Police

19   Department.

20           Q      Was the U.S. Air Force before the San

21   Bernardino Police Department?

22           A      And since, yes.

23           Q      When did you start with the Air Force?

24           A      1980.

25           Q      In what capacity do you serve?

**Exhibit 17 - 2**

004

```
 1          A     As a law enforcement specialist.

 2          Q     Was that your status in 1980, law

 3    enforcement specialist?

 4          A     Yes.

 5          Q     And you continue to serve through today?.

 6          A     Yes.

 7          Q     Is that in the same capacity, law

 8    enforcement specialist?

 9          A     Yes, but in a -- now it's a managerial

10    position as opposed to a, you know, road-officer-type

11    thing.

12          Q     Okay.  What generally do you do as a law

13    enforcement specialist?  What are your responsibilities?

14          A     For the Air Force?

15          Q     Right.

16          A     At the time -- at this time now, I'm a

17    senior enlisted leader for a security forces squadron.

18          Q     You said special forces squadron?

19          A     Security forces squadron.

20          Q     How often do you serve in that capacity?

21    Is it daily, once a month, or is it sporadic?

22          A     The basic requirement is for one two-week

23    period and 12 other days throughout the year.

24          Q     Do you receive compensation for that

25    service?
```

**Exhibit 17 - 3**

1            MR. MEYERHOFF:   Right.

2            MR. PERRY:   Okay.

3        Q      BY MR. MEYERHOFF:   I understand you're

4    currently serving with the Air Force and currently still

5    work for the fairgrounds; correct?

6        A      I'm still an active reservist.   My

7    status -- right now, I'm not doing any military time --

8        Q      Right.

9        A      -- but yes, I'm still subject to recall and

10   whatnot, and to participate for my basic requirement.

11       Q      Your basic requirement being a two-week

12   stint and then 12 days throughout the year?

13       A      Correct.

14       Q      Okay.  Getting back to the Barstow Police

15   Department.  When did you first become president of the

16   Barstow Police Officers' Association?

17       A      Sometime in the late '90s was the first

18   time.

19       Q      And that was in the position as president

20   of the -- I'll call it the "POA."

21       A      At some point during those years, I was I

22   believe the president, and at another time I was the vice

23   president, and I don't recall what other positions I may

24   have held on the board.

25       Q      I assume when you started with the police

Exhibit 17 - 4

006

Page 27

1   department back in 1986, that you became a member of the

2   POA just because you were an officer; is that correct?

3            A       That's correct.

4            Q       When was the first time you held -- I'll

5   call it "board position." Do you understand what board

6   positions with the POA --

7            A       Yes.

8            Q       When was the first time you had a board

9   position with the POA?

10           A       Again, that would have been sometime in the

11  late 90s, '97, '98, '99, along in there I believe.

12           Q       Do you recall what your first position was?

13           A       It was -- I recall it to either be

14  president or vice president. Now again, I may have had

15  some sort of treasurer or secretary position and I just

16  don't remember it.

17           Q       During that time frame when you were either

18  president or vice president in the late '90s, how long did

19  you serve in that capacity?

20           A       I believe each of the positions is a

21  two-year stint.

22           Q       Okay. How are board members selected by

23  the POA?

24           A       There's some sort of an election process by

25  the members -- the membership of the Association.

**Exhibit 17 - 5**

Page 29

1    was handled.  It's been three years ago.

2           Q     Okay.  Any recollection as to when your

3    tenure as president started -- the tenure that ended in

4    January of 2007?  Any recollection as to when you started

5    that tenure as president?

6           A     I think it was at least -- at least a year

7    prior to that.

8           Q     And prior to starting your tenure as

9    president -- the last tenure as president -- you were vice

10   president, you said?

11          A     I had been vice president.

12          Q     Okay.  When did you start your tenure as

13   vice president prior to becoming president?

14          A     I'm not absolutely sure.  We'd have to

15   check the records with the Association.  I just don't

16   remember the dates.

17          Q     You said that the current -- or the

18   president had left and then you filled the role.  Is that

19   your recollection as to how you became president during

20   your last tenure?

21          A     I think that's what happened.

22          Q     Who was the prior president?

23          A     Officer Andrew Ellis.

24          Q     And you were serving as vice president

25   while he was president; is that correct?

**Exhibit 17 - 6**

1       that I was serving in some capacity for the entire time,

2       which I don't believe that was the case because I was gone

3       to, you know, post 911.  There was, I believe, some breaks

4       where I wasn't on the board.

5               Q       Okay.  You've alleged that in mid to late

6       2006 you assisted an officer named Sharon Jackson.  Am I

7       pronouncing her name right?

8               A       It's actually Sharon.  It's just spelled

9       wrong.

10              Q       That you assisted her in submitting a

11      complaint against Lieutenant Alcantara.  Do you recall that

12      situation?

13              A       Yes.

14              Q       Do you recall what date it was or what time

15      frame it was that you first assisted her in submitting some

16      type of a complaint to the City?

17              A       No.  I don't remember the dates.

18              Q       Okay.  Do you know what capacity -- were

19      you the president of the POA at the time, or may it have

20      been when you were vice president, or do you recall?

21              A       I'm fairly sure I was the president at the

22      time.

23              Q       Do you recall what type of complaint it was

24      that she -- well, let me back up.

25              Do you recall when she first came to you and told

**Exhibit 17 - 7**

009

Page 32

1    you about some type of complaint that she had?

2           A      She complained to me using the telephone.

3    We spoke on the telephone.  She had called me and made the

4    complaint as it were.

5           MR. PERRY:  He's asking for when.  I believe you

6    said you didn't know, but do you know -- have an idea of

7    when she came to you?

8           Q      BY MR. MEYERHOFF:  When you received that

9    phone call.

10          A      I don't know what the dates were.

11          Q      Late 2006?  Does that seem like the time

12   frame?

13          A      That sounds about right.

14          Q      Did she contact you on your personal cell

15   phone?  Office number?  Do you recall?

16          A      It would have been on personal phones,

17   either home or cell phone.  I don't recall which one.

18          Q      Do you recall what she told you when she

19   called you on the phone?

20          A      Essentially, she was uncomfortable because

21   of the frequency of phone calls coming to her from

22   Lieutenant Alcantara.

23          Q      She was out on injury leave at that time;

24   is that correct?

25          A      That's correct.

**Exhibit 17 - 8**

010

Page 33

1        Q        When she told you this, was this the first
2    time that you had heard that Alcantara was allegedly
3    calling her frequently while she was off duty?
4        A        I don't know.
5        Q        Okay. Did she say -- did you respond to
6    her in any way during that phone call when she told you
7    about this accusation?
8        A        I'm sure I responded. I don't know
9    exactly -- we had a conversation regarding the issue. I
10   don't know what my response was.
11       Q        Do you recall anything else regarding her
12   complaint? Any other details other than Alcantara was
13   contacting her frequently?
14       A        There was -- I don't remember the
15   specifics. She was concerned -- or again, uncomfortable
16   with the frequency of the phone calls and she felt
17   uncomfortable that -- as I'm trying to recall -- that he
18   was making offers to her to -- I want to say to help her
19   move or, you know, personal efforts like that that seemed
20   inappropriate to her. And again, I don't remember all the
21   specifics of that, but she was uncomfortable with the
22   frequency and the content of the phone calls.
23       Q        Other than remembering that she may have
24   been uncomfortable with him offering to help her move, was
25   there anything else that you recall that she said which

**Exhibit 17 - 9**

011

1   made her uncomfortable?

2          A     At the moment, I don't recall specifically.

3          Q     Okay.  Did you take any notes of the

4   conversation?  Do you recall?

5          A     Not that I recall.

6          Q     Anything else you recall about the

7   conversation other than what you've testified to?

8          A     Not at the moment.

9          Q     Did she explain to you or tell you why she

10  was contacting you regarding this?

11         A     Because she was uncomfortable with the

12  current situation between her and the Lieutenant.

13         Q     Were you friends with her at the time she

14  called you?

15         A     Yes.

16         Q     Did you have any understanding as to why

17  she was seeking you out to tell you this?  Was it

18  because -- if you know -- because of your friendship or

19  because of any other reason?

20         A     No.  It was because I was the board

21  president.

22         Q     Okay.  After you received her phone call,

23  did you take any steps to follow up or to do anything with

24  the information that she gave you?

25         A     I recall that I contacted the Human

**Exhibit 17 - 10**

012

Page 35

1   Resources Director, Eileen Martin, and gave her the

2   information that I knew to that point.

3          Q      How did you convey the information to

4   Eileen Martin? Was it in person, through e-mail, letter?

5   Do you recall?

6          A      I do recall that I spoke personally to her.

7   It's possible I gave her a memo or an e-mail. I really

8   don't remember.

9          Q      How long after the telephone call from

10  Sharon Jackson did you contact Eileen Martin?

11         A      Fairly soon after. If I was working that

12  day, I probably went directly over there. If I was off, I

13  probably went over there on my next work day.

14         Q      And you recall the first contact with

15  Eileen Martin was in person? You had a face-to-face

16  meeting with her?

17         A      I think that's the case.

18         Q      Was anyone else present besides you and

19  Eileen?

20         A      I don't know. I don't recall at the

21  moment.

22         Q      Do you recall if Sharon Jackson, if she

23  went with you to the meeting?

24         A      She may have. Honestly, she was off --

25         Q      She was off duty --

**Exhibit 17 - 11**

013

1           A       Yeah.  You know, I'm not going to speculate

2    on that because she was off on her time.  So I just don't

3    remember whether she was there or not for that.

4           Q       Okay.  What did you tell -- what do you

5    recall telling Eileen Martin about what you learned from

6    Sharon Jackson?

7           A       All I would have told her is what Jackson

8    would have told me.

9           Q       That would be what you've already testified

10   to?  What you recall Jackson telling you?

11          A       Essentially, yes.

12          Q       Do you recall any response that Eileen

13   Martin gave after you conveyed what Jackson told you?

14          A       That would have been none of my business.

15   I don't know what her response was.

16          Q       In your capacity as a board member,

17   president, vice president, had you received any complaints

18   like this from members prior?

19          A       Possibly.  I don't recall any specifically

20   at the moment.

21          Q       Did you take any steps to -- other than

22   just -- I won't say "just," but other than talking to

23   Eileen Martin, did you do anything else in response to what

24   Sharon Jackson had told you?

25          A       I think my part in that situation would

**Exhibit 17 - 12**

014

1    have been to make the report to Human Resources so that

2    they could take appropriate action as necessary.  So I

3    don't know that I did anything other than to make -- or to

4    facilitate reporting the issue.

5          Q       Did you submit anything in writing to Human

6    Resources regarding this claim or was it just -- was it a

7    verbal communication to Eileen Martin?

8          A       Again, I don't recall specifically.  I know

9    that I spoke to her personally and I may have prepared some

10   sort of memo or e-mail, but again, I don't remember

11   specifically whether I did or not.

12         Q       This meeting that you had when you conveyed

13   it to Eileen Martin, did that take place in Eileen Martin's

14   office?

15         A       As I recall.

16         Q       Do you know what Eileen Martin did with the

17   complaint after you conveyed it to her?  Do you know any

18   steps that she took?

19         A       Yeah.  Again, that would have been none of

20   my business.  I don't know.

21         Q       Okay.  Other -- after the first time you

22   spoke with Sharon Jackson where she conveyed this to you,

23   did you have any further conversations with her about her

24   allegations?

25         A       With Jackson?

**Exhibit 17 - 13**

015

Page 44

1   says you cannot contact an officer that is off on injury

2   leave.  The Department subsequently put out a memo

3   dictating that.  But at that time, I don't know that she

4   said anything about who could contact who.

5           Q       Other than her saying that -- what you've

6   testified to -- do you recall anything else that Eileen

7   Martin said regarding officers who were out on leave?

8           A       Not specifically right now.

9           Q       You mentioned the Department subsequently

10  issued some policy regarding contacting officers on leave.

11  Do you recall when that policy was issued?

12          A       I believe it was the day after I went to

13  Eileen Martin with Sharon Jackson's concern.

14          Q       Do you currently have a copy of any such

15  policy in your possession?

16          A       I believe it was a memo, and I don't

17  know -- I don't think that I have a copy of that.

18          Q       Do you recall reading the memo when it was

19  issued?

20          A       Yes.

21          Q       Do you recall who it was issued from?

22          A       I believe Lieutenant Alcantara issued the

23  memo.

24          Q       To the best of your recollection, do you

25  recall what the memo said?

**Exhibit 17 - 14**

016

Page 45

1           A       Again, I'll paraphrase it to the best of my

2   recollection.  Something to the effect of:  Employees who

3   are off hurt or sick in any manner, I believe, were not to

4   be contacted by other Department members.

5           Q       Do you recall if the memo distinguished

6   between officers and superiors in any way?

7           A       I believe it applied to all personnel --

8   Department personnel.

9           Q       Did you have any discussions with

10  Lieutenant Alcantara about this memorandum?

11          A       Absolutely not.

12          Q       Did you have any discussion with any

13  managers, supervisor, meaning sergeant or above, regarding

14  this memo that you recall?

15          A       I don't recall specifically.

16          Q       Did anybody ever explain to you why the

17  memorandum was issued or prepared?

18          MR. PERRY:  Other than management?  He's already

19  testified he hasn't spoken to any management about the

20  memo, so the only person that can explain to him now would

21  be Officer Level (Phonetic).  Is that where we're at?

22          MR. MEYERHOFF:  Yeah, or anybody at all.

23          Q       Did anybody at any time explain to you or

24  tell you why the memorandum was issued, including Eileen

25  Martin?

**Exhibit 17 - 15**

1  have been aware.  And specifically, I don't recall who it

2  was.

3          Q      Okay.  You said "other board members."  Do

4  you recall any particular position -- even if you don't

5  recall the person -- any particular position that you may

6  have discussed it with?  Treasurer?  Vice President?

7  Anyone at all?

8          A      No.  I don't recall specifically.

9          Q      Okay.  Do you recall discussing this issue

10 during a board meeting in any way, an official meeting?

11         A      I don't know.  I'm not sure.

12         Q      Did you ever talk to any supervisor or

13 manager, meaning sergeant or above, about the fact that you

14 had gone to Human Resources and facilitated this complaint

15 from Sharon Jackson?

16         A      I don't recall speaking to any supervisor

17 regarding this.

18         Q      Did any supervisor or manager ever make any

19 comments to you which led you to believe that they knew

20 that had you facilitated this complaint to Human Resources?

21         A      There had to have been some conversation at

22 some point following the complaint.  It's a small

23 department and everybody knew what was going on.

24         Q      Do you have any -- do you know whether

25 Eileen Martin ever told anybody that you were the one who

**Exhibit 17 - 16**

018

Page 49

1    facilitated the complaint from Sharon Jackson?

2            A        I don't know who she may have told.

3            Q        Do you have any evidence that she ever told

4    Chief Gibson that you were the one who came to her with the

5    complaint?

6            A        I would have to assume that she had.  At

7    some point he would have had to know, I'm sure.

8            Q        Why do you say you're sure that he would

9    have to know that you were the one who facilitated the

10   complaint?

11           A        Well, it would not have been a secret, and

12   in fact I probably told either Lieutenant Alcantara or

13   whoever the Watch Commander was that I was going over to

14   Human Resources as we were required to do.

15           Q        Let's back up then.  On the day that you

16   went to talk to Eileen Martin, do you recall specifically

17   telling anybody in the Department that you were going to go

18   talk to Human Resources on that day?

19           A        I would have had to have told the Watch

20   Commander.

21           Q        Are you sure that you went and spoke to

22   Eileen Martin on a day that you were on duty or was it

23   possible that you talked to her on a -- before or after a

24   shift or on an off-duty day?

25           A        I'm pretty sure I was working that day.

**Exhibit 17 - 17**

019

Page 50

1       Q       Do you have any specific recollection of

2   telling a Watch Commander that you were going to go over to

3   talk to Eileen Martin or to Human Resources?

4       A       I know specifically that I would not have

5   gone over there without telling somebody.

6       Q       Was there some type of directive that you

7   had to tell somebody if you were going to go speak to

8   somebody in Human Resources?

9       A       Yes.

10      Q       Was it a written directive?

11      A       I think it was.

12      Q       Do you know when that directive was issued?

13      A       I will estimate probably some time in early

14  2006-ish.

15      Q       Do you know who issued that directive?

16      A       I believe it was Lieutenant Alcantara.

17      Q       Do you know why that directive was issued?

18          MR. PERRY:  Objection; calls for speculation.

19      Q       BY MR. MEYERHOFF:  If you know.

20      A       As far as I know, it was so they could

21  track me going over to the City side so frequently.

22      Q       In 2006 -- let's just stick with that

23  year -- how many times did you advise the Watch Commander

24  that you were going to go speak to the City side, Human

25  Resources, or City -- I'll assume "City side" means not the

**Exhibit 17 - 18**

020

Page 51

1    police department portions of the city.

2              How many times do you recall informing someone

3    that you were going to go speak to the City side?

4              MR. PERRY:  Objection; vague and overbroad.

5              MR. MEYERHOFF:  All right.

6         Q    Define "City side" for me.

7         A    The City Hall building.  It was separate

8    from the police department.

9         Q    Okay.  And was it your understanding that

10   any time you went and spoke to the City side, that you had

11   to inform the Watch Commander?

12        A    It was clear that I was supposed to do

13   that.

14        Q    Did that apply to anyone else besides you?

15        A    I believe so.

16        Q    Do you know if other officers also had to

17   inform Watch Commanders if they were going to go speak to

18   the City side?

19        A    I believe so.

20        Q    Did you ever talk to Lieutenant Alcantara

21   about the directive that he issued, that you speak to a

22   Watch Commander?

23        A    I had told Alcantara on occasion that I was

24   going over to the City side.  Now -- if that's what you

25   mean.

**Exhibit 17 - 19**

021

Page 58

1   actually -- I may have asked this, but was this actually a

2   written directive, a memorandum, that you recall seeing?

3        A     I don't know.  I don't recall.  There may

4   have been something and I don't know whether I saw it or

5   not.

6        Q     Okay.  I want to hand you what's labeled as

7   Plaintiff Ray Warren's responses to Defendant's request for

8   production.  I'll mark this as Defendant's Exhibit 1.

9             (Whereupon the document is marked

10            by the Deposition Officer as Defendant's

11            Exhibit No. 1 for identification.)

12       Q     BY MR. MEYERHOFF:  Do you recall receiving

13  a request for production from the defendant, City of

14  Barstow, in this action, Mr. Warren?

15       A     What is that?

16       Q     The request itself would have been --

17       A     From the discovery --

18       MR. PERRY:  Yeah.  These are our responses.

19       THE WITNESS:  Okay.

20       Q     BY MR. MEYERHOFF:  Yeah.  I want you to

21  turn to Page 4.  I want you to look down at the heading as

22  "Request No. 6," just for identification.  The next page

23  asks you to produce all documents relating to the directive

24  Gibson and Alcantara issued ordering that before Plaintiff,

25  meaning you, were to visit or speak with a nonDepartment

**Exhibit 17 - 20**

022

Page 59

1    personnel, that he must first inform and/or get such visit

2    or ability to speak with a Watch Commander as alleged in

3    Paragraph 42 of the complaint in this action.

4         In your response it states, "Unaware of this

5    directive."  Do you know why in this response you state

6    that you're unaware of this particular directive?

7         A    I think probably because the request asked

8    for all documents, and maybe that's not clear the way I

9    wrote it.  If there is a document, I don't know where it

10   is.

11        Q    So when you say, "Unaware of directive,"

12   you meant that you're unaware of any documents?

13        A    That would be correct.

14        Q    Okay.  But you are -- sitting here today,

15   you do have specific recollection that there was such a

16   directive?

17        A    Definitely.

18        Q    How was the directive conveyed to you?  Do

19   you recall?  How did you learn of the directive?

20        A    You know, at one point -- it was either

21   Keith Libby or Albert Ramirez, who would have been

22   sergeants at the time, who told me that I need to let them

23   know each time I go over to the City side.  It was one of

24   those two I believe.

25        Q    Did you ever ask anybody why such a

**Exhibit 17 - 21**

023

1    directive was issued?

2              A        I don't know.  I may have.  I don't recall.

3              Q        I'm going to hand you a second document,

4    and we can mark this as Exhibit 2.

5                       (Whereupon the document is marked

6                       by the Deposition Officer as Defendant's

7                       Exhibit No. 2 for identification.)

8              Q        BY MR. MEYERHOFF:  I'll identify it as a

9    November 1st, 2006 e-mail from Ray Warren to Eileen Martin.

10   Subject:  Offer Jackson.  Take whatever time you need to

11   review this, Mr. Warren.  I want to ask you if you recall

12   sending this e-mail.

13             A        It looks like this is an e-mail that I sent

14   to Eileen Martin on November 1st of 2006, and I cc'ed the

15   POA attorney it looks like also.

16             Q        Do you recall sending this e-mail?

17             A        Specifically at the moment, I don't

18   remember sitting down and typing the e-mail.  I probably

19   did it just to document that I actually did report the

20   issue.

21             Q        In reviewing the content of the e-mail,

22   does it, to your recollection, accurately convey what

23   Sharon Jackson told you?

24             A        Not in its entirety.  This is just a

25   thumbnail -- just to document that I initiated a complaint.

**Exhibit  17 - 22**

Page 72

1    document regarding the 3/12 schedule or the Association

2    support for it?

3         A    Specifically, I don't recall.

4         Q    Do you recall ever obtaining permission

5    from the Chief to post any documentation or memos about the

6    3/12 schedule?

7         A    Specifically, I don't remember.

8         Q    I assume you don't recall the Chief ever

9    denying you the permission to post anything regarding a

10   3/12 schedule.

11        A    I don't really remember him denying any

12   memos.  He just wanted to know what was going up there, him

13   or his secretary.

14        Q    This advocating for the 3/12 schedule, was

15   a 3/12 schedule eventually adopted by the Department for

16   patrol officers?

17        A    Yes, as I recall.

18        Q    Do you recall when that happened?

19        A    About the time I got put in the school

20   assignment.

21        Q    Would that be November/December of '06?

22   Does that sound correct?

23        A    I believe it was early '07, very early '07.

24        Q    Do you recall when you first -- or when the

25   Association first decided to advocate for the 3/12

**Exhibit 17 - 23**

025

Page 74

1    "the Department." If you have something in mind, you can

2    answer.

3              THE WITNESS:  I don't know of any.

4         Q    BY MR. MEYERHOFF:  Did Chief Gibson ever

5    tell you why a 3/12 schedule was ultimately implemented?

6         A    No.

7         Q    Did Lieutenant Alcantara ever tell you why

8    it was implemented?

9         A    Not that I recall.

10        Q    Did anybody in the City explain to you why

11   a 3/12 schedule was adopted?

12        A    Not that I recall.

13        Q    I assume you were pleased when -- that they

14   adopted a 3/12 schedule.  That's what the Association

15   wanted; correct?

16        A    Well, it was kind of bittersweet.

17        Q    Because you were in a school resource

18   officer position at the time?

19        A    Correct.

20        Q    During the time that you advocated for a

21   3/12 schedule, did the Chief Gibson ever convey to you that

22   he was upset by the fact that you were advocating for a

23   3/12 schedule?

24        A    I don't remember him ever saying that he

25   was -- to me -- that he was upset for me advocating for the

**Exhibit 17 - 24**

026

1   schedule.

2        Q       Did Lieutenant Alcantara ever express to

3   you in any way that he was upset by the fact that you were

4   supporting a 3/12 schedule?

5        A       Not that I recall.

6        Q       Did anyone other than those two tell you

7   that Chief Gibson was upset that you were taking this

8   position up in regards to the 3/12 schedule?

9        A       I don't recall anybody specifically telling

10  me that the Chief said he was upset because I was

11  advocating -- because of the schedule.

12       Q       Did anybody tell you that Lieutenant

13  Alcantara was upset that you were advocating for the 3/12

14  schedule?

15       A       Again, not that I recall.

16       Q       Again, you don't recall anybody telling you

17  the reasons why the 3/12 schedule was ultimately

18  implemented?

19       A       I'm sorry.  Ask me that again.

20       Q       Sure.  Do you recall anybody ever telling

21  you any reasons why the 3/12 schedule was implemented?

22       A       Not as I sit here right now.

23       Q       Do you have any idea whose decision it was

24  to implement the 3/12 schedule?

25               MR. PERRY:  Objection; calls for speculation.  You

**Exhibit 17 - 25**

027

Page 84

1    eight-hour shift?

2           A      I don't know of the specific notification.

3    I don't know how it came or exactly who it came from.

4           Q      Then the e-mail above that dated November

5    17th, 2006 from you to Chief Gibson, do you recall

6    preparing that e-mail to the Chief?

7           A      Yes.

8           Q      After sending this e-mail in November or

9    December of 2006, do you recall the Chief ever meeting with

10   you to discuss -- as you put it -- providing a meeting

11   simply to provide a forum for the members of the OA to

12   discuss issues directly with you?  Do you recall him ever

13   sitting down and meeting with you after this e-mail?

14          A      Yes.

15          Q      When do you recall meeting with the Chief

16   after November 17th, '06?

17          A      It was sometime after this e-mail I stepped

18   into his office (Indicating).

19          Q      And was this -- when you say you stepped

20   into his office, was this a meeting within the context of

21   Article 9, wanting to have a general meeting with him?

22          A      Yes.

23          Q      Did he meet with you at that time or did he

24   refuse?

25          A      No.  He refused saying that he needed to

**Exhibit 17 - 26**

028

Page 85

1   contact the attorneys to see if he was required to comply

2   with this.

3        Q        Comply with what?

4        A        Article 9 of the MOU.

5        Q        When did you go to him and -- go into his

6   office and ask if he'd comply with Article 9?

7        A        As I recall, it was sometime after having

8   received this e-mail from him (Indicating).

9        Q        Did he ever get back to you after he said

10  he had to consult with his attorneys?

11       A        Never.

12       Q        Did you make any further request that he

13  meet with you pursuant to Article 9?

14       A        Not that I recall.

15       Q        Prior to this, had you asked the Chief to

16  meet with you pursuant to Article 9 prior to November of

17  2006?

18       A        In accordance with this Article 9 of the

19  MOU?  Is that what you're asking?

20       Q        Yeah.

21       A        No.  I don't recall specifically having

22  done that.

23       Q        Do you know of any other time that the

24  Chief refused to meet with the Association pursuant to

25  Article 9?

**Exhibit 17 - 27**

Page 86

1          MR. PERRY: Objection; overbroad in scope --

2          Q       BY MR. MEYERHOFF: Well, let me ask this:

3    Prior to asking the Chief to meet with you pursuant to

4    Article 9 in November of '06, had the Association asked the

5    Chief to meet pursuant to Article 9 at any other time?

6          MR. PERRY: Objection; overbroad to "the

7    Association." Would it be to the time that he's in the

8    Association or a board member or --

9          MR. MEYERHOFF: My definition is limited to the

10   time Chief Gibson was a Chief.

11         Q       So, did the Association request that Chief

12   Gibson meet with you pursuant to Article 9?

13         A       You know, referring to Article 9, the only

14   time I specifically remember having made a request in

15   accordance with Article 9 was this one here (Indicating).

16   We had previously made requests with Chief Gibson to meet

17   with us and he always declined.

18         Q       Okay. After November 17th, 2006 when you

19   wrote this e-mail, did you have any further conversations

20   at all with the Chief regarding the 3/12 schedule, other

21   than the one you testified to where he said he had to speak

22   to his attorney?

23         A       I probably stepped in his office and asked

24   him something about it at one time or another.

25         Q       And did he respond to you -- well, back up

**Exhibit 17 - 28**

1   a second.  Do you recall what you said to him when you

2   stepped into his office after November 17th to discuss the

3   3/12?

4          A        Specifically, no.

5          Q        Do you recall if he discussed the schedule

6   with you at that time that you did step into his office?

7          A        For the most part as I recall, he deferred

8   to Lieutenant Harpole.

9          MR. PERRY:  Counsel, when you see fit for a break,

10  I'd request --

11         MR. MEYERHOFF:  Sure, yeah.  How long do you need?

12         MR. PERRY:  Just five minutes.

13                  (Recess taken.)

14         Q        BY MR. MEYERHOFF:  Mr. Warren, we were

15  talking about when you requested the meeting in November

16  and Chief Gibson refused to meet with you.  Did he ever

17  give you a reason as to why he did not want to meet with

18  you or the POA?

19         A        He never gave me a specific reason why he

20  did not want to meet.

21         Q        Did anybody, to your recollection, give you

22  any reason why the Chief, after November 17th, did not meet

23  with you to discuss the matters that you put forth in your

24  November 17th e-mail?

25         A        Not that I recall a specific reason.

Exhibit 17 - 29

031

```
 1         Q      What specific steps did you take to
 2   advocate the Association's position?
 3         A      I don't recall specifically exactly what I
 4   did.  I know that I had conversations with police
 5   department management personnel, police department rank and
 6   file personnel, and City management personnel.
 7         Q      In terms of police department management,
 8   who specifically did you talk to in regards to advocating
 9   for the recreation of the corporal program?
10         A      At some point during that year-or-two time
11   period, I know I spoke with the Chief about it, I know I
12   spoke with each of the Lieutenants about it, and I spoke
13   with some or all of the sergeants about it.
14         Q      The "Lieutenants" being Alcantara and
15   Harpole?
16         A      Correct.
17         Q      When you spoke to Chief Gibson about it,
18   were you -- was that a one-on-one conversation at any point
19   or were you with other Association members or board
20   members?
21         A      You know, as I recall -- and I don't
22   remember exactly when it was -- I do remember the subject
23   coming up during the course of a conversation in his
24   office, which I think was just he and I.  And then he --
25         Q      What do you recall of that conversation
```

**Exhibit 17 - 30**

Page 96

1   with Chief Gibson?

2          A       I don't recall the specifics of the

3   conversation.

4          Q       Do you recall the time frame that this

5   conversation occurred?

6          A       It would have been within a year or two

7   prior to the late '06 time period.

8          Q       So sometime in 2004/2005?

9          A       Probably 2005/2006.

10         Q       Okay.  Do you recall what the Chief's

11  position was in regards to the corporal program?  Did he

12  convey that to you?

13         A       To the best of my recollection, everybody

14  within the police department was in favor of the corporal

15  program.

16         MR. PERRY:  He's asking about:  Do you recall the

17  Chief's position?  Including the Chief?

18         THE WITNESS:  Yes, to include the Chief.  I'm

19  sorry.

20         Q       BY MR. MEYERHOFF:  Okay.  Would that

21  include the Lieutenants as well?

22         A       Yes.

23         Q       Okay.  Did you ever make any presentations

24  to the City Council in regards to the corporal program that

25  you recall?

**Exhibit 17 - 31**

033

Page 97

1          A     No.

2          Q     Did you ever speak to the City Council

3    about the corporal program that you recall?

4          A     It's possible I spoke to a council member

5    or two individually, but not as a group.

6          Q     And I think you said that you recall the

7    Council did approve the corporal program sometime in

8    early -- I'm sorry -- in July of 2006; is that correct?

9          A     The month of July comes to mind, and I

10   believe it was '06, and it actually could have been '05.  I

11   believe July was the month, and I think it was either '05

12   or '06.

13         Q     And at some point, I assume that a corporal

14   program was reinstituted within the Department; is that

15   correct?

16         A     Not while I was there.

17         Q     Okay.  Do you have any understanding as to

18   why there was -- a corporal program was not created after

19   the Council approved it?

20         MR. PERRY:  Objection; calls for speculation.  If

21   you have an understanding --

22         Q     BY MR. MEYERHOFF:  Do you have any personal

23   knowledge as to why a corporal program was not created?

24         A     Yes.

25         Q     What is your personal knowledge?

**Exhibit 17 - 32**

1    had heard that you were to blame for the corporal program?

2          A       Specifically, I don't know.

3          Q       Did anybody else besides those three tell

4    you that you were being blamed for the delay in the

5    corporal program?

6          A       Probably.  I don't recall specifically.

7          Q       Did Chief Gibson ever tell you that he was

8    angry at you for the delay in the corporal program?

9          A       You know, he never specifically said that.

10   It was understood that there was an adversarial

11   relationship, and I'll refer to this November 8th, '06 memo

12   where it says, "The OA, not Ray," and I prefaced it with

13   that to try and divorce myself from the issue so that I

14   wouldn't get beat up.  I mean, that's what it had come down

15   to.

16         Q       Okay.  You felt that there was just this

17   adversarial relationship between you, personally, and

18   Management as opposed to the Association and Management?

19         A       Well, there clearly was.

20         Q       Okay.  Any other reason why you felt the

21   Chief was angry at you personally because of the corporal

22   program?

23         A       You know, I don't know that "angry" is the

24   correct word.  I know that again, there was a, you know, an

25   adversarial, if you will, relationship between me and the

**Exhibit 17 - 33**

1   Chief because of the stuff that I did here with the OA, and

2   it was just understood.

3         Q      You mentioned that Andy Espinoza, Jr.

4   accused you of lying.  Did any other member of the

5   Association accuse you of lying in regards to the corporal

6   program?

7         A      Not that I know of.

8         Q      Okay.  And again, he claimed that you were

9   lying because he said that he spoke with Steve Curran and

10  was told something different than what Steve Curran told

11  you?

12        A      He didn't call me a liar, but he disputed,

13  and so I inferred that he was calling me a liar.  But he

14  disputed my version of the conversation saying that he had

15  learned something different from Steve Curran.

16        Q      Did he -- did Andy Espinoza, Jr. ever tell

17  you what he had learned from Steve Curran?

18        A      Yes.

19        Q      What did he tell you that Steve Curran had

20  told him?

21        A      I don't recall specifically what he said,

22  though it differed from what I had said.

23        Q      Was it in connection with corporal program?

24        A      That, and the Sheriff's Department issue.

25        Q      Okay.  Do you recall a policy in 2006 that

**Exhibit 17 - 34**

036

Page 115

1           A       I don't recall.

2           Q       Was it a manager or fellow officer or

3     somebody else?

4           A       I believe it was a manager or a records

5     person.

6           Q       Did you personally know about this late

7     accident report or was that something that you were told

8     about?

9           A       This was something I was told about.

10          Q       You said there were some late reports.  Did

11    you personally have knowledge that there were some late

12    reports or was that again something that you heard about?

13          A       There's always an issue of reports being

14    late.

15          Q       This policy that -- early 2006, was this a

16    written policy that reports had to be done before officers

17    could be relieved of duty?

18          A       Yeah.  There was a memo that came out from

19    either the Chief or Patrol Lieutenant.

20          Q       Did you object to this policy?

21          MR. PERRY:  Objection; vague to whether personally

22    or his capacity as POA?  If you have an understanding, you

23    can answer.

24          THE WITNESS:  Personally, I didn't like it because

25    I didn't want to get stuck over to do reports; however,

**Exhibit 17 - 35**

037

Page 116

1    trying to see it objectively, I understood it.

2         Q    BY MR. MEYERHOFF:  Did the Association take

3    any position on this policy?

4         A    Eventually.

5         Q    What position did the Association take?

6         A    After a period of time -- and I believe it

7    was a month or maybe more than a couple of months -- the

8    officers were tired of getting held over their regular

9    shift to complete reports.  So after discussion amongst

10   Association members, we believed that the Chief had made

11   his point with this policy and we asked that he relent.

12        Q    When did that happen, that the Association

13   asked the Chief to relent?

14        A    It was sometime in the latter part of '06 I

15   believe.

16        Q    Okay.  How did the Association convey to

17   the Chief that it wanted him to relent and not -- I guess

18   when you say "relent," not enforce the policy any longer?

19        A    Yeah.  That's what I was asking for.

20        Q    How was that conveyed to the Chief?

21        A    I think I wrote an e-mail or a letter to

22   either the Chief or the Lieutenant, the Patrol Lieutenant.

23   I probably had some conversation with those guys also.

24        Q    Who was the Patrol Lieutenant at the time?

25        A ·  I believe that was Alcantara.

**Exhibit 17 - 36**

038

Page 117

1          Q       Do you have a copy of any such e-mail in

2     your possession?

3          A       Not that I know of.

4          Q       Was the e-mail made on -- did it come from

5     you or did it come from the Association?

6          A       That was usually the problem.  It usually

7     came from me on behalf of the Association.

8          Q       Do you know if -- did you receive any

9     response to the e-mail?

10         A       I don't remember what it was, if there was

11    one.

12         Q       Did anybody ever tell you that the Chief

13    was -- made any comments about your e-mail at all?

14         A       I don't recall any specific comments.

15         Q       Do you know if Lieutenant Alcantara made

16    comments to anybody about the e-mail; that the policies

17    should not be enforced anymore?

18         A       The only thing I remember the Lieutenant

19    saying about that is that he wanted me to go through the

20    Lieutenant and to stop going to the Chief.

21         Q       Lieutenant Alcantara told you that?

22         A       Yes.

23         Q       That he wanted you to go through him and

24    not go directly to the Chief?

25         A       Yes.

**Exhibit 17 - 37**

039

Page 121

1    our way up before just going to the Chief and saying:

2    Hey...

3            Q        So just to get it straight, you don't think

4    that the implementation of this policy had anything to do

5    with you personally; is that correct?

6            A        For the report-writing?

7            Q        Yes.

8            A        No, not because of something I did.

9            Q        Okay.  Do you feel that the fact that you

10   objected on behalf of the Association to the policy upset

11   the Chief -- Chief Gibson in some way?

12           A        Yes.

13           Q        What do you base that on; that he was upset

14   by you objecting to the policy?

15           A        Well, the inference I got from him and the

16   supervisors is because I was after him so often about so

17   many things, that he was basically sick and tired of

18   hearing from me.

19           Q        Which supervisor told you that?

20           A        Well, again, Hunter, during a conversation

21   with him, he knew that the Chief didn't like my point of

22   view regarding the corporal program.

23           Q        Right.  Anything else that Hunter said that

24   the Chief didn't like other than accusing you of slowing

25   down or preventing the corporal program from being

**Exhibit 17 - 38**

040

1    instituted?

2         A       From Hunter, I don't recall specifically.

3         Q       Did any other manager or supervisor besides

4    Hunter tell you that the Chief didn't like you bringing

5    issues up or raising disputes?

6         A       I don't recall any specific comments.  I

7    think it was just kind of understood.

8         Q       Do you feel that the police department,

9    meaning management, took any action against you because of

10   your role as the Association president?

11        A       Yes.

12        Q       What do you believe the Department did to

13   you -- let me ask this:  Do you feel that you were punished

14   in any way because of these positions you took as the

15   Association president?

16        A       Yes.  In fact, I'm unemployed from there

17   right now.

18        Q       Okay.  So I take it you believe your

19   termination was motivated by your status and your position

20   as POA president; is that correct?

21        A       Absolutely.

22        Q       Okay.  You mentioned a couple of things in

23   your complaint.  First, you claim that Lieutenant Alcantara

24   contacted the Air Force, your unit, and tried to inquire

25   about your schedule.  First of all, is that something that

Exhibit 17 - 39

041

Page 123

1    you believe Alcantara did based upon positions you took as

2    a POA president?

3         A    Yes.

4         Q    When did Lieutenant Alcantara contact

5    your -- I'll say "unit." Is that the correct term?

6         A    Yes, that's fine.

7         Q    When did he contact -- first contact the

8    unit to ask about your schedule?

9         A    I don't recall the date specifically. It

10   would have been within a couple of years prior to late '06.

11        Q    You mentioned a number of things that you

12   did as POA president that we've discussed: Advocating for

13   the corporal program, facilitating the complaint with

14   Sharon Jackson, advocating for that 3/12 work schedule.

15        Did all those things happen simultaneously? I'm

16   just trying to compartmentalize in time when you advocated

17   for each of those particular events. Do you recall any

18   particular time frame where, let's say, you advocated for a

19   3/12 schedule other than what you've testified to?

20        MR. PERRY: I want to just object. It is

21   compound, but I think you narrowed it -- the last question,

22   but if you have an understanding of what he's asking, you

23   can go ahead and answer.

24        THE WITNESS: I have had an adversarial -- I hate

25   to use that word. I have not always seen eye to eye with

**Exhibit 17 - 40**

042

1   Management.  And then as the POA president, it seemed to

2   get worse because I was constantly -- I say "constantly."

3   I should say "frequently" voicing opinions adverse to

4   Management policy or decisions.

5          Now, I believe what precipitated this whole thing,

6   if you will, is in I believe February of 26 (sic), the

7   Denny's incident, where I voiced a complaint against

8   Sergeant Mike Hunter for use-of-force issue.  Things seems

9   to snowball from there.

10         Q      BY MR. MEYERHOFF:  So prior to February of

11  2006, do you feel that the Department punished you in any

12  way or took any negative action against you because of you

13  advocating for the Association?

14         A      Sure.

15         Q      Okay.  What do you think the Department did

16  to you prior to February of '06?

17         A      Denied promotion.

18         Q      When did the Department deny you a

19  promotion?

20         A      I believe it was during my initial stint as

21  president or vice president of the Association.

22         Q      When was that?

23         A      It would have been during the tenure of

24  Chief Becknell, B-e-c-k-n-e-l-l.

25         Q      What year did you apply for a promotion?

**Exhibit 17 - 41**

043

Page 132

1    Sergeant Hunter had used excessive force?

2        A    Yes.

3        Q    Do you feel that the actions, your

4    termination and the other things that you've alleged in

5    your complaint as punishment, were motivated by the fact

6    that you complained about Sergeant Hunter or motivated by

7    some other reason?

8        MR. PERRY:  Objection; calls for speculation.

9        THE WITNESS:  It appears to me that it's a

10   totality of all of that.

11       Q    BY MR. MEYERHOFF:  Let me ask you about

12   this Alcantara contacting your unit.  Again, you don't

13   recall specifically when he first did that; is that

14   correct?

15       A    I don't recall a specific date.

16       Q    Did he do it at any -- did anybody in the

17   Department contact your Air Force unit prior to Alcantara

18   contacting them in 2006/2007?

19       A    Not that I know of.

20       Q    How did you learn that Alcantara had

21   contacted your unit?

22       A    In my unit there's a position of Unit

23   Reserve Coordinator, URC, and at some point, Alcantara

24   asked me for information to contact my unit which I freely

25   gave him.  I then called the Unit Reserve Coordinator to

**Exhibit 17 - 42**

044

1   let them know that a member of my Department may contact

2   them.  Following that, at some point I was told by the Unit

3   Reserve Coordinator that the Lieutenant had called him.

4          Q       Did Alcantara -- when he asked for

5   information about how to contact your unit, did he tell you

6   why he wanted to contact your unit?

7          A       Yes.

8          Q       What did he say to you?

9          A       He wanted to obtain some kind of definite

10  scheduling to find out when I was supposed to be there to

11  participate with the unit.

12         Q       Did he give you a reason why he wanted to

13  get that definite scheduling?

14         A       He told me he needed to know when I was

15  going to the unit and not that he was just going to take my

16  word for it.

17         MR. MEYERHOFF:  Why don't we break now.  We'll go

18  off the record.

19                 (Lunch taken from 1:20 to 1:50.)

20         Q       BY MR. MEYERHOFF:  Mr. Warren, we were

21  discussing a conversation you had with Lieutenant Alcantara

22  where he asked you for some information regarding your

23  military unit so that he could contact them.  Just to pick

24  up, what exactly did he tell you in terms of why he wanted

25  to contact your Air Force unit?

**Exhibit 17 - 43**

045

Page 136

1    did he do or say that leads you to believe that he couldn't

2    grasp that your schedule was fluctuated?

3         A    That's the direction he kept going every

4    time I explained it to him.  He kept referring to the one

5    weekend a month and I said, "Forget all that.  That's not

6    how it works."

7         Q    When did he first start having theses

8    conversations with you about your schedule with the Air

9    Force?

10        A    It was kind of an ongoing thing.

11   Probably -- the last time I remember was probably early to

12   mid '06 it came up.

13        Q    Had it come up before that?

14        A    Yes.

15        Q    When was the first time that Alcantara

16   talked to you about your schedule with the Air Force?

17        A    It would have been within the year or two

18   prior to that.

19        Q    At that time prior to 2006, was he also

20   asking you for some schedule that you worked with the Air

21   Force?

22        A    You know, for the most part it had never

23   been a problem, and I tried to deconflict the whole thing.

24   But as -- you know, closer to '06 -- and I'm going to say

25   after the, you know, February 6th time period, that's when

**Exhibit 17 - 44**

046

Page 137

1    it seemed to reach critical mass where he decided he needed

2    to know, you know, absolutely what my schedule was and how

3    it worked and so on.

4        Q    Okay.  Did he give you any reason why he

5    wanted to know your schedule?

6        A    He wanted to be able to control when I was

7    going to do my reserve duty.

8        Q    Is that what he told you or is that what

9    you're guessing?

10        A    That was the inference I got because he

11    thought that I was -- and again, this is my opinion.  He

12    thought that I was getting away with something and that he

13    needed to know how to rein me in as far as when I was going

14    to participate in my reserve duty.  And each time he asked,

15    I was a cooperative as I could possibly be with him.

16        Q    Did he ever tell you that he was trying to

17    rein you in or that he thought you were getting away with

18    something?

19        A    His words to me were something along the

20    lines of:  I need to know when you're going to go.

21        Q    Okay.  I'll ask again though.  Did he ever

22    tell you why he was asking for your schedule with the Air

23    Force?

24        A    He just told me he needed to know

25    essentially when I was going to go, when I was going to be

**Exhibit 17 - 45**

047

Page 138

1   there.

2           Q      Do you recall him giving you any reason
3   whatsoever?

4           A      No.

5           Q      Did you give him the information to contact
6   your unit?

7           A      Yes.

8           Q      And you then claimed that you called up
9   the -- is it the unit reserve coordinator?

10          A      Yes.

11          Q      Did you learn that Alcantara did call your
12  unit?

13          A      Yes.

14          Q      How did you learn that?

15          A      I got a call back from the unit reserve
16  coordinator saying that this guy called the unit.

17          Q      Okay.  I'm sorry.  Did you have anything
18  else?

19          A      That was it; just that he had called.

20          Q      Did the coordinator tell you what Alcantara
21  had asked for?

22          A      He told me that Alcantara was not pleased
23  because they would not even confirm that I was assigned to
24  that unit.

25          Q      Do you have an understanding if that's

**Exhibit 17 - 46**

048

Page 140

1    asked any of these officers if the Department contacted

2    their units to ask about their schedule?

3         A     Not specifically that I recall.

4         Q     Just as far as you know, it never has

5    happened; is that correct?

6         A     Not that I ever knew of prior to Alcantara

7    calling this one time.

8         Q     Okay.  Why do you think at this particular

9    time that he called your unit?  What do you think motivated

10   him at that time?

11        A     Here again, this is the -- all of these

12   things coming together at once.

13        Q     When you say "all of these things," you

14   mentioned your complaint about Sergeant Hunter.  Did that

15   happen prior to Alcantara contacting your unit?

16        A     Yes.

17        Q     How about your advocating for the 3/12

18   schedule?  Did that happen prior to Alcantara contacting

19   your military unit?

20        A     I don't know specifically what the time

21   line for that stuff was.

22        Q     How about the corporal program issues that

23   we discussed?  Did those occur prior to Alcantara calling

24   your unit?

25        A     Again, I don't know the specific time line

**Exhibit 17 - 47**

049

1   there.  That stuff all happened along in that time period

2   of a year or so.

3           Q    Okay.  How about your request that the --

4   or the Association's request -- that the Department retract

5   the report-writing policy that we talked about?  Do you

6   know if that happened before or after Alcantara contacted

7   your unit?

8           A    I don't know.  I don't recall.

9           Q    Your facilitating Sharon Jackson's

10  complaint, do you know if that happened before or after

11  Alcantara contacted your unit?

12          A    I'm not sure.

13          Q    After you talked to the coordinator, your

14  unit coordinator, about Alcantara's call, did Alcantara

15  have any further discussions with you about your schedule

16  with the Air Force?

17          A    Yes, he did.

18          Q    What do you recall -- what further

19  discussion did you have with him?

20          A    When the discussion regarding my reserve

21  time came up, he wanted a set schedule and I told him,

22  "There is no set schedule."  So I told him, "I will try to

23  be as -- and I had always done it the same way, as

24  cooperative with the Department as I could.

25              Now, if something specifically came up where I

**Exhibit 17 - 48**

050

1          A      I've been in the IMA program since I

2   separated from active duty in 1984.

3          Q      Okay.

4          A      And I've been with this unit since, I

5   believe, 1992, '93.

6          Q      Okay.  Has anybody in the Department ever

7   asked you for a schedule before Alcantara did so in 2006?

8          A      Not that I ever recall.

9          Q      Have you ever explained to the Department

10  prior to this the fact that your schedule fluctuates; it's

11  not a set schedule?  Did you ever have the occasion to do

12  that?

13         A      Yes.

14         Q      Who did you explain that to?

15         A      Supervisors.  I don't recall specifically.

16         Q      Did the Department ever -- or the City --

17  did anybody in the Department or the City ever prevent you

18  from reporting to your unit at any time?

19         A      No.

20         Q      Do you feel that the fact that Alcantara

21  called your unit caused you some detriment in any way?  Did

22  it cause you any harm?

23         A      It caused me a great deal of frustration.

24         Q      What was your frustration?

25         A      That I had to explain to him, you know, at

**Exhibit 17 - 49**

051

Page 144

1   this time over and again: This is how it works. There is

2   no schedule. And then I even offered up again the

3   information for him to call, which unfortunately wasn't

4   very helpful for him. But it's no secret how this program

5   works. It's the US Military, and for him to doubt me or

6   distrust me so that he could...

7           Q       Did he ever tell you that he didn't trust

8   you?

9           A    ·  Yes.

10          Q       What did he say specifically to you?

11          A       "I don't trust you."

12          Q       When was that?

13          A       On several occasions in the past.

14          Q       In regards to the military issue or some

15  other issues?

16          A       Just stuff in general. He's made that

17  comment to me before.

18          Q       What specifically was the issue where he

19  said he didn't trust you?

20          A       The issue specifically, I don't recall.  I

21  just remember hearing that from him in the past.

22          Q       When did he make these comments to you?

23          A       Oh, I'll say over the period of the last

24  ten years that I actually worked with him.

25          Q       After Alcantara called your unit and then

**Exhibit 17 - 50**

Page 146

1    A    I think it was just another attempt for him

2    to have control over me during this whole time period of

3    2006 basically.

4    Q    So you felt during 2006, Alcantara was

5    trying to gain further control over you or restrict you in

6    some way?

7    A    Well, that's generally his nature anyway.

8    It wasn't just 2006, but I think that was an attempt that

9    he made I believe during 2006.  I think that was an attempt

10   that he made to try and somehow reign me in or gain control

11   of me.

12   Q    Did he ever tell you that or is that

13   something that you just believe?

14   A    That's an inference that I grew from the

15   way he acted overall.

16   Q    You claim that in November or December of

17   2006, you were denied permission to have a ride-along; is

18   that correct?

19   A    Yes.

20   Q    Who specifically was the ride-along that

21   you were denied?

22   A    A local citizen named Roger Martin.

23   Q    How do you know Roger Martin?

24   A    His children both were members of our

25   Explorer program at the Department, and he's a local

**Exhibit 17 - 51**

053

1    citizen with whom I've had contact over the years.

2        Q    Had you gone on a ride-along with him

3    before this November/December '06?

4        A    I don't know.  I don't know whether I have

5    or not honestly.

6        Q    Had you gone on ride-alongs with local

7    citizens prior to this?

8        A    Other citizens have gone on ride-alongs

9    with me, yes.

10        Q    How many times has that happened in your

11    20-plus-year career?

12        A    I couldn't even tell you.  Many times.

13        Q    More than ten?

14        A    Oh, yes.

15        Q    More than 20 do you think?

16        A    I'm sure.

17        Q    And these would just be local citizens, not

18    employees of the City; correct?

19        A    Yeah.  I think that's fair to say.  Not

20    employees of the City, yes.

21        Q    Were they employees of other law

22    enforcement agencies?

23        MR. PERRY:  Objection; overbroad.  For 20

24    ride-alongs?  If you understand, you can answer.

25        THE WITNESS:  You know, I don't remember who all

**Exhibit 17 - 52**

054

Page 149

1    the -- whatever the designated date and time was, as I

2    recall.

3              Q       I'll show you this and I'll mark it as

4    Exhibit 5.

5                      (Whereupon the document is marked

6              by the Deposition Officer as Defendant's

7              Exhibit No. 5 for identification.)

8              Q       BY MR. MEYERHOFF:  You can look through it,

9    but I'll ask if you recognize this particular policy.

10             A       It appears to be the policy for -- the

11   ride-along policy following -- or after 10/7 of '94.

12             Q       In the middle of the page there's a heading

13   "General Policy" and then an "A."  It says, "Only the

14   following shall be allowed to take part in the Barstow

15   Police Department's ride-along program."

16             I want you to look at the first five categories of

17   people identified there.  Did you ever conduct a ride-along

18   prior to November/December 2006 where somebody rode along

19   with you who did not fit within Categories 1, 2, 3, 4, or

20   5?

21             A       Possibly.

22             Q       Do you know any specific person that that

23   applied to?

24             A       Not right off the top of my head.

25             Q       Now, Roger Martin, he did not fit within 1,

**Exhibit 17 - 53**

1   2, 3, 4, or 5; is that correct?

2            A       That's correct.

3            Q       So No. 6 says, "Other individuals the Chief

4   of Police may allow to take part."  Did you seek permission

5   from the Chief of Police to allow Roger Martin to ride

6   along with you in November/December of '06?

7            A       No.   That was not the standing policy.

8            Q       Was there some other policy besides this

9   written policy?

10           A       The standard operating procedure, aside

11  from this policy, was to simply seek approval through the

12  Lieutenant if there was a ride-along request.

13           Q       Was that SOP in writing somewhere?

14           A       Not that I know of.

15           Q       How did you know that was the policy?

16           A       Because that's just what we did.

17           Q       So you're saying even though this policy

18  existed, you followed -- you say "we."  I imagine you mean

19  the other officers followed some other practice.  Is that

20  fair to say?

21           A       Yes.

22           Q       Did you ask a Lieutenant then if you can

23  ride with -- if Roger Martin could ride along with you?

24           A       As I recall, Roger approached me about the

25  ride-along.  At that time I did not realize that he wanted

**Exhibit 17 - 54**

Page 157

1          A       It would have been my work computer because

2    I was working on that Sunday when I sent him the e-mail.

3          Q       Do you recall what it said?

4          A       Basically, like:  What's going on?  I don't

5    get it.  Why do I now not get ride-alongs?

6          Q       Did you receive any response to the e-mail?

7          A       Oh, yes.

8          Q       What was your response -- his response?

9          A       Just so happened he showed up that Sunday,

10   went into his office, evidently read the e-mail.  He called

11   me over to his office and he asked me -- he said to me that

12   he received my e-mail.  And I said, "Is that what this is

13   about?"  And he said, "Yes."  And I said, "Well, I'm not

14   prepared to discuss that with you right now."  And he

15   ordered me into his office, told me to sit down and listen,

16   close the door, and carried on from there.

17         Q       What happened after he closed the door?

18   What did he say?

19         A       He gave me a sarcastic browbeating about

20   how he had so many problems, family problems, personal

21   problems, so on and so forth, and gave me a sarcastic

22   apology about:  I'm sorry you didn't get your ride-along,

23   Ray.

24         And I'm trying to think what else he said.  I just

25   remember being kind of surprised that this police

**Exhibit 17 - 55**

057

Page 158

1  Lieutenant was talking to me this way when in fact if he

2  had so many problems, he could have deferred this decision

3  or process to someone else instead of treating me like a

4  five-year-old kid.

5        Q     You said that Alcantara told you that he --

6  Alcantara had problems, family problems?

7        A     Yes.

8        Q     What did he say specifically?

9        A     His brother was dying or his mom was sick

10  or something.  I don't remember.  Something along those

11  lines.  It was a fairly close family member who was --

12  maybe it was his father-in-law dying.  I really don't

13  remember at the moment.

14        Q     You said he -- was he sarcastic while he

15  was telling you that?

16        A     The entire time he was sarcastic --

17        Q     Was he sarcastic when he was talking about

18  his family member dying?

19        A     He was sarcastic in his tone of voice to

20  me.

21        Q·    During the entire conversation?

22        A     Correct.

23        Q     Did he explain why that affected -- the

24  family member dying -- affected you not being able to ride

25  along with Mr. Martin?

**Exhibit 17 - 56**

058

Page 159

1       A       He's not a very articulate person, but his

2    excuse to me for the ride-along issue was because -- that

3    he had personal problems, and that how dare I make a

4    complaint such as this at a time when he was having so many

5    personal problems.

6       Q       Did he say those words to you:   That how

7    dare you make a complaint?

8       A       No, he didn't say that.

9       Q       Other than discussing these personal

10   problems, what else -- and you said he told you he was

11   sorry, but you claim it was sarcastic.  Did -- anything

12   else that you recall of this conversation?

13      A       No.   It was clearly his tone of voice that

14   was condescending and sarcastic, and since he forced me in

15   there at that time when I was not prepared to discuss it, I

16   was not able to have anyone else with me that would ever be

17   able to recall this with me.

18      Q       Did he order you into the office at that

19   time?

20      A       Yes.

21      Q       How did you want to prepare for this

22   conversation?

23      A       If nothing else, I wanted somebody else

24   there with me.

25      Q       A representative?

**Exhibit  17 - 57**

059

Page 160

1          A      Not necessarily a representative.  Simply a

2    witness, if nothing else.

3          Q      Did you ask him for one?

4          A      Yes -- I beg your pardon, no, I did not ask

5    him for a witness.

6          Q      Had you had other ride-alongs, 2006/2007?

7          A      I don't remember.

8          Q      Is it possible?

9          A      I'm sure it is.  Well, I can tell you in

10   2007, no.  I only worked there for two weeks in 2007.

11         Q      How about in 2006?

12         A      It's possible.  Again, I don't recall

13   specifically.

14         Q      Do you know if the Department has denied

15   any other officer a ride-along request?

16         MR. PERRY:  Objection; overbroad, calls for

17   speculation.

18         Q      BY MR. MEYERHOFF:  Let me back up.  This

19   request was made by Mr. Martin.  You never requested to

20   ride along with anybody in particular; is that correct?

21         A      That's correct.

22         Q      Martin was the one requesting the

23   ride-along?

24         A      That's correct.

25         Q      Do you know if any other individual has

**Exhibit 17 - 58**

060

1   ever been denied the ability to ride along with a Barstow

2   police officer?

3           MR. PERRY:  Same objections.  You can answer.

4           THE WITNESS:  That's likely, but I don't know of

5   any specific circumstances.

6           Q       BY MR. MEYERHOFF:  Do you feel this denial,

7   Martin not being able to ride along, affected you in some

8   way?

9           A       Again, it was terribly frustrating.

10          Q       Frustrating in what way?

11          A       So to speak, if it's not one thing, it's

12  another.

13          Q       Did you feel that this whole situation with

14  Martin was motivated by something you had done, either

15  individually or as a union president?

16          A       That's clearly what I inferred.

17          Q       What specific conduct did you engage in

18  that you think motivated Alcantara to deny you or deny

19  Martin the ability to ride along?

20          MR. PERRY:  Other than what's already been

21  discussed as far as --

22          MR. MEYERHOFF:  We didn't discuss anything.

23          Q       What specific conduct do you feel motivated

24  this particular decision by Alcantara?

25          A       I think it was another straw in the pile of

**Exhibit 17 - 59**

Page 165

1          A      Not that I know of.

2          Q      Other than meeting with the Chief, is there

3    anything specifically that you said in regards to the 3/12

4    work schedule that you think the Department did not like or

5    the Chief did not like?

6          A      Aside from my comments about the 3/12 work

7    schedule?

8          Q      That you wanted the 3/12 work schedule.

9    Any specific statement that you made which you felt

10   motivated the Chief or Lieutenant Alcantara to retaliate

11   against you?

12         A      They believed that I was campaigning to

13   have the Sheriff's Department take over and dissolve the

14   police department.

15         Q      Did that have anything to do with the 3/12

16   work schedule or is that separate?

17         A      No.   That's outside of the 3/12 work

18   schedule.

19         Q      I'm just talking about the 3/12 work

20   schedule.  Is there anything specific that you said in

21   regards to that issue that you felt motivated the Chief or

22   Alcantara to retaliate against you in any way?

23         MR. PERRY:   I'm going to object; it's improper, it

24   calls for speculation.   If you know.

25         THE WITNESS:   I don't know exactly where you're

Exhibit 17 - 60                    062

Page 166

1    going.  I don't know of any specific word or statement that

2    I said that would have agitated them with regard to the

3    3/12 work schedule.  I can't think of anything right off

4    the top of my head.

5         Q     BY MR. MEYERHOFF:  You mentioned that Toro

6    talked to the Chief about the 3/12 work schedule.  Was Toro

7    an advocate for it?

8         A     As I recall, yes, I believe so.

9         Q     And that others may have talked to the

10    Chief about it from the Association that you're not sure if

11    they did or not; correct?

12         A     I'm saying it's possible.  I don't know of

13    anybody that actually did.

14         Q     Other than talking to the Chief about the

15    3/12 work schedule, did you engage in any other manner in

16    advocating for the work schedule other than just talking to

17    the Chief about it?

18         A     There may have been some e-mails or some

19    memos.  Maybe -- like I said before, it was probably

20    discussed in some OA general meetings.  I don't remember

21    exactly how it all went.

22         Q     Did you make any statements to the press

23    about the 3/12 work schedule that you recall?

24         A     I don't -- I couldn't tell you the last

25    time I talked to the press.  I don't think so.

**Exhibit 17 - 61**

1    before they went home or did other Association members also

2    express an objection to that policy?

3           A      I think unanimously everybody was against

4    it.  I was just the mouthpiece to represent.

5           Q      Did any other Association members, to your

6    knowledge, talk to Chief Gibson or Lieutenant Alcantara

7    about that policy, voicing their objection to that policy?

8           A      I don't know that anybody did.

9           Q      Do you know one way or another?  Do you

10   know that did not happen?

11          A      I don't know that anybody did, one way or

12   the other.

13          Q      Do you recall in December of 2006 receiving

14   a reprimand from the Department for missing work or coming

15   in late?

16          A      Yes, I believe so.

17          Q      Okay.  We can mark this as Exhibit 6.

18                 (Whereupon the document is marked

19                 by the Deposition Officer as Defendant's

20                 Exhibit No. 6 for identification.)

21          Q      BY MR. MEYERHOFF:  You can take the time

22   you need to look through it, but I'll ask if you recognize

23   this as the reprimand that was issued to you?

24          A      Yeah.  I remember essentially what this is

25   about.

**Exhibit 17 - 62**

064

Page 169

1          Q      And this reprimand was issued by Sergeant

2    Libby; is that correct?

3          A      That's correct.

4          Q      And the reprimand was issued in regards to

5    some mix-up with your schedule where you did not appear for

6    work as scheduled for one of your shifts; is that correct?

7          A      Yes.  The memo reflects absence, but

8    actually I was not absent, just late.

9          Q      Okay.  It also says that you failed to

10   report for duty on December 3rd of '06, a Sunday.  Was

11   that -- is that also accurate?

12         A      Right.  It was two days in a row as I

13   recall.

14         Q      As I understand it, you didn't really --

15   you sort of -- well, let me rephrase it.

16         You didn't contest the content of the reprimand.

17   You basically admitted that what it states happened.  Is

18   that accurate, or do you have some -- do you think that

19   part of this reprimand is not accurate?

20         A      As I recall, it's generally accurate, it

21   just wasn't necessary.

22         Q      Okay.  When you were absent the day

23   prior -- or failed to report for duty on December 3rd, did

24   you receive any type of a discipline just based on that, on

25   that date, that incident?

**Exhibit 17 - 63**

065

Page 170

1       A       I think it was following the -- this whole

2  thing was put together, like, a week after the actual thing

3  happened.

4       Q       The date of the reprimand is December 4th,

5  '06.  Do you have any reason to doubt that it was actually

6  prepared on that date?

7       A       Yes.

8       Q       Why do you doubt that it was prepared on

9  December 4th?

10      A       Because everything that follows is dated

11  December 8th.

12      Q       When you say "everything that follows,"

13  what are you referring to?

14      A       Well, my signature and the time stamp where

15  it looks like Personnel has received it.

16      Q       Is it possible that this was prepared on

17  the 4th and it was just given to you -- sent to Personnel

18  four days later?

19      A       I suppose that's possible.

20      Q       Do you have any reason to believe that's

21  not what happened?

22      A       Yeah, personally, I do.

23      Q       What's your personal reason as to why you

24  believe that it wasn't actually prepared on the 4th?

25      A       Because I would imagine that Libby got

**Exhibit 17 - 64**

066

Page 171

1    together with Alcantara and they conspired on how they

2    wanted to handle this, because I know that Libby couldn't

3    just read off policy numbers and California Government

4    Code, dah, dah, dah, dah, without him having to sit down

5    and so some research and stew on it for a while.

6           Q     Do you have any evidence that this was

7    actually prepared after December 4th?

8           A     No.

9           Q     It says in the memo in the third paragraph

10   that -- the last sentence of the third paragraph -- that

11   Sergeant Ramirez advised me, meaning Sergeant Libby, that

12   he verbally counseled you for your absence on Sunday,

13   December 3rd, 2006.

14          Do you recall Sergeant Ramirez verbally counseling

15   you after your absence on the 3rd?

16          A     Yeah.  He probably said something like:

17   Hey, Knucklehead, what are you doing, or something like

18   that.  It wouldn't have been a serious -- you know, just on

19   the one occasion.  It wouldn't have been that serious.

20          Q     Do you recall what Ramirez specifically

21   said to you on December 3rd?

22          A     Nothing that comes to mind.  No, I don't.

23          Q     You said it was not necessary that this

24   reprimand be given to you.  Why do you say it was not

25   necessary?

**Exhibit 17 - 65**

1           A        Because historically, I'm very prompt and

2    dependable.  Now, I can only concede that I messed up here

3    on this shift change because they changed the way they did

4    this shift change from the way they had historically done

5    it over the past 20 years that I've been there.

6           So yeah, was it my fault that I didn't look at the

7    schedule closely and read exactly what it said?  Sure.  But

8    this is a very minuscule issue in the big scheme of things,

9    so it wasn't really necessary other than to build a

10   package.

11          Q        Did other officers have problems with the

12   shift change at this point in time?

13          A        Yes.

14          Q        Okay.  Did other officers not appear for

15   duty around this same time?

16          A        Yes.

17          Q        Did any other officer, other than you, fail

18   to report or fail to appear on time two days in a row?

19          A        Not that I recall.

20          Q        Do you claim that -- do you know Officer

21   Randy Duran (Phonetic)?

22          A        Yes.

23          Q        Do you think he also failed to report for

24   duty; is that correct?

25          A        He completely failed to report for duty.

**Exhibit 17 - 66**

068

1       Q       So on December 3rd, did you eventually

2   report for duty on that day?

3       A       Yes.  I think I was an hour late.

4       Q       How about on December 4th?

5       A       I think I was an hour late again.

6   Something like that.

7       Q       And that's -- you're sure you recollect

8   just being an hour late on both those days?

9       A       It wasn't more than, like, an hour or two

10  at the very most.

11      Q       And you say Randy Duran failed to report at

12  all on the regular day that he was scheduled; is that

13  correct?

14      A       Correct.

15      Q       Was that the same time frame, December 3rd,

16  December 4th, around --

17      A       Yes.  It was during that shift change.

18      Q       Do you know that he was not reprimanded for

19  that conduct?

20      A       Yes.

21      Q       Do you know that he was not reprimanded for

22  failing to report for duty?

23      A       Yes, I know that.

24      Q       How do you know he was not reprimanded?

25      A       Because I explained the circumstances to

**Exhibit 17 - 67**

Page 174

1    him and then asked him if he'd been reprimanded.

2         Q        Do you know when you had that conversation

3    with him?

4         A        It was after I was reprimanded.

5         Q        How soon after did you talk to Mr. Duran?

6         A        Fairly soon, and I couldn't give you an

7    exact time or date, but it was fairly soon after I was

8    reprimanded.

9         Q        Did you specifically ask him if he was

10   reprimanded for not coming to work?

11        A        Yes.

12        Q        And he said he was not reprimanded?

13        A        That's correct.

14        Q        Did you ask him if he received any

15   counseling or any type of discipline whatsoever?

16        A        Yes.

17        Q        Do you recall -- what did he say to that

18   question?

19        A        I don't exactly remember what the

20   conversation was.  I explained to him the circumstances

21   about me getting in trouble, and then I told him that I

22   knew that he completely didn't show up and asked him if he

23   got in trouble, and he told me that he had not.

24        Q        Was Sergeant Libby your direct supervisor

25   during this time?

**Exhibit 17 - 68**

070

Page 179

1          Q          Do you know of that happening in the past

2    specifically?

3          A          Not that I specifically recall.

4          Q          Okay.  Other than believing that Libby

5    talked to Alcantara about this reprimand before he wrote

6    it, do you have any evidence that Libby discussed this with

7    Alcantara before he prepared the memorandum?

8          A          I don't recall anything specifically.  I

9    know they were pretty close about the way they did things

10   like this, but I don't know specifically that they

11   discussed it prior to this.

12         Q          Did you appeal the reprimand in any way?

13         A          No.

14         Q          Did you have any understanding if this

15   reprimand was a reprimand that went into your personnel

16   file or was it a lesser form of reprimand?  Does that make

17   sense?

18         A          Well, a reprimand is a reprimand, and as

19   far as I know, it's all supposed to go into your personnel

20   file.

21         Q          To your understanding, do all written

22   reprimands go into the personnel file?

23         A          Yes.

24         Q          After you were issued this reprimand, did

25   you ever inspect your personnel file with the City?

**Exhibit 17 - 69**

071

Page 180

1        A      I couldn't tell you.  I don't remember

2   specifically.

3        Q      You claim in December of '06 that you were

4   removed from the officer-in-charge position; is that

5   correct?

6        A      Correct.

7        Q      How long -- first of all, explain to me

8   what the officer in charge -- what that position is.  What

9   does that officer do?

10        A      In the absence of a bona fide sergeant or

11   Corporal or Watch Commander, there is a senior officer who

12   is chosen to be the leader of the shift who is responsible

13   for what the crew does, for what the shift does.

14        Q      Does that position carry some additional

15   pay?

16        A      I believe it did.

17        Q      I assume when you're acting in that

18   capacity only, you get some additional pay.  Do you know

19   what the additional compensation was?

20        A      I couldn't tell you honestly.  I don't

21   remember the amount, but I believe there was some kind of

22   incentive.

23        Q      Do you know when you first started acting

24   as an officer in charge, what year that was?

25        A      It's been many years ago.  I couldn't tell

**Exhibit 17 - 70**

072

Page 181

1    you a date or a year, but it's been many years ago.

2         Q    Is that a position that you applied for or

3    are you basically told: Hey, you're going to be acting as

4    an officer in charge if needed?

5         A    As I recall in the beginning, it was one of

6    those things where some days in advance, they knew that the

7    Watch Commander was going to be gone so they said:  Hey,

8    Ray, we're going to make you the OIC to sort of prepare me

9    to participate in this position.  And then from then on,

10   you would be scheduled -- or if something came up, you

11   would be asked to do this duty.

12       Q    So when you served as an officer in charge,

13   you were basically serving as the Watch Commander for that

14   shift; is that correct?

15       A    Yes.

16       Q    In say, 2005, is there any way for you to

17   recollect how often that you would serve as the officer in

18   charge during that year?

19       A    In the year 2005, I couldn't give you a

20   number.  I don't know.

21       Q    How often would it happen that there was no

22   sergeant or corporal on duty during a shift?  Was it

23   frequent or was it pretty rare?

24       A    I wouldn't say it was rare, but there are a

25   lot of variables:  If there was a shift-scheduling issue or

**Exhibit 17 - 71**

073

Page 182

1    if the Watch Commander was going to go on vacation or if he

2    got sent to school for a few days or if he called in sick.

3          So generally speaking, they would attempt to

4    schedule a Watch Commander, but things happen, we are

5    human, so you know, these things come up.  There was no --

6    I shouldn't say "there was no."  Generally, they didn't

7    just schedule somebody as an OIC unless there was something

8    going on.  So it's kind of hit and miss

9          Q    Is there any way to estimate on average how

10   many times you served as an OIC per year?

11         A    There's really no fixed pattern to base an

12   estimation on.  Like I say, it's kind of hit and miss.

13         Q    Again, just by year, do you know when you

14   first started serving as an OIC?  Would it be '04, before

15   that, after that; any recollection at all?

16         A    You know, I really don't know honestly.

17   I'm going to say probably at least ten years ago, but

18   that's just a real rough estimation.

19         Q    Okay.  So, like, back in the late '90s?

20   Even as far back as that?

21         A    Yeah.  I hate to lock down a date --

22         Q    Sure.

23         A    -- but it's been quite a while back.

24         Q    Understanding that it fluctuated, would

25   it -- would five to ten times a year be in the ballpark?

**Exhibit 17 - 72**

074

Page 183

1   Would it be more than that?

2        A    I honestly couldn't even make an educated

3   guess.  I really just don't know.

4        Q    Were there some years where there just was

5   no opportunity to serve as an OIC or would it happen

6   fairly -- pretty much every year on some shift at least?

7        A    You know, it's hard to say.  Maybe you had

8   a perfect year so there were none this year.  There's no

9   way -- like I said, there's no kind of fixed pattern where

10  you can estimate something like that.  I just can't give

11  any kind of an accurate answer for that.

12       Q    Are there any requirements for serving as

13  an OIC?  Any prerequisites that need to be met?

14       A    I think either in the policy and procedures

15  manual or perhaps the MOU, there's some kind of guidelines,

16  and I don't recall what they were and I don't really recall

17  exactly where it's written, but I believe there is

18  something as far as how it works.

19       Q    How were you notified that you were being

20  removed from being eligible to serve as the OIC?

21       A    I wasn't actually notified.

22       Q    How did you learn that you were not

23  eligible to serve as an OIC any longer?

24       A    Because they scheduled a junior officer on

25  overtime to work my shift as an OIC.

**Exhibit 17 - 73**

075

Page 192

1   understanding that to be eligible for OIC, you needed an

2   "Exceeds Standards" or better on your last evaluation?

3          A     Only after having reviewed the policy after

4   having received this.

5          Q     The effective date listed on this policy on

6   the first page is October 22nd, 2003.  Do you see that?

7          A     Yes.

8          Q     Any reason to doubt that's the date the

9   policy went into effect?

10         A     No.

11         Q     Okay.  The evaluation that you received

12  prior to 2006, do you recall what your overall rating on

13  that evaluation was?

14         A     Probably just "Meets Standards."

15         Q     Okay.  Did that -- did the Chief's

16  explanation give you any -- provide you in your mind with a

17  legitimate reason why you were removed from the OIC

18  position?

19         A     No.

20         Q     Why not?

21         A     The only reason he was able to find this is

22  because somebody else went and looked it up for him.  Then

23  you can see later on, he had to go back and look at

24  everybody else and see that Lee Howard also had a "Meets

25  Standards," so they had to take him off the OIC program

Exhibit 17 - 74

076

Page 193

1    too.

2             Q      And that was Lee Howard?

3             A      Yes.   It says, "I've also discovered

4    another officer who's being used as OIC."  That shouldn't

5    be, so they pulled him out too because I think he had a

6    "Meets Standards" evaluation also.

7             Q      Do you have any idea how many officers

8    served as OICs during this time period in 2006?

9             A      I couldn't give you a number.  I don't

10   know.

11            Q      Would it be ten?  Less than ten?  More than

12   ten?  Any way to estimate?

13            A      Probably just two, three, four, something

14   like that.  I don't think there was a big call for OICs,

15   but -- it wasn't big business.

16            Q      Meaning that you didn't get a lot of

17   additional compensation for it?

18            A      No.  I want to say it's, like, 5 percent,

19   and I could be wrong, but -- no.  There's a degree of

20   prestige that goes along with that.  But as far as quantity

21   and the number of days used -- OIC is used, I don't think

22   it was a big hot-button issue until I started making it an

23   issue here.

24            Q      Were there any other officers besides --

25   I'm sorry.  The name of the officer that you mentioned was

**Exhibit 17 - 75**

```
 1          A      I couldn't tell you a name or a place or a
 2     time.
 3          Q      How about the timing of those comments?
 4     Did those comments occur after you were removed from the
 5     OIC position or did they happen at some other time?
 6          A      All the time.
 7          Q      Starting when?
 8          A      Most specifically during the year of 2006 I
 9     would say.
10          Q      How many times did someone make a comment
11     to you along the lines of:  Why are they f-ing with you?
12          A      I couldn't count.  Many times.
13          Q      Did you take any notes or document in any
14     way who said this to you?
15          A      Not that I recall.
16          Q      And again, you don't recall any specific
17     person who said that?
18          A      Not right now.
19          Q      Going back just to the evaluations.  It is
20     true that your most recent evaluation before you were
21     removed from OIC was a "Meets Standards" of overall grade;
22     is that correct?
23          A      Probably.  I just -- I don't have it with
24     me.  I think they're all "Meets Standards" basically.
25          Q      Did any member of the Department,
```

**Exhibit 17 - 76**

078

1    supervisor or manager, tell you at any time that you were

2    removed from the OIC because of your activities as a union

3    president?

4           A     No.

5           Q     Did anybody outside of the Department, a

6    City employee, tell you that?

7           A     Not that I recall.

8           Q     Did anybody within the Department ever tell

9    you that the written reprimand that we looked at was issued

10   to you because of your involvement as a union president?

11          A     Not that I recall.

12          Q     Anybody outside the Department -- any other

13   City employee tell you that?

14          A     Not that I recall.

15          Q     You also claim that at some point -- let me

16   ask you:   Did Chief Gibson at some point receive a

17   no-confidence letter from the Association?

18          A     No.

19          Q     Did he receive a no-confidence letter, to

20   your knowledge, from anybody?

21          A     Yes.

22          Q     Do you know anything about who prepared the

23   no-confidence letter?

24          A     Absolutely not.

25          Q     Did the Association, while you were

**Exhibit 17 - 77**

Page 208

1        Though again, I supported their decision and we

2    opened it to discussion, but personally, I thought it was a

3    bad idea.  And I explained to them at that time why I

4    thought it was a bad idea.

5        Q        Did anybody besides Espinoza express this

6    proposal that there should be a no-confidence vote against

7    the Chief?

8        A        By and large, nobody had confidence in the

9    Chief.  I recall Espinoza -- his name and face come to mind

10   as far as bringing up the idea of doing this.  You know, I

11   don't remember specifically anybody else saying:  Let's do

12   a no-confidence.

13       Q        Was there any type of a vote that the

14   Association conducted to see if there was support for this

15   proposal?

16       A        I don't think so.  I think it was a matter

17   of discussion, and I think we just kind of put it away

18   after that.  I don't think it came up again after that.

19   There may have been some idle chitchat about it, but I

20   don't think it ever again became a serious subject.

21       Q        Was Espinoza, Jr. a board member or was he

22   just an Association member?

23       A        I think he was a general member at the

24   time.

25       Q        When did you first learn that something was

**Exhibit 17 - 78**

080

1   sent to the Chief which indicated that there was a

2   no-confidence vote against him?

3           A       I was told that the Chief had received a

4   letter, and I'm trying to think of who I talked to that

5   actually saw this letter.  I want to say -- gosh, who was

6   it?  A member of the Department.  Like, Chris Kirby's name

7   comes to mind.

8           Q       Chris Kirby, he was an officer; is that

9   correct?

10          A       Yes, that's correct.

11          Q       It may have been him, but you're not

12  positive?

13          A       Yeah.  Evidently, the letter was received

14  by the City Council or City Hall; I think somebody on that

15  side.  So evidently, it did really exist, this letter,

16  whatever it was.

17          Q       Did you ever see a copy of it?

18          A       Nope.  I was refused.

19          Q       So at some point, I assume you requested a

20  copy of it; is that correct?

21          A       Yeah.  I did an official records document

22  request through the City Clerk.

23          Q       It says, "Late '06, early 2007."  Is that

24  your recollection as to when this issue with the

25  no-confidence letter came up?

**Exhibit 17 - 79**

1           A      Yeah.    I'm not sure.    That sounds about

2     right.    I'm not absolutely sure.

3           Q      Now, understanding you're not sure about

4     Chris Kirby, but you do recall speaking to somebody who

5     told you that a letter had been received by the Council or

6     the City Manager?

7           A      Yes.    I believe the City Manager told me

8     that he saw it also, and I'm thinking maybe the Mayor also

9     told me that he saw it, and he didn't want to discuss it or

10    acknowledge it.

11          Q      At some point did you believe that you were

12    being blamed for sending this letter?

13          A      Oh, absolutely.

14          Q      Who first told you that you were the one

15    who was suspected to have sent the letter?

16          A      I'm trying to remember.    Evidently, it was

17    either signed by me or signed on behalf of the OA.    And

18    then who told me the Chief blamed me in front of somebody?

19    Gosh, who was it?    In any case, it was clearly understood

20    that I was the one that had allegedly sent this letter

21    (Indicating).

22          MR. PERRY:    Just to clarify, you're not saying you

23    signed this letter?

24          THE WITNESS:    I absolutely did not sign it.    I

25    don't know anything about its origin or anything else.

**Exhibit 17 - 80**

Page 212

1        Q     Did anybody tell you that the Chief was --

2  believed that you had sent the letter and was blaming you

3  for it?

4        A     Somebody did.

5        Q     Do you recall who that was?

6        A     I don't know.  Just the buzz around all of

7  City Hall and the Department was that they just believed

8  that I did it because it was written on behalf of OA.

9        Q     Do you recall any specific person who

10  expressed to you that the belief was that you had sent this

11  letter?

12        A     You know, Chris Kirby comes to mind, and I

13  don't know if he's the one that actually read it.

14  Somebody, I believe, actually saw it.  Maybe Hector showed

15  it to him or -- and I don't remember what the circumstances

16  were that he may have seen it.

17       But somewhere along the lines, someone actually

18  saw it, actually read it, and actually described that it

19  was written in a manner similar to the one that I wrote

20  before, though it was postmarked from San Diego, and of

21  course I hadn't been to San Diego in that time period.

22        Q     Who specifically told you that the Chief

23  believed you had sent it?  Anybody specific that you

24  recall?

25       MR. PERRY:  I believe it's been asked and answered

**Exhibit 17 - 81**

083

Page 213

1   a few times.

2          THE WITNESS:  Yeah.  It's just not coming to mind.

3   I'm sorry.

4          Q       BY MR. MEYERHOFF:  I know you told me that

5   Kirby may have seen it, but the question is:  Who, if

6   anybody, told you that you were being blamed for it?

7          A       Again, specifically, I don't know.  That

8   was what was understood, that supposedly I had done this.

9          Q       How did you know that that was understood?

10  Do you recall anything at all that led you to believe that

11  people understood that you were being blamed for sending

12  this letter?

13         A       Well, there was a buzz about (Indicating),

14  you know, about this letter that came in and that

15  supposedly I wrote it.  And of course, I was never given

16  the opportunity to see it, so I never got to defend it.  I

17  never even saw it.

18         Q       Do you recall how you learned it was

19  allegedly postmarked in San Diego?

20         A       Whoever this person was -- maybe it was

21  Drew Ellis and not Chris Kirby.

22         Q       Drew Ellis, is that another officer?

23         A       Yes, and I believe he was a board member at

24  the time.  He was the one that mentioned to me that it was

25  ironic that it was postmarked in San Diego, and that during

**Exhibit 17 - 82**

084

Page 214

1    that time period, Sergeant Heiden and Sergeant Hunter were

2    at a school in San Diego.

3          Q      What efforts did you make to see the

4    letter?  Who did you ask to see it?

5          A      I think I went to the Chief.  I think I

6    went to the City Manager.  Again, I made a public records

7    request.

8          Q      Just the Chief, for instance, did the Chief

9    ever talk to you about this letter of no confidence?

10         A      No, I talked to him.

11         Q      What do you recall saying to the Chief

12   about this letter?

13         A      I told him that in no uncertain terms did I

14   write this letter nor did I know anything about it, and in

15   fact, that the issue came up and I didn't mention

16   Espinoza's name or anyone else's name because I didn't want

17   to throw anybody under the bus, so to speak.

18         Q      Okay.

19         A      But I did mention that the subject came up

20   and that I recommended against it, and again explained the

21   reasons why.

22         Q      Did this conversation take place in the

23   Chief's office?

24         A      As I recall, I believe it did.

25         Q      Would this be December '06, January '07,

**Exhibit 17 - 83**

Page 217

1    about the request?

2           A      I believe I went and made a second request.

3           Q      Any response to that request?

4           A      None.

5           Q      Did the Chief after -- other than that one

6    conversation that you testified about, did you have any

7    other conversations with the Chief about this letter?

8           A      Not that I recall.

9           Q      How about Lieutenant Alcantara?  Was he

10   involved, to your recollection, with this issue at all?

11          A      Not that I recall.

12          Q      Did you ever talk to Sergeant Gibson about

13   the letter?

14          A      Sergeant Gibson?

15          Q      Yeah.  Was that the name of the Sergeant?

16   I probably have that wrong.  You mentioned Sergeants Hunter

17   and Heiden --

18          A      Heiden.

19          Q      -- Heiden were in San Diego in some

20   training; is that correct?

21          A      Yes.

22          Q      Do you know what date the letter was

23   postmarked?

24          A      I never saw it.  I just don't know.

25          Q      Do you have any idea if they were -- what

**Exhibit 17 - 84**

086

Page 218

1   dates that Sergeants Heiden and Hunter were training in San

2   Diego?

3           A       No.   It was the same time period that it

4   was postmarked in San Diego is what I was told.

5           Q       Do you recall who told you that?

6           A       Again, I believe now that it was Drew

7   Ellis.   I was saying "Chris Kirby," but I think it might

8   have been Drew Ellis.

9           Q       Did you know personally that Heiden and

10  Hunter were training in San Diego or did somebody tell you

11  that as well?

12          A       I don't recall.

13          Q       Do you believe that one of them sent the

14  letter?

15          A       I don't believe Heiden would have done it.

16  I suppose it's possible.   I believe Hunter may -- could

17  have, but I can't really accuse either one of them, but I

18  suppose it's possible.

19          Q       You also had mentioned this issue about the

20  takeover of the Sheriff's Department -- or by the Sheriff's

21  Department, the takeover of the Barstow Police Department.

22          A       Right.

23          Q       Was this an issue that had been discussed

24  with the Association while you were the Association

25  president, any potential takeover by the Sheriff's

**Exhibit 17 - 85**

1  Department?

2          A       It was never officially an issue that was

3  discussed as far as it was actually going to happen, but it

4  was a frequent topic of conversation every time somebody

5  got ticked off about the way things were going at the PD.

6          Q       Did you have any personal opinion as to

7  whether the Sheriff's Department should take over the

8  police department or not?

9          A       I had a personal opinion, yes.

10         Q       What was your opinion?

11         A       I felt -- it was kind of a double-edged

12  sword.  I felt that if the Sheriff's Department were to

13  take over law enforcement in the city, it would be

14  unfortunate for the police department to go away.

15         But on the other hand, I felt that there would

16  probably be a lot more opportunities for the officers who

17  would have been picked up by the Sheriff's Department.

18         Q       Did the issue ever proceed in the

19  Association with any type of vote or anything like that?

20         A       We were not in any position to vote on it

21  one way or the other.  It was never officially an issue

22  that this was going to happen.  There were lots of opinions

23  about it.

24         Q       How long, to your recollection, had this

25  issue been sort of kicking around, this issue about the

Exhibit 17 - 86

Page 220

1  Sheriff's Department potentially coming in?

2          A       Since God was a kid.  Forever really.  I

3  don't know a certain date.

4          Q       So from when you even started with the

5  Department, you've heard about this issue?

6          A       There was talk about it then.  Not as much

7  as after time went on and people were becoming upset with

8  the way the PD was running and so on.

9          Q       Now, you claim that at some point you were

10  labeled as the one who was advocating for the takeover by

11  the Sheriff's Department; is that correct?

12          A       Yes.

13          Q       When did you first learn that you were

14  accused of advocating for the takeover by the Sheriff's

15  Department?

16          A       There was -- it was never a secret that I

17  thought it could be a good thing.  Now, specifically when I

18  spoke with Steve Curran during this lunch that he had with

19  the Chief -- and I believe the Lieutenant -- that

20  specifically came up; that Ray Warren was one of eight

21  people who were -- I think it was one of eight people --

22  who were actively campaigning to cause for this Sheriff's

23  Department takeover thing.

24          Q       And this was something that Steve Curran

25  told you?

**Exhibit 17 - 87**

089

1           A       Correct.

2           Q       You mentioned some lunch he had with the

3    Chief and who else?

4           A       I believe it was one of the Lieutenants,

5    and I could be wrong.  It was the lunch that I spoke of

6    earlier when, you know, the disgruntled employee, who?  Ray

7    Warren.

8           Q       Okay.  And this is the conversation that

9    Curran told you about afterwards; that is correct?

10          A       Correct.

11          Q       What did Curran tell you specifically about

12   the Sheriff's Department issue?

13          A       Just that the Chief told him that I was one

14   of -- I believe one of eight people who were actively

15   trying to cause for this to happen, that the Sheriff would

16   take over.

17          Q       Had you taken any affirmative steps to

18   advocate for the Sheriff's Department taking over up to

19   this point?

20          A       None.

21          Q       When the Chief said that, did you -- or

22   when Curran told you the Chief had said that you were one

23   of eight people, were there any Association members, to

24   your knowledge, who had actively advocated for the

25   Sheriff's Department to take over?

**Exhibit 17 - 88**

Page 240

1          A     I never heard of such a thing.

2          Q     Did you have that opinion?

3          A     That I could not be promoted unless I was

4     an SRO?

5          Q     Yeah, that you couldn't be promoted if you

6     were an SRO; that that was not a path to promotion.

7          A     I don't ever remember that coming up as a

8     prerequisite or in discussion about getting promoted.

9          Q     Correct me if I'm wrong, but I think you

10    said that nobody wanted that position.  Do you mean that

11    literally nobody in the entire Department wanted that

12    position?

13         A     I believe that's the case.

14         Q     Did you speak to every particular officer

15    about their desire for that position?

16         A     You know, everybody that I recall speaking

17    to about it, it was kind of one of those:  Not no, but hell

18    no -- excuse me -- kind of responses, and in fact nobody

19    put in for the position when it was advertised.

20         Q     Do you have any knowledge if anybody

21    applied previously for previous recruitments for the

22    position?

23         A     I did.

24         Q     You applied for the SRO --

25         A     Many years ago --

Exhibit 17 - 89

091

Page 241

1          THE DEPOSITION REPORTER:  One at a time, please.

2          THE WITNESS:  I'm sorry.

3          Q     BY MR. MEYERHOFF:  Just to back up.  At

4    some point you applied for the SRO position?

5          A     Yes, I did.  Many years ago.

6          Q     When was that?

7          A     I believe it was a relatively new program

8    and I was trying to do good things, move up and lateral

9    within the Department, and I recall having applied for it

10   at some time in the past.  I don't recall the specific

11   date.

12         Q     Was it -- I assume it was prior to Chief

13   Gibson?

14         A     Long before.

15         Q     Why did you feel at the time that it was a

16   path to move up?

17         A     I don't necessarily think it was a path to

18   move up, but you know, in life, there are certain times

19   when you feel you need to move upward or lateral and that

20   would have been a lateral move to broaden my horizons, if

21   you will.

22         Q     Do you feel that this position allows an

23   officer to be exposed to different situations to get a

24   broader perspective of law enforcement?

25         A     I'm sure that's the fact.

**Exhibit 17 - 90**

Page 243

1    of dollars and we will furnish "X" number of officers.  I

2    don't know anything more than that.

3          Q     Are you aware of any other situation where

4    a specialty assignment was -- a special-duty assignment;

5    that nobody applied for the position in the past?

6          A     I think that's how Toro got stuck in there.

7          Q     How do you know that?

8          A     Because I remember at some point in the

9    past that he wanted to come out of there and come back on

10   Patrol -- and maybe he even did for a short period of time,

11   and then it came up again and he got stuck back in the

12   schools.  I believe he may have been in there at least two

13   different times -- assigned there two different times.

14         Q     Do you have any knowledge as to how the

15   Department selects assignments if nobody applies for the

16   assignment?

17         A     Yeah.  They just stick you in there.

18         Q     Has that happened -- you mentioned it

19   happened to Albert Toro.  Do you believe he was put in that

20   position due to -- as a punishment for anything?

21         A     I couldn't speak to that.  I don't know.

22         Q     Do you know if anybody else in the

23   Department has been assigned to a position that they didn't

24   desire?

25         A     Nothing is coming to mind right now.  I'm

**Exhibit 17 - 91**

Page 244

1    not sure.

2         Q      During this meeting, were you given any

3    reason why the Department had chosen you for this

4    assignment?

5         A      I really don't recall.

6         Q      So according to your recollection, you

7    didn't really say anything and you're not -- you don't

8    recall if you were told anything other than you were

9    assigned to the position; is that correct?

10        A      I remember that I was extremely

11   uncomfortable that I would be in the Chief's office with

12   two Lieutenants and then with Toro. And then when they

13   told me that I was being assigned there, I almost -- quite

14   literally, it took my breath away, and there was nothing I

15   was going to say or do that was going to change that, and I

16   knew that.

17        Q      Why did you think it was so unusual that

18   the Chief and the two Lieutenants and Toro would be there?

19        A      Well, it was an unusual circumstance.  Why

20   would I be in the Chief's office with the two Lieutenants

21   without some kind of prior announcement or reason?

22        Q      Whose decision was it, if you know, to

23   place you in the school resource officer position?

24        A      I was told it was the Chief's decision.

25        Q      Who told you that?

**Exhibit 17 - 92**

094

Page 245

1        A      I believe Alcantara did.

2        Q      Was that a subsequent conversation you had

3    with Alcantara?

4        A      As I recall.

5        Q      When did you have this subsequent

6    conversation with Alcantara?

7        A      January 17th, 2007.

8        Q      That was the date that you were -- the date

9    you had the meeting with Alcantara?

10       A      The interrogation, yes.

11       Q      Did you ever talk to the Chief about your

12   assignment?  Ask him any questions about it?

13       A      You know, I want to say -- and again, I

14   don't remember the timing, but when I went in and spoke to

15   him about something or some things, I believe I told him

16   that I did not want any part of the school program.

17       Q      After you were assigned; is that correct?

18       A      I believe so.

19       Q      Do you know where that conversation took

20   place?

21       A      As I recall it was in his office.

22       Q      How soon after you were assigned did that

23   conversation occur?

24       A      I'm not really sure.  Probably a week or

25   two.  I'm not absolutely certain.

**Exhibit 17 - 93**

095

Page 254

1    Q    Everything that you've testified to
2    already?
3    A    For the most part, yes.
4    Q    I want to ask you about the January 17th,
5    2007 meeting.  I know you've testified about this during
6    your administrative hearing, so I do have that testimony so
7    I don't want to rehash everything.
8        But tell me how you were called to this meeting on
9    January 17th, 2007.  How did you become aware that
10   Lieutenant Alcantara and -- I believe it was Sergeant
11   Libby -- wanted to talk to you?
12   A    As I recall, I was called on the radio and
13   told to come back to the station.  When I came into the
14   station, I was told by Sergeant Libby something to the
15   effect of:  Boss wants to see you or Boss wants to see us,
16   something like that.
17   Q    And you were already in the SRO position;
18   is that correct?
19   A    Correct.
20   Q    Who was your immediate supervisor after you
21   were placed on that assignment?
22   A    Libby.
23   Q    Did Libby give you any indication over the
24   phone -- I'm sorry -- the radio as to why you were being
25   called back to the station?

Exhibit 17 - 94                096

Page 255

1          A          Actually, the dispatcher called I believe,

2     and then I spoke to Libby when I entered the building.  And

3     at no time did I get any indication as to what the purpose

4     of my return to the station was for.

5          Q          Did you proceed immediately to Alcantara's

6     office with Libby after he told you that Libby -- I'm

7     sorry -- Alcantara wanted to see you?

8          A          Yeah, I believe so.

9          Q          The tape-recorder that you had, was that

10    your -- is that your officer-issued tape-recorder that you

11    use out in the field?

12         A          It's not issued.  It was my own personal

13    digital recorder, not a tape-recorder.

14         Q          Okay.  Does the Department have a recording

15    policy that you're aware of?

16         A          There's some kind of policy regarding that

17    I believe.  I don't know specifically what it says.

18         Q          Does the Department issue recorders or do

19    officers use their own recorders?

20         A          At the time, they issued a mini cassette

21    recorder and there had been some conversation -- I remember

22    Lieutenant Harpole talking about purchasing some kind of

23    digital recorders.

24         Q          But you had purchased your own digital

25    recorder; is that correct?

**Exhibit 17 - 95**

097

Page 263

1        A     Honestly, that seemed kind of rude to me to

2  even do that -- if I just put my recorder on his desk

3  (Indicating).  I mean, he's a Lieutenant, whether you like

4  him or not, and for me to just come in and put that on his

5  desk, that probably would have been kind of rude.  And not

6  only that, I didn't need to.  I just had it right here

7  (Indicating).

8        Q     And you never told either Sergeant Libby or

9  Lieutenant Alcantara that you were tape-recording them; is

10  that correct?

11       A     That's correct --

12       Q     And -- I'm sorry.  Yeah, go ahead.

13       A     I'm sorry.  Until they asked me afterwards.

14       Q     The second time that you spoke with them

15  that day?

16       A     Correct.

17       Q     And you never told either one that you had

18  a tape-recorder in your hand; correct?

19       A     No.

20       Q     After this meeting with Libby and

21  Alcantara, you went and spoke to Eileen Martin; is that

22  correct?

23       A     Yes.

24       Q     You felt that your -- I'll call them the

25  "POBR rights," public safety officer procedural bill of

**Exhibit 17 - 96**

Page 266

1    documents.  I assume you read that pretty carefully; is

2    that accurate?

3              A      I would have to say yes, as I recall.

4              Q      And reading --

5              MR. MEYERHOFF:  Why don't we take a quick break?

6    I want to make a couple of copies.  Off the record.

7                     (Recess taken.)

8              Q      BY MR. MEYERHOFF:  I just want to ask about

9    one document that I want to come back to.  This will be

10   Exhibit -- are we at 10?

11             THE DEPOSITION REPORTER:  Yes.

12             Q      BY MR. MEYERHOFF:  This will be Exhibit 10.

13   It's a one-page e-mail -- actually, there's two e-mails on

14   it, but the bottom e-mail is from Ray Warren to Rudy

15   Alcantara, December 3rd, 2006 regarding the ride-alongs.

16             A      Uh-huh.

17                    (Whereupon the document is marked

18             by the Deposition Officer as Defendant's

19             Exhibit No. 10 for identification.)

20             Q      BY MR. MEYERHOFF:  You mentioned earlier

21   that you prepared something to Lieutenant Alcantara

22   concerning the ride-along issue.  Was this the e-mail that

23   you were describing?

24             A      I believe it is, yes.

25             Q      I asked you if -- going back to January

**Exhibit 17 - 97**

099

Page 282

1    A    Yeah.  I'm reading this and now it's coming

2  to mind.  I remember that now.

3    Q    What role did you have in Jackson bringing

4  that complaint against Toro?

5    A    She, again, gave me a thumbnail of what it

6  was that had occurred, and I don't remember specifically

7  what it was, at that time.  I have since learned other

8  things.  But I believe I took her over -- I personally

9  walked with her over to the HR Director's office and

10  allowed her to voice her complaint.  And at that time, I

11  believe the City Manager was also present.

12    Q    So Jackson came to you with these

13  allegations against Toro; is that correct?

14    A    That's correct.

15    Q    And you were on duty at the time?

16    A    I believe so.

17    Q    You were both working the school resource

18  officer at this time I would guess?

19    A    I think that's correct.

20    Q    And you accompanied Officer Jackson to

21  Eileen Martin's office?

22    A    Yes.

23    Q    Did you stay there while Officer Jackson

24  told Eileen Martin about these allegations?

25    A    I was there for at least a short period of

**Exhibit 17 - 98**

Page 283

1    time, but here again, I wasn't going to be involved with

2    what was going to happen as far as the complaint or

3    appropriate action, so I just made sure that they made the

4    connection, and I probably excused myself fairly soon

5    afterwards.  I don't know what happened after we met that

6    time.

7         Q    Okay.  This is the same day that you had

8    met with Libby and Alcantara?  Did you meet with Libby and

9    Alcantara after you escorted Officer Jackson to Eileen

10   Martin's office?

11        A    You know, it had to have been before

12   because after that, I got booted out the door.

13        Q    Which was before?  I'm sorry.

14        A    The Jackson thing would have been before.

15        Q    Okay.  Do you recall how much time elapsed

16   between bringing Jackson to Libby's office -- I'm sorry --

17   to Martin's office and then going to the meeting with Libby

18   and Alcantara?

19        A    I don't know.  I see that I have that date

20   written down as far as when I took Jackson over there, but

21   I just don't remember the times.

22        Q    Do you recall what your shift -- you were

23   working as an SRO on that day.  What was normal hours of

24   duty?

25        A    Probably, like, 7:00 or 8:00 in the morning

**Exhibit 17 - 99**

Page 284

1    until 4:00 or 5:00 in the afternoon.  I'm not sure exactly.

2    Something along those lines.

3            Q      Did anybody from the police department

4    besides Officer Jackson know that you had brought her to

5    Eileen Martin on that date?

6            A      You know, it's an open walk across the

7    parking lot.  I'm sure everybody and their brother saw us.

8            Q      Well, I assume that employees and managers

9    aren't just looking out in the parking lot all day.

10           A      If Ray Warren is walking across it, they

11   are.

12           Q      Do you have any evidence that anybody knew

13   that you had taken Officer Jackson over to Eileen Martin's

14   office?

15           A      Any personal evidence?

16           Q      Yeah.

17           A      No.

18           Q      How long would you say that you stayed in

19   Eileen Martin's office before you excused yourself, as you

20   said?

21           A      I'm not really sure.  It was probably not

22   more than 15 minutes or a half hour.  It wasn't a long

23   drawn-out thing.

24           Q      Did you see Hector Rodriguez while you were

25   over there at Eileen Martin's office?

**Exhibit 17 - 100**

1    related to --

2         Q        BY MR. MEYERHOFF:  Let me ask you this, Mr.

3    Warren:  Do you believe that Hector Rodriguez retaliated

4    against you in any way based on your union activities?

5         A        I don't know the extent of his involvement.

6         Q        Do you know of any involvement he had in

7    regards to the allegations that you've made?

8         A        All I know is that he signed the final

9    termination letter.

10        Q        Other than that, is there anything else

11   that he did that you believe constitutes retaliation

12   against you for your union activities?

13        A        No.

14            MR. MEYERHOFF:  Okay.  I don't believe I have any

15   further questions, Mr. Warren.  Do you have any questions?

16            MR. PERRY:  No.

17            MR. MEYERHOFF:  Okay.  Great.  Why don't we

18   stipulate to -- Federal Court, I guess we still release you

19   from your obligations under the Code.  We'll stipulate that

20   the transcript will be delivered to our office, and then

21   I'll forward it over to Mr. Perry's office; Mr. Perry, you

22   will transmit it to Mr. Warren for his review.  I think 30

23   days would be okay in this case to review the transcript;

24   any changes that you make will be -- your attorney will

25   explain to you how you can indicate changes on the

**Exhibit 17 - 101**

103

Page 311

1                   DECLARATION UNDER PENALTY OF PERJURY

2

3         I, RAY WARREN, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on January 19, 2010; that

6    I have made such corrections as appear noted herein; that

7    my testimony as contained herein, as corrected, is true and

8    correct.

9

10

11            DATED this _23RD_ day of _MAY_____,

12    20_10_, at _APPLEVALLEY_____, California.

13

14

15

16

17

18

19

20

21    _____

22                                  RAY WARREN

23

24

25


**Exhibit 17 - 102**

104

```
1                           CERTIFICATE

2                               OF

3                    CERTIFIED SHORTHAND REPORTER

4                             *  *  *  *

5

6           The undersigned Certified Shorthand Reporter of

7    the State of California does hereby certify:

8           That the foregoing Deposition was taken before me

9    at the time and place therein set forth, at which time the

10   Witness was duly sworn by me.

11          That the testimony of the Witness and all

12   objections made at the time of the Deposition were recorded

13   stenographically by me and were thereafter

14   transcribed, said transcript being a true and correct copy

15   of the proceedings thereof.

16          In witness whereof, I have subscribed my name,

17   this date:  2-3-10          .

18

19

20

21   _____

22            Kelly V. Charles, CSR No. 12164

23

24

25
```

312

**Exhibit 17 - 103**

105

# Exhibit 18

# COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY WARREN,<br><br>                    Plaintiff,<br><br>          VS.<br><br>CITY OF BARSTOW, CITY OF<br>BARSTOW POLICE DEPARTMENT,<br>HECTOR RODRIGUEZ, in his<br>capacity as the CITY Manager<br>for the CITY of Barstow, CALEB<br>LEE GIBSON, individually and<br>in his capacity of Chief of<br>Police for the CITY of<br>Barstow; RUDY ALCANTARA,<br>individually and in his<br>capacity as the lieutenant for<br>the CITY of Barstow Police<br>Department; and DOES 1 THROUGH<br>10 inclusive,<br><br>                    Defendants. | CASE NO. EDCV08-0405 |

DEPOSITION OF CALEB LELAND GIBSON

WEDNESDAY, MARCH 10, 2010

Reported by: BRANDY L. WILLIAMS, CSR, RPR *11084

**Exhibit 18 - 1**

107

1    they changed or what schedule we were on in any

2    particular time.

3        Q.    Do you recall Officer Warren attempting to

4    speak with you regarding the shift-change hours a few

5    months before his January 2007 incident?

6        A.    Yes.

7        Q.    Did you -- let me ask you, what do you recall?

8        A.    Again, the best I can recall, I think we

9    were -- we had been working a 12-hour shift, and then we

10   went to an eight-hour shift.

11       Q.    I'm going to have you take a look at an

12   exhibit. It was previously entered into as

13   Defendant's Exhibit No. 4. I'm going to give you a

14   moment to take a look at it and let me know when you're

15   all done. It's a two-page document Bates stamped on the

16   bottom 400 and, it looks like, 398. There's one for --

17            MS. ARCE: I think these are two -- actually,

18   they go together.

19            THE WITNESS: Oh, okay.

20            MS. ARCE: Thank you.

21            THE WITNESS: Okay.

22            (Defendant's Exhibit 4, previously

23            marked in the deposition of Ray Warren,

24            is attached for reference.)

25   ///

41

1    Q.    What was your preference?

2    A.    My preference, because of the manpower issue,

3  was the eight-hour shift because it provided better

4  coverage.

5    Q.    Have you -- was that a consistent position for

6  you as Chief?

7    A.    Pretty much.

8    Q.    Did it bother you to have Officer Warren

9  indicate that it might be better to have a different

10  shift than the eight-hour shift?

11    A.    No, because that wasn't just Officer Warren's

12  issue. It was the POA's issue. It was a

13  department-wide issue.

14    Q.    Do you understand -- do you have an

15  understanding of what the POA members preferred as tar

16  as the shift schedule?

17    A.    Yeah.

18    Q.    What's that?

19    A.    They wanted to be on the 12-hour shifts.

20    Q.    Was that communicated to you by Officer Warren

21  or from somebody else?

22    A.    It was communicated to me by everybody.

23    Q.    Did they explain why they wanted to have the

24  12-hour shift?

25    A.    Yeah, morale.

43

1    Q.    Did they explain how that came into play?

2    A.    They wanted more time off.

3    Q.    The change in schedule, officers still work the

4    same amount of hours every week; correct?

5    A.    Correct.

6    Q.    So it's not additional time off, per se, is it?

7    Is it just lumping more hours together in the week? Is

8    that what we're talking about?

9    A.    Right.

10    Q.    Do you recall switching to the 3/12 shift after

11    Officer Warren was transferred to SRO?

12    A.    Vaguely. But, again, I don't know exactly when

13    we made the shift changes. I would have to see the

14    schedules with the dates on them.

15    Q.    But you do recall switching to the 3/12 shift?

16    A.    I believe that we did, if I recall correctly.

17    100 percent, sitting here today, I couldn't tell you,

18    yeah, we switched to 12 hours. I believe we did, but I

19    can't be 100 percent sure.

20    Q.    Do you recall what shift Officer Warren had to

21    work as the school resource officer?

22    A.    Day shift.

23    Q.    What hours does that entail? Is that 8-hour or

24    12-hour? What's that?

25    A.    That would be Monday through Friday. But I

44

```
 1   BY MR. PERRY:

 2       Q.   Do you have an understanding of my question?

 3       A.   No one asked for my permission. And my

 4   understanding, it was a decision of Lieutenant Alcantara

 5   to remove Officer Warren from the OIC position.

 6       Q.   I'm going to have you take a look at an exhibit

 7   that's been previously marked as Defendant's Exhibit

 8   No. 8 in Plaintiff's deposition.

 9            Does this document refresh your recollection

10   regarding the Officer-in-Charge issue?

11       A.   Yes.

12            (Defendant's Exhibit 8, previously

13            marked in the deposition of Ray Warren,

14            is attached for reference.)

15   BY MR. PERRY:

16       Q.   There's -- on the first page, the page that's

17   labeled "402" at the bottom, there's an e-mail response

18   to Officer Warren that looks like it came from you that

19   starts out "Refer to Policy No. 124."

20            Do you see that paragraph?

21       A.   Yes.

22       Q.   Do you recall typing this e-mail out to

23   Officer Warren?

24       A.   I don't recall it, but I guess I did.

25       Q.   Were these your reasons for preventing
```

58

**Exhibit 18 - 5**

111

1    Officer Warren from the Officer-in-Charge position, or

2    are these the reasons that Lieutenant Alcantara gave

3    you?

4         A.    The OIC position was not something that the

5    Chief made the decision on. That was pretty much left

6    up to the sergeants and the patrol lieutenant. They're

7    the ones that usually handle that. And I think that's

8    why I've referred him back. I put, "Please talk to

9    them, and hopefully they will be honest with you."

10        Q.    It also says, "You were not recommended by your

11   or any other sergeant."

12              Do you recall asking all the sergeants whether

13   or not Officer Warren should be an OIC?

14        A.    I don't recall that, no.

15        Q.    Do you recall having any command-staff meeting

16   regarding Officer Warren's complaint that he is no

17   longer being considered for OIC?

18        A.    No, I don't recall any specific meeting.

19        Q.    You indicated, in your response, that he had

20   received a "meets standard" on his last two evaluations.

21              Can you tell me why he was not removed from

22   consideration for OIC when he received the first "meets

23   standards" overall evaluation?

24              MS. ARCE: Objection. Calls for speculation.

25              If you know.

                                                              59

```
 1    BY MR. PERRY:
          Q.    Besides that -- let me ask you this:
 3              Is that everything that you recall from the
 4    incident, the ride-along with Officer Warren regarding
 5    Roger Martin, that you can recall?
 6        A.    Yes.
 7        Q.    Was there any other issues with ride-alongs
 8    with Officer Warren that you can recall?
 9        A.    Not that I'm aware of.
10        Q.    Do you recall assigning Officer Warren to the
11    SRO position in December 2006?
12        A.    Yes.
13        Q.    Isn't it true your department had issued a memo
14    out to the department for officers to put in a request
15    for that position? Is that accurate?
16        A.    Yes.
17        Q.    Do you recall what kind of response you
18    received from the department regarding the --
19        A.    No one applied for it.
20        Q.    Who was the -- was there more than one SRO at
21    the time?
22        A.    Two.
23        Q.    Who were the two SRO's at the time?
24        A.    It was vacant.
25        Q.    So it's my -- so is it true that it was just
                                                              74
```

1    Officer Toro -- or let me ask you, was Officer Toro the

2    SRO at the time before Officer Warren went over there?

3        A. Well, I think that particular time, if memory

4    serves me correctly, there wasn't an SRO assigned. But

5    prior to that, when there was an SRO, I believe it was

6    Officer Toro.

7        Q.   There were two vacancies or one vacancy?

8        A.   Two.

9        Q.   And were there two -- can you tell me who the

10   two SRO's were before Officer Warren and

11   Officer Jackson?

12           MS. ARCE: Objection. Misstates testimony.

13   BY MR. PERRY:

14       Q.   Were there two officers in that position at one

15   time?

16       A.   I believe there was, but I -- I can't recall.

17   See, we had a contract with the school district for the

18   SRO's, and I believe the contract called for two.

19       Q.   How long -- did you get the contract with the

20   school district while you were Chief of Police?

21       A.   I want to say that it was -- the contract was

22   revisited, maybe rewritten, but I'm not sure of that.

23       Q.   You don't recall an SRO position when you were

24   lieutenant?

25       A.   Yeah. And that's why I'm not sure if it was --

                                                      75

STEARNS WILLIAMS REPORTING
(909) 803-0091

**Exhibit 18 - 8**

114

1    A.    Right.

2    Q.    Why did you select Officer Warren for that

3    position?

4    A.    Why did I select Officer Warren to the

5    position?

6    Q.    Yeah.

7    A.    He was on day shift. Ray had indicated that he

8    wanted to be more than just a police officer. He wanted

9    to be an OIC. He wanted to be a sergeant. He wanted to

10   promote. I felt that this was a good opportunity for

11   Ray to show us that he had potential.

12          Now, what's the most important criteria for the

13   school resource officer? Not what's written down in the

14   Policy and Procedure, but in reality. And in reality, a

15   person who's a school resource officer, that's an

16   extremely important job. And I don't think I need to

17   explain why it's an extremely important job. You're

18   talking about schools. You're talking about children.

19   You're talking about educators. That's an extremely

20   important job. Ray had the personality. He had the

21   smarts to do a very good job as the SRO.

22   Q.    Well, you'd already said that Ray had always

23   done the bare minimum; isn't that correct?

24   A.    Correct.

25   Q.    So what made -- what changed your mind in

                                                          78

1    December of 2006 to put him in that very important

2    position you're describing?

3        A.    Because that job fit Ray.

4              MS. ARCE: Objection. Assumes facts not in

5    evidence.

6              Go ahead.

7              THE WITNESS: That job fit Ray; okay? And what

8    I mean by that is, it wasn't a job that demanded, "Okay,

9    you know, you need to arrest so many people. You need

10   to write so many citations," you know, the normal stuff

11   that patrol is usually evaluated by.

12             Okay. That job requires -- no one cares if he

13   ever makes an arrest. Why? We don't care about

14   arrests. We don't care about citations with the SRO.

15   We care about the protection of those kids. We care

16   about how that SRO is going to relate to the school

17   administration, to the school teachers, to those campus

18   monitors. Ray possesses all those skills. As far as I

19   was concerned, Ray was a perfect person for that

20   position, and it was an opportunity. It was an

21   opportunity for him to go in there and do a good job and

22   say, "Hey, look."

23        Q.    Your agency had just removed him from

24   consideration from OIC the month before, in November of

25   2006, and now he's being selected as a good candidate

79

**Exhibit 18 - 10**

116

```
 1   for SRO.

 2           Does that make sense to you?

 3      A.   Yeah, it sure does, for the reasons I just

 4   explained to you. Patrol. Division and the issues that

 5   patrol has to deal with is totally different from the

 6   SRO position. I have officers that are outstanding -- I

 7   had officers who were outstanding in Patrol Division

 8   that I would not have put in the SRO position.

 9      Q.   Wasn't it true -- or wouldn't it have been

10   better to pick someone -- if you were going to force

11   someone into a spot, that you could force someone in

12   that's less senior than Officer Warren?

13           MS. ARCE: Objection. Calls for speculation;

14   incomplete hypothetical. Excuse me.

15           THE WITNESS: As the Chief of Police, I'm

16   responsible for assigning personnel for the benefit of

17   the City of Barstow and the protection of its citizens,

18   which includes the school. And I have to make those

19   decisions based on what I'm comfortable with because, as

20   you, everyone else knows, the Chief is ultimately

21   responsible for everything in his organization.

22   BY MR. PERRY:

23      Q.   Isn't it true that you want people to be in

24   positions that want to be there? Does that factor in at

25   all?
```

80

1    Officer Warren that he needed to be careful with regard

2    to his activities with Barstow Management?

3            MS. ARCE:   Objection. Calls for speculation;

4    lacks foundation.

5            You can answer if you know.

6            THE WITNESS: No, I wasn't aware.

7    BY MR. PERRY:

8        Q.   Do you recall that there was a change in policy

9    regarding when officers can go home and whether or not

10   their reports are completed at the time? Do you recall

11   a policy change around the time that Officer Warren was

12   terminated?

13       A.   Yes.

14       Q.   What do you recall the -- what was the policy

15   change, as you recall?

16       A.   I don't remember exactly what the Policy and

17   Procedures Manual said prior to me addressing this

18   issue. But the issue came about as a result of people

19   coming into the office wanting reports. Reports weren't

20   completed.

21           I went to the records supervisor, Mrs. Miestas

22   (phonetic). I had her do an audit of the reports that

23   were outstanding. And I was shocked at the number -- I

24   don't recall what the number was. I was shocked at the

25   number of outstanding reports. I was shocked at the

95

**Exhibit 18 - 12**

118

1    time that these reports hadn't been completed. We're

2    talking six months. Some of them were over a year,

3    never been completed by the officer who pulled the crime

4    report number, took the report.

5        That happened a couple of times. And I went to

6    Lieutenant Alcantara and told him, "This has to stop.

7    This is not acceptable." And there were several

8    conversations.

9        And so finally -- I don't know if it was me or

10   if it was Lieutenant Alcantara who actually put the

11   directive out that reports have to be completed on a

12   daily basis. But even after that was done, reports

13   still weren't being turned in.

14       Q.   Do you recall Officer Warren attempting to

15   discuss this with you as POA president?

16       A.   I don't specifically remember Ray. I remember

17   that it was an issue because I believe they were on

18   12-hour shifts. And they'd stay over, late, doing their

19   reports, and then they didn't have much time to go home

20   and sleep and then come back, you know, rested for the

21   next day.

22       Q.   Was this an issue that was, if not brought to

23   you by Officer Warren, other board members of the POA,

24   as an issue for the rank and file?

25       A.   I can say that it was an issue with the

96

STEARNS WILLIAMS REPORTING
(909) 803-0091

**Exhibit 18 - 13**

119

1    at the City side, and then I'd go back over to the P.D.
2    And I'd ask the sergeant -- I think it was Libby, at the
3    time, that I can recall -- "You know where Ray's at?"
4              "No."
5              "Why don't you? You're his supervisor. How
6    come you don't know where he's at?" I said, "I'll tell
7    you where he's at. He's over on the City side."
8              "Well, he didn't tell me."
9              I said, "Well, you're his supervisor. You
10   should handle it."
11   BY MR. PERRY:
12        Q.    Do you recall what assignment Ray was working
13   at the time?
14        A.    You know, I don't know, at that particular
15   time, if he was school resource officer or if he was in
16   patrol.
17        Q.    Was there a directive that Ray was supposed to
18   contact his supervisor or the watch commander every time
19   he goes over to the City side?
20        A.    I don't know if there was a directive. I know
21   that he was supposed to keep his watch commander, who he
22   worked for, you know, appraised of what he was doing --
23   where he was at and what he was doing. And if he needed
24   to go take care of any kind of business over at City
25   side, any of the officers, that they should check in

98

**Exhibit 18 - 14**

120

1   with their watch commander so that he knows what they're

2   doing, where they're at.

3          And to add to that, it had been a problem

4   through the years, way before I was Chief, with officers

5   going over on City side, and the city manager and others

6   over there calling up the department and said, "Hey,

7   your people are bothering my people. They're not

8   getting their work done. They're over here, you know,

9   talking rather than working."

10          And so that was not just a recent problem.

11   That was an ongoing problem for years.

12      Q.   Did you notice that Officer Warren had been

13   making frequent trips to the City side? Let's just

14   narrow it to maybe the year before he was terminated.

15      A.   It seemed like he was over there quite a bit.

16      Q.   And did the frequency of his visits disturb

17   you?

18      A.   I questioned what he was doing over there, why

19   he needed to be over at City side so much. And if he

20   was -- I don't recall exactly what it is   But there's

21   something in the City policy, I believe, that says that,

22   for union business, you're allowed so many -- so much

23   time in a certain period to conduct that business. And

24   as many times as I saw him over there, I thought that he

25   was exceeding that time. And his supervisor never knew

99

**Exhibit 18 - 15**

1    A.    Everything but sexual harassment part. I'm not

2    clear on the sexual harassment part. Now, the other

3    about calling her about her reports and things of that

4    nature, yes, I talked to Eileen Martin about that.

5        Q.    Was that prior to the January 17th, 2007

6    incident?

7        A.    You know, I'm not sure. Probably was, but I'm

8    not sure. You'd have to show me some document with the

9    date on it to refresh my memory.

10       Q.    What about an allegation of sexual harassment

11   by Officer Jackson to Officer Toro?

12       A.    Yes, I'm aware of that.

13       Q.    Are you aware that Officer Warren helped

14   facilitate that earlier in the day,

15   January 17th, 2007 -- facilitate the filing of the

16   complaint?

17       A.    And, again, Ray didn't come into that picture.

18   At the time, I was under the impression that it was

19   Jackson.

20       Q.    Just one other clean-up question that I

21   remembered from before.

22            Was there ever a time that you refused to meet

23   with POA membership pursuant to Officer Warren's request

24   for a general meeting?

25       A.    I wouldn't classify it as a refusal. I wanted

159

**Exhibit 18 - 16**

122

1  STATE OF CALIFORNIA   )
                         )  ss.
2  COUNTY OF_____)

3

4

5         I, CALEB LELAND GIBSON, say I have read the

6  foregoing deposition and declare under penalty of

7  perjury that my answers, as indicated, are true and

8  correct.

9

10

11

12  _6 - 2 - 2010_
         (Date)

13

14

15         _____
                   (Signature)

16

17

18

19

20

21

22

23

24

25

189

Exhibit 18-17

123

1  STATE OF CALIFORNIA
                              ss
2  COUNTY OF SAN BERNARDINO }

3

4       I, Brandy L. Williams, certified shorthand

5  reporter, license No. 11084, do hereby certify:

6

7       That, prior to being examined, the witness named

8  in the foregoing deposition, to wit,

9  CALEB LELAND GIBSON, was by me duly sworn to testify the

10  truth, the whole truth and nothing but the truth;

11

12      That said deposition was taken down by me in

13  shorthand at the time and place therein named and

14  thereafter reduced to computer-aided transcription under

15  my direction.

16

17      I further certify that I am not interested in the

18  event of the action.

19

20      WITNESS my hand this  6+1 ay of

21            , 2010.

22

23  _____  AMS, OSR #11084
         BRANDY L. W

24

25
                                              190

STEARNS WILLIAMS REPORTING
(909) 803-0091

**Exhibit 18 - 18**

124

Exhibit 19

# COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY WARREN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) CASE NO. EDCV08-0405 |
| VS. | ) |
| | ) |
| CITY OF BARSTOW, CITY OF | ) |
| BARSTOW POLICE DEPARTMENT, | ) |
| HECTOR RODRIGUEZ, in his | ) |
| capacity as the CITY Manager | ) |
| for the CITY of Barstow, CALEB | ) |
| LEE GIBSON, individually and | ) |
| in his capacity of Chief of | ) |
| Police for the CITY of | ) |
| Barstow; RUDY ALCANTARA, | ) |
| individually and in his | ) |
| capacity as the lieutenant for | ) |
| the CITY of Barstow Police | ) |
| Department; and DOES 1 THROUGH | ) |
| 10 inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

DEPOSITION OF RUDOLPH ANGEL ALCANTARA

THURSDAY, MARCH 11, 2010

Reported by:  BRANDY L. WILLIAMS, CSR, RPR #11084

**Exhibit 19 - 1**

126

```
 1        Q.    Before Officer Warren was terminated, the year

 2   before, do you recall an issue arising regarding change

 3   of shift schedules for the rank-and-file officers?

 4             MR. MEYERHOFF:  Objection.  Vague and

 5   ambiguous.

 6             THE WITNESS:  Yes.

 7   BY MR. PERRY:

 8        Q.    Do you recall that it was an issue surrounded

 9   whether you should work an eight-hour shift or

10   three-twelves or something to that effect?

11        A.    That's correct.

12        Q.    At the time, were the patrol officers working

13   five eight-hour shifts?  Is that your understanding?

14        A.    They were working three-twelves.  And due to

15   problems that had arisen out of that, we made a decision

16   to go to five-eights because the three-twelves created

17   more problems and, whereas, the 5/8, it was a better

18   schedule for everybody concerned; the City, employees.

19             Now, the three-twelves, the only benefit it had

20   was officers were getting more time off than they

21   should.

22        Q.    Did they work the same amount of hours?

23             MR. MEYERHOFF:  Objection.  Vague and

24   ambiguous; compound.

25             THE WITNESS:  It was based on a 40-hour-week
```

                                                                22

```
1        Q.    The shift.

2        A.    The shift?  I don't remember.

3        Q.    Was it to switch from the 3/12 -- I mean, from

4   the five days a week to the three-twelves, switched back

5   to the way it was before?

6        A.    I believe he wanted it because the Association

7   wanted it.  He was their representative.  Whether he

8   actually wanted it, I couldn't tell you.  I don't

9   remember.

10       Q.    Did it bother you that you received such stiff

11  opposition from the rank and file on that issue?

12       A.    No.

13       Q.    What about the Chief?

14             MR. MEYERHOFF:  Calls for speculation as to the

15  Chief.

16             THE WITNESS:  You have to ask the Chief.

17  BY MR. PERRY:

18       Q.    Do you recall Officer Warren having a

19  discussion with you regarding ride-alongs just a few

20  months before he was terminated?

21       A.    No.  A few months before he was terminated, no.

22  A ride-along?  Yes.  Yes.

23       Q.    What do you recall from -- was there one

24  ride-along incident you're thinking of?

25       A.    Yes.
```

26

**Exhibit 19 - 3**

1    Q.    What do you recall from that incident?

2    A.    I believe it came up during the time that I had

3    the counseling session with him.  And this stems over --

4    I had received a phone call from a Roger Martin who came

5    around the police department a lot, you know, associated

6    with the officers.  If I recall, his son and daughter

7    were part of our explorer program, and they were there

8    because of that.

9         And then the kids finally grew up and went off

10   to other things, but Roger Martin basically kept in

11   touch with the department.  I remember one time he had

12   called me and we were talking about something, and then

13   he had mentioned wanting to come in and ride.  And he

14   had mentioned that he was going to ride with Ray.  And I

15   said -- if I recall correctly, I was dealing with more

16   things than just my concern whether there was going to

17   be a ride-along or not.  If I recall, I told Roger,

18   "Roger, look, why don't you just call me some other

19   time."

20        He became a pest even before that.  But if I

21   recall, I was dealing with personal issues, and I cut it

22   short.  I said, you know, "Call me some other time,"

23   whatever it was.  I don't remember for sure the exact

24   complete conversation.

25   Q.    Did you receive an e-mail from Officer Warren

                                                    27

```
1          A.    A few minutes ago, yes.

2          Q.    What other concerns did you have?

3                MR. MEYERHOFF:  Objection.  Vague and

4    ambiguous.  You might -- do you recall what your last

5    answer was?  Do you want the reporter to read it back?

6                THE WITNESS:  I was going to ask if you can

7    read it back.

8                (Last question was read.)

9                THE WITNESS:  I'm trying to recall what my

10   concerns were at this point.  I'm drawing a blank right

11   now.  I'm sorry.

12   BY MR. PERRY:

13         Q.    Well, one of the issues you had indicated was

14   the city manager was doing things with the Association

15   that brought concerns to you.

16                What can you tell me about those concerns?

17                MR. MEYERHOFF:  Objection.  Misstates the

18   testimony; foundation.

19                THE WITNESS:  My concerns, at the time,

20   regarded things that we had worked for, like the

21   corporal program to be established, was being held and

22   not allow us to continue on with it -- for it; because I

23   wanted to see more officers get promoted.  Nobody was

24   going anywhere.  It was stagnant.  And that was -- the

25   day when it was granted, the corporal positions, we
```

                                                          37

**Exhibit 19 - 5**

1    wanted to get it done to show these guys, "Here's your

2    chance.  Go for this promotion."  That was never -- we

3    were never allowed to do that.

4    BY MR. PERRY:

5        Q.    And is that because of something between the

6    city manager and the Association?

7            MR. MEYERHOFF:  Objection.  Calls for

8    speculation.

9            If you know any relationship between the city

10   manager and the Association, I guess you can answer.

11           THE WITNESS:  I don't recall anything specific.

12   BY MR. PERRY:

13       Q.    You indicated you were concerned about

14   something regarding that relationship; correct?

15       A.    Yes.

16       Q.    What was your concern about the relationship

17   between the city manager and the POA?

18       A.    If I recall correctly, it was making us look

19   bad, Management, referring to myself -- I don't know how

20   Lieutenant Harpole felt.  I don't know how the Chief

21   felt -- but myself, not being able to do certain things

22   because it was being stonewalled.  Nothing was being

23   allowed to do -- to give to the officers.

24   BY MR. PERRY:

25       Q.    How were you looking bad?  Looking bad to who,

                                                            38

1   at the time, and the POA?

2       A.   I don't recall any conversation with

3   Lieutenant Harpole about that.

4       Q.   Were there any other concerns that you had that

5   you described earlier?

6       A.   I can't remember anything as we speak.

7       Q.   Do you recall, in February of 2006, demanding

8   that Officer Warren give you forecasted schedules

9   relating to his military service?

10          MR. MEYERHOFF:  Objection.  Vague and ambiguous

11  as to "forecasted schedules."

12          You can answer if you understand it.

13          THE WITNESS:  Yes.

14  BY MR. PERRY:

15      Q.   What do you recall from that?

16      A.   I wasn't getting any, and I wanted them.

17      Q.   You wanted to know when he was going to need to

18  be -- time off or something to that effect?

19      A.   Whenever Ray was notified of training, I'm sure

20  he was notified by documentation.  I needed that copy of

21  that for our purposes.  Finance needs it for their

22  filing, for their system to show that we're not just

23  arbitrarily just giving money away.  It was just a way

24  of, you know, me trying to keep track of where he's at.

25  If he's supposed to be working and he's not here,

                                                        42

1    where's he at?

2              "He's off to training."

3              "Where's the documentation?"

4         Q.    How do you know for sure that he would have

5    written documentation?

6         A.    We've had other officers in the past that --

7    same situation -- they were gone because of military

8    duty, but they come and they say, "Here's my orders" or

9    "copy" or whatever the case may be, but not Ray.

10        Q.    Were you ever in the military?

11        A.    No.

12        Q.    And Ray was in the Air Force; is that correct?

13        A.    That's my understanding.

14        Q.    Were the other officers you're referring to in

15   the Air Force?

16        A.    No.  I think it was Army and, maybe, Marines.

17        Q.    Do you think the Air Force could have done

18   things differently than the Army or Marines?

19        A.    Oh, I'm sure.

20        Q.    Did Officer Warren tell you he receives -- did

21   you ask for written documentation with the trainings he

22   was going to attend?

23        A.    Not the training; just his orders that he's

24   going to be attending -- he's going to be gone from this

25   date to this date.  That's all I wanted.

43

**Exhibit 19 - 8**

1    to report to the watch commander before he was to go

2    over to the City side sometime during the last year

3    before he was terminated?

4         A.    Yes.

5         Q.    When I say the phrase "City side," do you have

6    an understanding of what that means?

7         A.    I believe I do.

8         Q.    I've heard the term before.  I just want to

9    make sure we're both on the same page.

10             Would you agree that it means the building

11   where the human resource director --

12        A.    Eileen Martin and -- yeah -- that, yeah.

13        Q.    Okay.  Do you recall -- were you involved in

14   the decision to have Officer Warren report to the watch

15   commander before he goes over to the City side?

16        A.    I wasn't, specifically.

17        Q.    Were you told that he was ordered to do so?

18        A.    I'm -- try that again.

19        Q.    Were you told by anybody that Officer Warren

20   was ordered to report to the watch commander before he

21   goes over to the City side?

22        A.    You know, I believe it was -- if I recall

23   correctly, there was a memo put out by the Chief's

24   office directing -- it wasn't just specifically Warren.

25   It was anybody; that they let the sergeants know before

                                                            47

1    they go over to City side.

2         Q.   Do you recall whether or not there was

3    discussion amongst you and the Chief, Gibson, regarding

4    the amount of time that Officer Warren was spending on

5    the City side?

6         A.   Yes.

7         Q.   Do you recall there being more than one

8    conversation with the Chief on this issue?

9         A.   Yes.

10        Q.   How many conversations with the Chief do you

11   recall regarding this issue?

12        A.   Probably couple times, anyway.

13        Q.   And what -- are you able to separate the

14   conversations that you had with the Chief regarding that

15   issue?

16        A.   No, not really.

17        Q.   With that in mind, what did you guys discuss

18   regarding Officer Warren's time over at the City side?

19        A.   What I recall was that the Chief had gone over

20   to the City side to speak with -- I'm not sure -- the

21   city manager or whatever.  And, of course, look into

22   Eileen's office, there's Mr. Warren.

23             And he asked -- he came back to the office.  He

24   asked me to -- "Do you know where Officer Warren is?"

25             I said, "No."

                                                          48

**Exhibit 19 - 10**

1   him report to the watch commander before going over to

2   the City side is, in part, to keep track of the amount

3   of time that he was spending over there on POA

4   activities?

5           MR. MEYERHOFF:  Objection.  Assumes facts not

6   in evidence that he was the only one required to report

7   to the watch commander.

8           Do you understand that question?

9           THE WITNESS:  Yes, I understand.  There was --

10  to my knowledge, nobody was keeping a time clock on Ray.

11  BY MR. PERRY:

12      Q.  Do you recall that Officer Warren was, at some

13  point, removed from the Officer-in-Charge position

14  sometime -- a few months before his termination?

15      A.  One incident.

16      Q.  The incident you're referring to, is it an

17  incident that he was removed from the program?

18          MR. MEYERHOFF:  Objection.  Vague and

19  ambiguous.  I don't know if it's a program or not.

20  BY MR. PERRY:

21      Q.  Why don't you explain the incident that you're

22  thinking of.

23      A.  This was on day shift.  Sergeant Ramirez was

24  the watch commander, but he was off.  Apparently he had

25  appointed Ray as the OIC.  And on my way to work, I came

                                                        53

**Exhibit 19 - 11**

1    onto -- I was on Barstow Road.  Right there at the

2    freeway interchange, there was an accident.  And as I

3    approached, I didn't see any officers around.  I saw

4    some units, but I didn't see any officers.  But as I got

5    closer, I saw the whole day-shift crew standing up

6    against the railing, talking.  Nobody was controlling

7    traffic around this accident.

8         And I looked over towards where they were

9    standing.  I believe it was Officer Holms came to me.  I

10   said, "What's going on?  Why isn't some traffic control

11   here?  Get it done."  And I said -- if I recall, I found

12   out, at that point, that Ray was in charge.  And maybe

13   it was Ray that I was talking to.  But then they started

14   doing things.

15        I left the scene, came back to my office.  And

16   I may have even had a conversation with Ray, but I don't

17   recall that for sure.  But I know I had a conversation

18   with Sergeant Ramirez when he came back to work.  I told

19   him, "You will not put Ray Warren as an OIC, period,"

20   because of my prior history with Ray, the way he does

21   things, the whole ball of wax, and the fact that he

22   didn't even qualify --

23        Q.   Why?

24        A.   -- for OIC.

25        Q.   Why didn't he qualify?

                                                              54

**Exhibit 19 - 12**

1    A.    One of the qualifications for OIC was you had

2    to have an "exceeds standards" or "outstanding"

3    evaluation.   I don't believe Ray ever had one.

4        Q.    Do you recall telling Officer Warren that he

5    was -- or explaining to him why he was removed from the

6    OIC position?

7        A.    I don't remember having that conversation with

8    Ray, no.

9        Q.    The incident you referred to, you didn't have a

10   conversation with Ray regarding that incident involving

11   the traffic collision?

12       A.    Like I mentioned earlier, I may have had a

13   conv- -- I don't recall a conversation I may have had

14   with Ray at the time.   But I don't remember whether I

15   called him in or -- I don't recall for sure.

16       Q.    On other occasions when he was OIC, did he do a

17   good job?

18       A.    Probably not.

19       Q.    When you say, "probably," I don't want you to

20   guess.

21              Is it -- do you have any other times, in your

22   mind, that he did a poor job as OIC?

23       A.    Ray did a poor job, period.   As an OIC, I don't

24   recall anything specific that I can tell you.

25       Q.    When you were talking about his removal from

                                                           55

**Exhibit 19 - 13**                                    138

1       A.     To the best of my recollection, yes.

2       Q.     Do you know whether or not Officer Warren was

3    concerned about the Chief's order to -- let me rephrase

4    it.

5              Did the Chief have an order, around that time,

6    that officers could not leave their shift until they

7    finished their reports?

8       A.     Yes.

9       Q.     I'm talking about the time period the last year

10   before Officer Warren was terminated, which would have

11   been -- most of it would have been in 2006.

12             Does that sound about right to you?

13      A.     Yes.

14      Q.     Do you recall whether or not Officer Warren

15   spoke out on this issue as POA president?

16      A.     Not clearly recall, no.

17      Q.     Do you recall this being an issue with the

18   Association regarding the Chief's order that officers

19   needed to stay on duty until they finished their

20   reports?

21      A.     It was an issue, yes.

22      Q.     What do you recall the issue being?

23      A.     I believe their concern was the fact that they

24   were already on 12-hour shifts; that they have to hang

25   over and do their reports before they go home, which

66

**Exhibit 19 - 14**

139

```
 1   would probably add another hour, maybe two hours, on to
 2   their 12-hour shift, and then having to drive back home,
 3   come back the next day and not get enough rest.  And I
 4   don't recall for sure what else it was.  But, yeah,
 5   there was people upset about having to do that.
 6        Q.   Do you know if the Association had taken a
 7   position on that issue?
 8        A.   It was my understanding they were not happy.
 9        Q.   Did that -- did you have any problems with the
10   position of the Association at that time?
11        A.   Sure, I did.
12        Q.   What was your problem?
13        A.   Working that 3/12 shift, work didn't seem to be
14   getting done.  I'm talking about reports.  A lot of
15   reports were outstanding.  People were taking off more
16   time.  People were tired.  And the alternative -- the
17   better alternative, at the time, was five-eights.  But,
18   no, they don't want that.  They want more time off.  And
19   they didn't have the same concerns that Management had.
20   They just wanted more time off.  Our concern was more in
21   line of getting the work done.
22        Q.   Were you irritated about the position that the
23   Association had on that issue?
24        A.   Oh, to a certain extent, certainly.  I had my
25   concerns.
```

67

```
 1    confidence?
 2        A.    To my knowledge, there was never a letter
 3    written up.
 4        Q.    Do you recall that Officer Warren was
 5    transferred to the school resource officer position in
 6    December of 2006?
 7        A.    Yes.
 8        Q.    Were you involved in the decision-making
 9    process to select Officer Warren for that position?
10        A.    I was involved by telling the Chief that we
11    need to pick two people for the school resource officer,
12    but I didn't say, "How about Ray?"  I had no -- that was
13    not my suggestion.
14        Q.    There was a memo that went out asking officers
15    if they wanted to put in for that position before the
16    Chief selected Officer Warren; correct?
17        A.    Correct.
18        Q.    Is it true that nobody responded to that memo?
19        A.    That's correct.
20        Q.    After your agency did not receive a response,
21    were there meetings with the Management to discuss how
22    to fill those positions?
23        A.    Yes.
24        Q.    Do you recall how many officers were in the
25    school resource position at that time?
```

72

**Exhibit 19 - 16**

141

1     A.    I want to say it was Officer Toro, but I don't

2     think we had one at that point.

3          Q.    Isn't it true there was Officer Toro and a

4     vacant position at that time?

5          A.    That's probably true, but I don't recall it.

6          Q.    Officer Warren wasn't the only officer selected

7     for the school resource position at that time; correct?

8          A.    Correct.

9          Q.    The other officer selected was Officer Jackson;

10    correct?

11         A.    That's correct.

12         Q.    What do you recall -- let me just ask it a

13    different way.

14               How was Officer Warren's name brought up as a

15    candidate for selection for the SRO position?

16         A.    There was names thrown around, and I believe it

17    was Lieutenant Harpole who suggested Ray Warren.  And I

18    felt it was a good -- good selection.

19         Q.    Was this in a meeting with Lieutenant Harpole

20    and Chief Gibson and yourself?

21         A.    Correct.

22         Q.    Was there anybody else at the meeting?

23         A.    Not that I remember.

24         Q.    Did Chief Gibson make a decision in that

25    meeting that you're referring to regarding the selection

73

**Exhibit 19 - 17**

1  of Officer Warren, or were there subsequent meetings?

2      A.   He finally made a decision.  I don't recall

3  whether it was that specific meeting or another meeting

4  or --

5      Q.   Do you recall having more than one meeting

6  regarding the SRO position?

7      A.   We've spoken about those positions in the past.

8  As far as specific meeting, that's what we're meeting

9  for, no.  The last meeting that we had was, it was to

10 the point where we needed to fill those positions.  It

11 was an absolute -- city manager said, "We're going to

12 fill them."  The school wanted them, and so we were

13 obligated to fill them.  And that's why the decision had

14 to be made.

15     Q.   Did Lieutenant Harpole indicate why he thought

16 Ray Warren would be a good selection for the SRO

17 position?

18     A.   Yeah.  If I recall, yes.

19     Q.   What did he say?

20     A.   It was just agreed, "Time for -- Hey, give Ray

21 the opportunity to shine.  Let's do it."  Senior man,

22 gets along with people, straight days, weekends off,

23 two-and-a-half-percent raise.  How can you go wrong?

24     Q.   Was it really weekends off, or were there

25 events that you were supposed to attend on weekends?

74

**Exhibit 19 - 18**

143

```
 1              MR. MEYERHOFF:  Why don't we take a quick
 2    break, Russell.
 3              MR. PERRY:  Okay.
 4              (Lunch recess taken.)
 5              MR. PERRY:  We can go back on the record.
 6    BY MR. PERRY:
 7         Q.   Lieutenant, do you recall how long
 8    Officer Warren had been at the SRO position before you
 9    needed to set up a meeting with him?
10         A.   It was a very short period of time.
11    Specifically, I couldn't tell you.
12         Q.   Would about 11 days sound about right?
13         A.   I would say about two or three weeks.  But,
14    yeah, that's --
15         Q.   And I know that a lot of this has been covered
16    on some of the transcripts that you've testified to, the
17    administrative hearing.
18              But do you recall indicating that a -- you've
19    received a complaint from a Barney Lopez regarding
20    Officer Warren's performance as an SRO?
21         A.   Yes.  It was Bonnie (phonetic), Bonnie Lopez.
22         Q.   Oh, okay.
23         A.   Yeah, there was other names in there that were
24    not right.
25              Bonnie Lopez was the first one against it.  I
                                                           86
```

1   first -- made me first aware of the situation.

2      Q.   How did you come into contact with Ms. Lopez?

3      A.   He was one of the -- I call them gate guards

4   there at the high school.  I had gone there for some

5   reason.  I don't recall what it was.  But he was out

6   there, out in front.  And as I got out of my unit, we

7   kind of just met up; because we've known each other for

8   a while, only through work.  He retired from the City.

9   And that's where I knew him from, actually.

10          But anyway, I asked him how things were going.

11  And he said, "Not bad," but then he went into his

12  complaint about Officer Warren.

13     Q.   Do you know how many days officer Warren had

14  been on the job before you spoke to -- Mr. Lopez?

15     A.   Right.  It was a short time.  I don't really

16  recall how many days it was or anything like that.

17     Q.   I believe I saw there was a mention that

18  Mr. Lopez had said that Officer Warren wasn't responding

19  to a school radio.

20          Do you recall some testimony to that effect?

21     A.   Yes.

22     Q.   Did the SRO have two radios in their possession

23  when they were on duty?

24     A.   If I recall, yes, they had the school -- a

25  school, little hand radio, and also they had their

87

1     police department issued radio.  They had their own

2     office up there, everything you needed.

3          Q.    The school radio, did they have a dispatch and

4     things like that?

5          A.    No.  It was more or less -- it was open to a

6     lot of people, whoever carried them.  Like, for

7     instance, if the -- Mrs. Ellis (phonetic), the

8     principal, if she needed something, get on the radio.

9     If somebody else needed it -- they needed something,

10    they'd get on the radio, calling for whatever.

11         Q.    What kind of distance did the school radio

12    cover, if you know?  Did it go beyond the school; or do

13    you know how far away?

14         A.    I have no idea.

15         Q.    Do you know whether or not the school radio

16    would work if you were at the police station or not?

17         A.    I don't know if it would or not.  I'm sure it

18    would, but I don't recall.

19         Q.    And what do you recall -- was it only one time

20    you spoke to Mr. Lopez regarding Officer Warren?

21         A.    Yes.

22         Q.    Just what do you recall Mr. Lopez stating?

23         A.    He was not happy with Officer Warren because he

24    was never -- he could never be reached.  He was never

25    around.  He was never in his office.  If you call for

88

**Exhibit 19 - 21**

146

1    him, he never answers his radio. That was basically it.

2        Q.    Did you find it unusual to have that kind of

3    complaint for someone that had been in an assignment for

4    such a short amount of time?

5            MR. MEYERHOFF:  Objection.  Vague and ambiguous

6    and hypothetical.

7            You can answer if you have a basis.

8            THE WITNESS:  Well, I wouldn't know how to

9    answer that as far as -- the first situation I've been

10   in like that, you know, this specific situation. But as

11   far as any other person on the school grounds, you know,

12   I don't know.

13   BY MR. PERRY:

14       Q.    Was that the first complaint that you'd

15   received for Officer Warren regarding his performance as

16   SRO?

17       A.    If I recall correctly, he was the first one

18   that made me aware of the problem.

19       Q.    What did you do in response to Mr. Lopez'

20   complaint?

21       A.    Well, I told him I would look into it.  And a

22   very short time had elapsed when Mrs. Ellis, who was the

23   principal at the time -- and I believe there was

24   Mr. Brown.  I'm not positive about the second person.

25   They came directly to my office.  And her major thing,

89

**Exhibit 19 - 22**

147

1    at the time, was school resource officer position.  And

2    she was not happy with who was working that position at

3    that time, and she asked for a replacement.

4         Q.   What was your response to that?

5         A.   Well, I told her I wasn't going to replace

6    anybody at this time, but I would look into the

7    situation.  I mean, there was -- it just started.  It

8    was a new situation, at that point, involving two school

9    resource officers that were assigned to the school.

10        Q.   Did she have complaints about Officer Jackson

11   as well?

12        A.   No.

13        Q.   What about Mr. Brown?

14        A.   No.

15        Q.   Did Mr. Lopez have complaints regarding

16   Officer Jackson as well?

17        A.   Not to my knowledge, no.

18        Q.   Do you recall anything else from your meeting

19   with Ms. Ellis and Mr. Brown in your office?

20        A.   No, other than I'd look into it, see what we

21   can do to make things better.

22        Q.   Did you talk to the Chief regarding the

23   concerns Ms. Ellis conveyed to you?

24        A.   Yes.

25        Q.   Did you do so the same day that you had the

90

1   meeting with Ms. Ellis?

2       A.   I don't know for sure it was the same day.  It

3   was not very much time that elapsed when I talked to him

4   about it because that was a major thing -- a major

5   concern with the city manager, the council and the

6   Chief.  They wanted that school resource officer

7   position filled.  And so we -- I know I told him.

8   Whether it be the same day, it may have been.  I don't

9   recall.

10      Q.   Was it a verbal exchange between you and the

11  Chief, or did you write a memo to him or anything?

12      A.   It was verbal.

13      Q.   Do you recall what the Chief's response was to

14  you?

15      A.   No.

16      Q.   Did you tell the Chief about Mr. Lopez'

17  concerns in the same conversation?

18      A.   I'm sure I did.

19      Q.   Do you recall how long your conversation was

20  with the Chief regarding the concerns Ms. Ellis and

21  Mr. Brown and Mr. Lopez had?

22      A.   No.

23      Q.   What did you do after that to follow up?

24      A.   Well, the next thing I did regarding that

25  situation was, I wanted to talk with Officer Warren.

91

**Exhibit 19 - 24**

149

1    And I got a hold of his sergeant, at the time, who was

2    Sergeant Libby, and I expressed my concerns regarding

3    what I had found out. And at that point, Libby had told

4    me what he had in mind regarding this memorandum.

5         Q.   Just for the record, you're pointing to

6    Exhibit --

7         A.   Oral reprimand.

8         Q.   -- twenty-eight, I believe, the one that's

9    dated January 17th?

10        A.   Yeah.

11        Q.   Okay.

12        A.   He said he had a memorandum he was going to

13   serve with Ray. And I said, "Well, we can take care of

14   this whole thing at the same time."

15             And the next thing I did is, I had him

16   accompany me to the Chief's office. It was early in the

17   morning. And I told the Chief that I was going to call

18   Ray in, have a counseling session with him regarding

19   information I had received. Hopefully we can make this

20   thing better. I had no -- I wasn't going to remove him

21   at that time. I wasn't going to do anything other than

22   talk to him, counsel him, let him know, "Hey, these

23   things were brought to our attention. We need to cure

24   the situation."

25        Q.   The conversation you had with the Chief, was

                                                          92

**Exhibit 19 - 25**                                    150

1    Q.   With all that in mind, why would you consider

2  him to be a suitable candidate for SRO?

3    A.   Well, first of all, we were faced with the fact

4  that nobody had applied.  We were, in essence, mandated

5  to put two people in there.  So in looking at the

6  totality of everything that was going on at the time, it

7  just gave -- you know -- like I said, his personality;

8  hopefully get along with kids.  He'd get a raise,

9  straight days, weekends off, holidays off.  I mean, we

10 thought it was a good thing.  Gave him the opportunity

11 to show us that he can be a productive officer.  It's

12 not a hard job.

13   Q.   Couldn't he be a productive officer while

14 remaining in patrol as well?

15   A.   He had 18 years of it -- of being

16 non-productive on patrol.

17   Q.   I'm just trying to say --

18   A.   No.

19   Q.   Productivity is something that's not assignment

20 specific; correct?

21   A.   No.

22   Q.   And after you had the concerns from Mr. Lopez

23 and Ms. Ellis, Mr. Brown, you didn't think -- you didn't

24 want to reconsider your selection to SRO at that time?

25   A.   No.

99

**Exhibit 19 - 26**

151

1    BY MR. PERRY:

2        Q.    Do you recall a rumor to that effect, of the

3    Sheriff's Department taking over the Barstow P.D.?

4        A.    That rumor's been up several times in my

5    30-some years with the department.  It comes up pretty

6    often.

7        Q.    Do you recall a lunch with city Councilman

8    Steve Curran and the Chief where the Chief referred to

9    Officer Warren as a disgruntled employee?

10        A.    Not specifically that, no.

11        Q.    Do you recall a lunch with the Chief and

12    Steve Curran?

13        A.    Oh, yeah, we have with the council people

14    periodically.

15        Q.    Did you ever tell Officer Warren that even as

16    POA president, that he'd have to go through you before

17    going to the Chief for POA issues?

18        A.    Not specifically that, no.

19        Q.    Something similar to that?

20        A.    No.  We had a working condition there where --

21    see, the Chief had put me in that particular office so

22    that I could kind of cut down on the traffic going into

23    his office.  And it was -- I believe there was a memo

24    put out, if I recall correctly, that "If you want to see

25    the Chief, you stop by and see Lieutenant Alcantara

                                                      134

**Exhibit 19 - 27**

```
 1    STATE OF CALIFORNIA  )
                           )  ss.
 2    COUNTY OF_____)

 3

 4

 5         I, RUDOLPH ANGEL ALCANTARA, say I have read the

 6    foregoing deposition and declare under penalty of

 7    perjury that my answers, as indicated, are true and

 8    correct.

 9

10

11

12    6-2-/0_____
           (Date)

13

14

15    _____
                   (Signature)

16

17

18

19

20

21

22

23

24

25
                                                            141
```

Exhibit 19-28

153

1    STATE OF CALIFORNIA       )
                               )  ss.
2    COUNTY OF SAN BERNARDINO  )

3

4          I, Brandy L. Williams, certified shorthand

5    reporter, license No. 11084, do hereby certify:

6

7          That, prior to being examined, the witness named

8    in the foregoing deposition, to wit,

9    RUDOLPH ANGEL ALCANTARA, was by me duly sworn to testify

10   the truth, the whole truth and nothing but the truth;

11

12         That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to computer-aided transcription under

15   my direction.

16

17         I further certify that I am not interested in the

18   event of the action.

19

20         WITNESS my hand this 29th day of

21   _____March_____, 2010.

22

23                    Mandy L. Williams
                  BRANDY L. WILLIAMS, CSR #11084

24

25

                                                          142

Exhibit 20

# LIEBERT CASSIDY WHITMORE

### A PROFESSIONAL LAW CORPORATION

LOS ANGELES | FRESNO | SAN FRANCISCO

6033 WEST CENTURY BOULEVARD, SUITE 500
LOS ANGELES, CALIFORNIA 90045
T: (310) 981-2000   F: (310) 337-0837

EARCH@LCWLEGAL.COM
(310) 981-2049

June 21, 2010

## VIA E-MAIL AND U.S. MAIL

Russell M. Perry
Lackie, Dammeier & McGill
367 North Second Avenue
Upland, California 91786

Re:   *Ray Warren v. City of Barstow, et al.*
      USDC Central District, Case No. EDCV08-0405 DDD (OPx)

Dear Mr. Perry:

Pursuant to Local Rule 7-3, the purpose of this letter is to meet and confer regarding Defendants intent to file a motion for summary judgment on Plaintiff's sole remaining claim for violation of 42 U.S.C. §1983.

In order for Plaintiff to prevail on his First Amendment retaliation claim, he has the burden to demonstrate that (1) he spoke on a matter of public concern; (2) he spoke as a private citizen; and (3) that his protected speech was a substantial or motivating factor in the alleged adverse actions taken against him. *See Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009). However, the discovery taken in this case makes clear that Plaintiff cannot make such a showing. Plaintiff has no admissible evidence to support his claim. Instead, Plaintiff's claim is based entirely on his own assumptions, inferences and inadmissible hearsay. Further, even if Plaintiff is able to satisfy the foregoing three factors, Defendants will still prevail on summary judgment because it is undisputed that Defendants had adequate justification for treating Plaintiff differently from other members of the public. It is also undisputed that Defendants would have taken the adverse employment actions even absent his protected speech. *Id.*

In short, Defendants believe they will be able to file a persuasive summary judgment motion that will result in the disposal of Plaintiff's First Amendment retaliation claim and, therefore, his entire case. While we understand Plaintiff will likely oppose Defendants' motion, Plaintiff should, at a minimum, consider dismissing Hector Rodriguez and Michael Hunter from this lawsuit because there is no evidence of them having anything to do with any of the alleged adverse actions taken against him. Moreover, there is no evidence that either Rodriguez or Hunter were even aware of Plaintiff's alleged protected speech. Consequently, Plaintiff should voluntarily dismiss Rodriguez and Hunter with prejudice.

422050.1 BA080-024                      www.lcwlegal.com

## Exhibit 20 - 1

Russell M. Perry
June 21, 2010
Page 2

If you would like to further discuss the substance of Defendants contemplated summary judgment motion, please feel free to contact me. I am available anytime this week with the exception of Friday, June 25, 2010.

I will also take this opportunity to remind you that more than 30 days have elapsed since you were sent Plaintiff's original deposition transcript for his review. Since we have heard nothing further from your office regarding the transcript, we will assume that Plaintiff made no changes to it. Notwithstanding, we request that you immediately return the original transcript to us pursuant to the stipulation entered into by counsel at the conclusion of Plaintiff's deposition.

Very truly yours,

LIEBERT CASSIDY WHITMORE

Elizabeth T. Arce

422050.1 BA080-024

**Exhibit  20 - 2**

157