.

# EXHIBIT H

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RAY WARREN,                              )
                                         )
                Plaintiff,               )
                                         )   CASE NO. EDCV08-0405
          VS.                            )
                                         )
CITY OF BARSTOW, CITY OF                 )
BARSTOW POLICE DEPARTMENT,               )
HECTOR RODRIGUEZ, in his                 )
capacity as the CITY Manager             )
for the CITY of Barstow, CALEB           )
LEE GIBSON, individually and             )
in his capacity of Chief of              )
Police for the CITY of                   )
Barstow; RUDY ALCANTARA,                 )
individually and in his                  )
capacity as the lieutenant for           )
the CITY of Barstow Police               )
Department; and DOES 1 THROUGH           )
10 inclusive,                            )
                                         )
                Defendants.              )
     _____)

DEPOSITION OF CALEB LELAND GIBSON

WEDNESDAY, MARCH 10, 2010

Reported by:  BRANDY L. WILLIAMS, CSR, RPR #11084

2

1                         I N D E X

2    DEPOSITION OF CALEB LELAND GIBSON

3    WEDNESDAY, MARCH 10, 2010                    PAGE

4              Examination By Mr. Perry              6

5

6                         EXHIBITS
     PLAINTIFF'S
7    EXHIBIT              DESCRIPTION           MARKED

8     20    Letter addressed to Chief            90

9     21    Report of Investigation             116

10    22    Memorandum dated 2/12/2006          121

11    23    Letter dated February 13, 2006      123

12    24    Letter dated February 16, 2006      124

13    25    Letter dated January 23, 2007       126

14    26    Letter dated June 7, 2007           132

15    27    Emails                              148

16

17

18

19

20

21

22

23

24

25

STEARNS WILLIAMS REPORTING
(909) 803-0091

000164

3

EXHIBITS

(Previously Marked for Identification

in the Deposition of Ray Warren.)

DEFENDANT'S
EXHIBIT                    DESCRIPTION                    MARKED

| | | |
|---|---|---|
| 4 | E-mails | 41 |
| 6 | Memorandum dated 12-4-06 | 92 |
| 8 | E-mails | 58 |
| 9 | Policies and Procedures Manual | 61 |
| 11 | Notice of Intent to Dismiss | 104 |
| 12 | Notice of Dismissal | 149 |
| 13 | Letter dated May 8, 2007 | 146 |
| 18 | Letter dated June 19, 1999 | 23 |

INFORMATION REQUESTED

(None)

QUESTIONS ASKED, WITNESS INSTRUCTED NOT TO ANSWER

(None)

000165

4

```
 1                          APPEARANCES

 2

 3        For the Plaintiff:

 4             LACKIE, DAMMEIER & McGILL APC
               BY:  RUSSELL M. PERRY
 5             367 North Second Avenue
               Upland, California  91786
 6             (909) 985-4003

 7

 8        For the Defendants:

 9             LIEBERT CASSIDY WHITMORE
               BY:  ELIZABETH TOM ARCE
10             6033 West Century Boulevard
               Suite 500
11             Los Angeles, California  90045
               (310) 981-2000
12

13

14        Also Present:

               RAY WARREN
15

16

17

18

19

20

21

22

23

24

25
```

5

1          DEPOSITION OF CALEB LELAND GIBSON

2          Pursuant to Notice to Take Deposition, on the

3    10th day of March, 2010, commencing at the hour of

4    9:16 o'clock a.m., at 367 North Second Avenue, in the

5    City of Upland, County of San Bernardino, State of

6    California, before me, Brandy L. Williams, Certified

7    Shorthand Reporter, State of California, Personally

8    Appeared:

9

10              CALEB LELAND GIBSON,

11   called as a witness by the Plaintiff, who, being by me

12   first duly sworn, was thereupon examined as a witness in

13   said cause.

14

15

16

17

18

19

20

21

22

23

24

25

6

```
 1                      EXAMINATION

 2

 3    BY MR. PERRY:

 4        Q.    Please state your name for the record.

 5        A.    My first name is Caleb, C-a-l-e-b.  My middle

 6    name is Leland, L-e-l-a-n-d.  My last name is Gibson,

 7    G-i-b-s-o-n.

 8        Q.    What's your current occupation?

 9        A.    Retired.

10        Q.    From the City of Barstow?

11        A.    Yes.

12        Q.    Have you had your deposition taken in a civil

13    matter in the last five years?

14        A.    Yes.

15        Q.    Was it -- there was one related to this case;

16    correct?

17        A.    Correct.

18        Q.    Was there any others?

19        A.    In the last five years?

20        Q.    Yes.

21        A.    Not that I recall.

22        Q.    I'm going to go over just a couple of the

23    ground rules with you --

24        A.    Okay.

25        Q.    -- just to refresh your memory, just in case.
```

000168

7

1          The court reporter has given you an oath, and

2     that's the same oath you would take in a court of law.

3     In other words, you're under penalty of perjury.

4          Do you understand that?

5     A.   Yes.

6     Q.   The court reporter will take down everything

7     that you say, and you'll have a chance to review that

8     later on when you receive the deposition transcript.

9     You can make changes or corrections to that transcript.

10    But I want to caution you that if you make any

11    substantial or material changes or corrections, that

12    either I or any of the other attorneys on this case, at

13    the time of trial, can make comments on that.  That may

14    be embarrassing not only to you personally but to your

15    position in this lawsuit.

16         Do you understand that?

17    A.   Yes.

18    Q.   The court reporter, even though she is very

19    efficient, she can only take down one person speaking at

20    a time.  So if you'll let me finish my question, I will

21    let you finish your answer and, therefore, we won't be

22    overlapping each other.

23         Do you understand that?

24    A.   Yes.

25    Q.   The court reporter can only take down the

000169

8

1    spoken word, so try to avoid normal responses such as

2    "uh-huh" or "huh-uh" or nodding of the head or gestures

3    of the hands.   The reason for that is to obtain your

4    best testimony today.

5            Can you do that for me?

6        A.   Yes.

7        Q.   If you do not understand the question, please

8    ask me to rephrase it or repeat it.

9            Will you do that?

10       A.   Yes.

11       Q.   You do not have to guess at anything, but I am

12   entitled to your best estimate.   And the difference

13   between a guess and an estimate is, something based

14   on -- an estimate is based on your personal knowledge or

15   something you've seen or observed, such as the length of

16   this table.   You can give me an estimate on the length

17   of this table because you can see it.

18            However, if I asked you for the length of the

19   table in the building across the street, presuming you

20   weren't ever there, it would just be a guess.

21            Do you understand the difference between the

22   two?

23       A.   Yes.

24       Q.   Have you reviewed any notes or documents in

25   preparation for your testimony today?

000170

1      A.    Yes.

2      Q.    What did you review?

3      A.    I reviewed the arbitration hearing, the

4   lawsuit.

5      Q.    The arbitration hearing, what do you

6   specifically -- like transcripts or --

7      A.    Transcripts of my testimony at the arbitration

8   hearing involving Officer Warren.

9      Q.    Besides your testimony, did you review the

10   testimony of any other witnesses in the administrative

11   hearing?

12      A.    No, no witnesses; just my deposition and the

13   lawsuit.

14      Q.    The deposition separate from the administrative

15   hearing?

16      A.    Excuse me.  Yeah, I stand corrected.  The -- my

17   testimony at the arbitration hearing, I read over that.

18   And I also read the lawsuit that was filed by your

19   office and Officer Warren.

20      Q.    "The lawsuit," do you mean the complaint?

21      A.    Yeah, the lawsuit.  Do you have a copy of the

22   lawsuit?  I can see.

23          MS. ARCE:  I think you mean the complaint;

24   right -- probably the Second Amended Complaint.  It was

25   on pleading paper?

10

1          THE WITNESS:  Yes.

2          MS. ARCE:  It had all of Mr. Warren's

3    allegations in it?

4          THE WITNESS:  Right.

5          MS. ARCE:  Yeah, I'm pretty sure he means the

6    Second Amended Complaint.

7    BY MR. PERRY:

8      Q.   Okay.  Any other documents that you've

9    reviewed?

10     A.   No.

11     Q.   Did the review of those documents refresh your

12   recollection?

13     A.   In some cases.

14     Q.   Is there any reason why your deposition should

15   not go forward today, such as are you feeling ill --

16     A.   No.

17     Q.   -- or taking any medication that could affect

18   your testimony today?

19     A.   No.

20     Q.   Do you know my client?

21     A.   Yes, I do.

22     Q.   When did you meet my client?

23     A.   I met Ray when he first came on to the

24   department, and I'm not sure what year that was.  But

25   he -- he was hired by the City of Barstow as a police

11

1   officer, and that's when I met him.

2       Q.   So you didn't know him before he became a

3   police Officer with Barstow?

4       A.   No.

5       Q.   Were you involved in the decision-making

6   process to hire him as a police officer?

7       A.   No.

8       Q.   You didn't sit on any interview panels or that

9   sort of thing?

10      A.   Not that I recall.

11      Q.   Were you ever Officer Warren's direct

12  supervisor?

13      A.   Yes.

14      Q.   How many times?

15      A.   I couldn't answer that.

16      Q.   Was it more than once?

17      A.   Yes.

18      Q.   Was it less than five times?

19      A.   More than five times.

20      Q.   This would be helpful for me.

21           Can you explain the command structure of

22  Barstow when you left, like management on down the

23  structure?

24           MS. ARCE:   Objection.   Relevance.

25           You can answer.

STEARNS WILLIAMS REPORTING
(909) 803-0091

12

1          THE WITNESS:   Okay.   You have the Chief.   You

2     have two lieutenants.   Lieutenants are divided up into

3     Administrative and Patrol.   We had five sergeants, I

4     think.

5     BY MR. PERRY:

6          Q.   The five sergeants are split between Patrol and

7     Administration?

8          A.   Most of the sergeants work patrol, and I

9     believe one sergeant was assigned to Detective Division.

10          Q.   Which would fall under the administrative

11     lieutenant?

12          A.   Yes.

13          Q.   And then how many officers, approximately,

14     would be under the supervision of the administrative

15     lieutenant?

16          A.   Four or five, I think.

17          Q.   And then just a ballpark figure of how many

18     officers were under the approximate four sergeants under

19     Patrol?

20          A.   It varied depending on staffing level; 20 --

21     20-some officers.   Would be hard for me to give you an

22     accurate count.

23          Q.   This structure was -- it was the way it was in

24     2007; correct, about?

25          A.   Yes, to the best of my recollection.

13

1    Q.   Did it change?  Was there any substantial

2  changes from when Officer Warren became an officer in

3  1986?  I'm just trying to get an idea.

4          Is this the basic structure of the department?

5  Did it change over the course of time while

6  Officer Warren was employed with the agency?

7    A.   There might have been some changes.  For

8  example, I think when Sonny Davis was Chief, he had a

9  lieutenant.  And I'm not sure if his title was

10  lieutenant or captain, but I don't recall there being

11  two lieutenants at that particular time.  We also had a

12  corporal program at different times.

13    Q.   Why would the -- do you know why the program

14  was started and stopped, the corporal program?

15    A.   There was two different times, if I'm -- my

16  memory serves me correctly, we had a corporal program.

17  And I think that the department, for whatever reason, or

18  the City felt that the corporal program was not needed

19  and it was disbanded.  And honestly, I can't tell you if

20  that happened one time or two times, but I'm thinking

21  that maybe it happened twice, but I could be wrong.

22    Q.   Is this during the course of your career with

23  Barstow?

24    A.   Yes.

25    Q.   Let's get to that.

000175

14

1        When were you hired by the City of Barstow?

2        A.   I started with the Barstow Police Department as

3    a reserve police officer.  I think it was '77 or '78.  I

4    was hired as a full-time paid police officer in

5    September of '79.

6        Q.   At some point, you promoted from officer?

7        A.   See, and that's where I'm not clear because

8    it's been so many years ago, but somewhere between 1979

9    and 1986 -- I was promoted to sergeant in 1986 -- I

10   served with the corporal rank.

11       Q.   Okay.  So in 1986, you were promoted to

12   sergeant?

13       A.   Yes.

14       Q.   Somewhere in between there, you were a

15   corporal?

16       A.   Yes.

17       Q.   The corporal assignment, was that an assignment

18   or a promotion?

19       A.   You know, I think it might have been a

20   promotion.  However, I don't recall whether or not we

21   actually got paid for it.  I'm not real clear on that.

22       Q.   Was there an interview panel and things like

23   that before you got selected to corporal?

24       A.   Honestly, I don't recall.

25       Q.   Before you became sergeant, did the City

15

1   withdrawal the corporal program?

2          MS. ARCE:  Objection.  Calls for speculation.

3          If you know the answer, you can answer.

4          THE WITNESS:  Can you ask the question again?

5   BY MR. PERRY:

6      Q.   Were you a corporal just before you were

7   promoted to sergeant?

8      A.   I don't recall.

9      Q.   How long were you a sergeant before you

10  promoted to the next level?

11     A.   I was promoted to lieutenant in 2001, I

12  believe.

13     Q.   Which Chief selected you for that position?

14     A.   Ken Becknell.

15     Q.   At some point, you promoted from lieutenant?

16     A.   Yes.

17     Q.   What year was that?

18     A.   I believe it was sometime in 2003.

19     Q.   To Chief of Police?

20     A.   Yes.

21     Q.   Is that an elected position; or how did you

22  become Chief of Police?

23     A.   I was appointed by the mayor and the city

24  council.

25     Q.   Is that something you had to apply for or they

STEARNS WILLIAMS REPORTING
(909) 803-0091

000177

16

1    just selected you?

2        A.    They just selected me.

3        Q.    What year did you retire?

4        A.    2007.

5        Q.    It's my understanding that the Barstow P.D.

6    does not have an Internal Affairs Division.

7              Was that the case when you left?

8        A.    Yes.

9        Q.    Was that always the case?

10       A.    Yes.

11       Q.    How are internal affairs investigations

12   initiated?

13             MS. ARCE:  Well, objection as to scope of time.

14   You mean when he was there or at the time he left?

15             MR. PERRY:  Yeah, of course, when he was there.

16   I don't expect him to know what it is now.

17             MS. ARCE:  Okay.  He's been there for, what,

18   over 25 years?

19   BY MR. PERRY:

20       Q.    Let's go from -- well, has the policy changed

21   over those years, from the time you were hired to the

22   time you left, regarding initiating internal affairs

23   investigations?

24       A.    No.  It's pretty much the same throughout my

25   career.  What would happen is, the -- an internal

17

1    affairs investigation would have to come from the

2    Chief's office.  In other words, it had to be approved.

3    Whether a sergeant initiated it or lieutenant initiated

4    it, it went through the Chief's office.  And ultimately,

5    the Chief was responsible for assigning whoever was

6    going to conduct that internal affairs investigation,

7    and that could be a sergeant or it could be a lieutenant

8    or, in matters that were conflict of interest, we would

9    ask the Sheriff's Department, which we did on several

10   occasions, to come in and conduct the internal affairs

11   investigation.

12        Q.   You said, "We."  Is that -- when you were Chief

13   of Police, you asked the Sheriff's Department to come in

14   on different occasions?

15        A.   No, not for an internal affairs investigation.

16        Q.   Or for -- were there conflicts of interest when

17   you were Chief of Police such that you had to refer a

18   matter to the Sheriff's Department?

19        A.   Not related to an internal affairs

20   investigation.

21        Q.   Then in what way was a matter referred to the

22   Sheriff's Department?

23        A.   On a criminal matter.

24        Q.   Was it just one; or how many do you recall?

25        A.   Just one that I was aware of.

1      Q.    Is it possible there's criminal matters that

2   were referred to the Sheriff's Department that you --

3   that would not have gone through you?

4      A.    Yes.

5      Q.    Like, for example, would a lieutenant be able

6   to refer a criminal matter to the Sheriff's Department

7   without going through you first?

8      A.    No.

9      Q.    The referrals to the Sheriff's Department, are

10   they -- can you give me some examples of a conflict of

11   interest?

12          MS. ARCE:   Objection.   Relevance.

13          You can answer if you know some examples.

14          THE WITNESS:   Years back, there was a situation

15   where my daughter was attending a religious retreat.

16   During that religious retreat, a priest accused a

17   detective on the police department of killing or having

18   gang members killed.

19          As you can imagine, this is coming from a

20   priest of a church; pretty serious allegation.   That was

21   one particular incident that I remember that -- I think

22   it was Bob Sessions was the Chief at that time;

23   contacted the Sheriff's Department and had them conduct

24   the investigation.

25   ///

19

BY MR. PERRY:

    Q.   Rather than have Barstow P.D. conduct the investigation?

    A.   Yes.  And the most recent one was involving my sister-in-law who struck a police officer with a pickup truck.  And I had the Sheriff's Department handle that criminal investigation.

    Q.   Your sister-in-law struck a pickup truck?

    A.   Struck a police officer with a pickup truck.

    Q.   Oh, struck a police officer with her pickup truck?

    A.   Uh-huh.  Yes.

    Q.   What year was that about?

    A.   Either the end of 2006 or the beginning of 2007.  I'm not really sure.

    Q.   And that was to the Sheriff's Department, or was there another agency?

    A.   Sheriff's department.

    Q.   What about CHP?  Do you guys refer anything to CHP as well?

       MS. ARCE:  Objection.  Relevance.

       THE WITNESS:  Yes, we do.

BY MR. PERRY:

    Q.   Things like vehicle accident reports involving City vehicles and things like that or --

000181

1        A.    Yes, patrol cars, family members.

2        Q.    Are officer-involved shootings also reviewed by

3   the Sheriff's Department?

4        A.    Yes.

5             MS. ARCE:   Objection.  Relevance.

6   BY MR. PERRY:

7        Q.    Is that set up by a contract between the City

8   of Barstow and the Sheriff's Department?

9        A.    No.  I think that's just a standard procedure

10  that all agencies in San Bernardino County use.

11       Q.    Was there a reason for that, that was ever

12  explained to you?

13            MS. ARCE:   Objection.  Calls for speculation.

14            If you know, you can answer.

15            THE WITNESS:   Can you ask the question again?

16  BY MR. PERRY:

17       Q.    Do you know why there's -- Barstow P.D. would

18  use an outside agency to investigate officer-involved

19  shootings?

20            MS. ARCE:   Same objection.

21            THE WITNESS:   Conflict of interest.

22  BY MR. PERRY:

23       Q.    Or the appearance of a conflict?

24       A.    Appearance.  Yeah, appearance.

25       Q.    The times that you were Officer Warren's direct

21

1   supervisor, was this when he was working in the Patrol

2   Division?

3      A.   I supervised him in the Patrol Division and the

4   Detective Division.

5      Q.   What assignments would he have -- do you recall

6   him working when he was in the Detective Division?

7      A.   Routine follow-up investigations.

8      Q.   So then the Detective Division, there are

9   certain officers that are just assigned to the

10   Detective Division where they go out and do follow-up

11   investigations for the detectives?  Is that an okay

12   summary?

13      A.   Yes, on a rotating basis.  Officers rotate

14   through the Detective Division from time-to-time to

15   supplement the full-time detectives.

16      Q.   Did you have an occasion, while you were

17   Officer Warren's direct supervisor, to write any of his

18   annual evaluations?

19      A.   Yes.

20      Q.   Well, let me ask you this:  Are annual

21   evaluations required with the City of Barstow?

22         MS. ARCE:  Objection.  Relevance.

23         THE WITNESS:  Yes.

24   BY MR. PERRY:

25      Q.   I mean, it's not every other year; correct?

000183

22

1    It's something -- it's once a year?

2        A.    Yes.

3        Q.    How many evaluations do you recall writing for

4    Officer Warren?

5        A.    I don't recall.

6        Q.    Is it more than one?

7        A.    Yes.

8        Q.    Less than five?

9        A.    More than five.

10       Q.    Are you able to recall -- it's been a lot of

11   years.  I understand that.

12            Are you able to remember different evaluations

13   that you wrote for Officer Warren?

14       A.    Not specifically, no.

15       Q.    Do you recall what your overall ratings were

16   for Officer Warren on any of the evaluations?

17       A.    No.

18       Q.    Do you recall whether or not Officer Warren

19   wrote any rebuttals to your evaluations?

20       A.    I don't recall.

21            MR. PERRY:  I'd like to enter in

22   Plaintiff's Exhibit No. 1.  There's one for you and

23   Counsel.

24            MS. ARCE:  Okay.  I think -- since we're in

25   Federal Court, I think we have to go in consecutive

23

1    order.  Do you happen to know what -- the last exhibit

2    number that was marked in Mr. Warren's depo, or do you

3    want --

4           MR. PERRY:  Let's go off the record for a

5    minute.

6           (Discussion was held off the record.)

7           MR. PERRY:  Let's go back on the record.

8    BY MR. PERRY:

9       Q.   Chief Gibson, I gave you a document just before

10   the break, and we've discussed how we're going to label

11   or enter these documents into the evidence -- or to the

12   transcript.  And these documents were entered into as

13   exhibits in Plaintiff's deposition, so I'm going to

14   change the numbering a little bit.

15          Just before I handed you the document, I

16   believe I said, "Exhibit 1."  However, on this document,

17   it says it's Defendant's Exhibit No. 18.  That was

18   entered as an exhibit for the depo of Plaintiff on

19   January 19th, 2010.

20          Have you had an opportunity to take a look at

21   this document?

22      A.   Yes.

23          (Defendant's Exhibit 18, previously

24          marked in the deposition of Ray Warren,

25          is attached for reference.)

24

1    BY MR. PERRY:

2        Q.    Does it refresh your recollection regarding any

3    rebuttals Officer Warren wrote in response to an

4    evaluation?

5        A.    This is vaguely familiar.

6        Q.    Do you recall receiving this?

7        A.    Do I recall receiving it?  No.  This is 1999.

8        Q.    At the time of this evaluation of 1999, on or

9    about that year, did you have any personal animosity

10   towards Officer Warren?

11       A.    No.

12       Q.    Do you recall any other instances where you

13   received rebuttals to evaluations in response to

14   evaluations you drafted for Officer Warren?

15       A.    No.

16       Q.    Do you recall some of these accusations that

17   were in this letter?  For example, the paragraph that

18   starts out, "There is some reason or reasons you don't

19   care for me and don't trust me," do you see that

20   paragraph?

21       A.    Yes.

22       Q.    Do you recall doing any of the things that were

23   mentioned in that paragraph?

24       A.    No.  Like I stated before, it's vaguely

25   familiar, but --

000186

25

1      Q.    The second to the last sentence, Officer Warren

2    accuses you of lying to him about -- in the past about

3    an internal affairs investigation.

4           Do you recall him saying that to you?

5      A.    No.

6      Q.    Did it bother you, at any time, when you

7    received any of his rebuttals?

8      A.    I don't recall if this bothered me back then or

9    not.

10     Q.    When you were the direct supervisor for

11   Officer Warren, did he do a good job as a police officer

12   in the performance of, you know, police work?

13          MS. ARCE:   Objection.  Overbroad.

14          You can answer if you know.

15          But I just think, you know, he was his

16   supervisor on and off, I think he said, more than five

17   times.

18          So if you can --

19   BY MR. PERRY:

20     Q.    I understand.  I can isolate each year, but

21   it's my understanding that they blended into one.  But

22   if you would like me to try and narrow it down, I can

23   try to narrow it down for you.  But -- would you like me

24   to narrow it down for you?

25          MS. ARCE:   If you can try to.

STEARNS WILLIAMS REPORTING
(909) 803-0091

26

1          Or if you can answer.

2          THE WITNESS:  I can sum it up for you; okay?

3          Ray, very likeable guy, nice guy.  Ray's a

4    smart guy, very intelligent.  Ray possesses the tools to

5    do anything that Ray wants to do.  My opinion of Ray's

6    career is he was never really devoted to his profession.

7    It was, in my opinion, a way for him to get a paycheck

8    and benefits, and that was it.  He did the absolute

9    minimum during his career to get by.

10   BY MR. PERRY:

11      Q.   How do you measure something like, "devotion,"

12   in your assessment?

13          MS. ARCE:  Objection.  Overbroad; lacks

14   foundation; calls for speculation.

15          MR. PERRY:  It's his term.  I'm giving him an

16   opportunity to explain how he determines whether

17   someone's devoted or not.

18          THE WITNESS:  He never really seemed to be

19   excited about his job in that he did the absolute

20   minimum.  He didn't -- you know -- he didn't go out

21   there and look for the bad guys, I guess is a way you

22   could put it.  He was assigned to a call.  More times

23   than not, he would kiss the call off.  We had talked

24   numerous, numerous times about, we couldn't believe that

25   he kissed some of these calls off and never generated a

000188

27

1    complaint behind it.  We couldn't believe that.

2    BY MR. PERRY:

3        Q.    Who's "We"?

4        A.    The management team of the Barstow Police

5    Department, from time-to-time.

6        Q.    Who do you consider to be the management team?

7        A.    The Chief, the lieutenants, sergeants.

8        Q.    Do you recall that Ray Warren -- Officer Warren

9    was the POA president starting in approximately 2005?

10       A.    I'm not sure of the year, but I know that he

11   was a POA president.

12       Q.    Was he involved in the POA prior to 2005 in any

13   capacity that you're aware of?

14       A.    Nothing specifically that I can think of right

15   now.

16       Q.    He wasn't on any -- he wasn't a member of the

17   board or anything like that before 2005 that you can

18   recall?

19       A.    I'm sure he probably was, but I don't recall

20   that.  I don't know when he was on the board and when he

21   wasn't.  I know he was on the board, you know, right

22   before I left.

23       Q.    Are sergeants part of the POA, or are they part

24   of a different union?

25            MS. ARCE:  Objection.  Relevance.

STEARNS WILLIAMS REPORTING
(909) 803-0091

28

1          You can answer.

2          THE WITNESS:  They're -- they have their own

3    management unit.

4    BY MR. PERRY:

5      Q.    That management unit, does that cover

6    lieutenant -- the lieutenants and the Chief as well?

7      A.    It covers the lieutenants.  The Chief is kind

8    of on the outside of that.  He is kind of part of it,

9    but he's not a part of it.

10     Q.    What's the name of that union?

11     A.    Barstow Police Management Association.

12     Q.    Were you ever an active member on the board of

13   the Barstow Police Management Association?

14         MS. ARCE:  Objection.  Relevance.

15         You can answer.

16         THE WITNESS:  I was never on the board.  I was

17   a member.

18   BY MR. PERRY:

19     Q.    Were you ever president of the BPA -- -MA?

20     A.    No.

21     Q.    Since Officer Warren was hired on or about

22   1986, since that time, that's when you were promoted to

23   sergeant; correct?

24     A.    Yes.

25     Q.    So it really -- it wouldn't be possible -- you

29

1    guys weren't a part of the same union at any given time;

2    correct?

3           MS. ARCE:   Objection.   Relevance.

4           THE WITNESS:   I'm not sure because, honestly, I

5    don't know if I was a sergeant at the time he came on or

6    if I was a patrol officer.   I'm not really clear on

7    that.

8    BY MR. PERRY:

9       Q.   Okay.   When Officer Warren was elected as the

10   POA president, did you have any meetings with him

11   regarding POA issues as Chief of Police?

12      A.   Did I ever have any meetings with

13   Officer Warren --

14      Q.   Yeah.

15      A.   -- while I was in the position of Chief of

16   Police?

17      Q.   Related to POA issues, yes.

18      A.   Yes.

19      Q.   Can you give me an idea of how many times you

20   might have met with Officer Warren?

21          MS. ARCE:   Objection.   Overbroad.   Just in

22   general or in his capacity as president of the BPOA?

23          MR. PERRY:   In the capacity of the BPOA.

24          THE WITNESS:   I don't know the number of times.

25   ///

000191

30

1    BY MR. PERRY:

2        Q.    More than 20 times?

3        A.    I don't know if it was more than 20 times.  I

4    don't know how many times it was.  I know it was more

5    than one, but I couldn't tell you how many times.

6        Q.    Was it less than 100 times?

7              MS. ARCE:  Objection.  Asked and answered.

8    BY MR. PERRY:

9        Q.    I can ask to see if it's -- to get a range

10   here, and that's what I'm trying to do.

11       A.    I wouldn't think that it was 100 times.

12       Q.    Is there a number you can think of that it

13   would be less than?  Between 1 and --

14             MS. ARCE:  I'm going to assert the same

15   objection.

16             THE WITNESS:  I would be guessing.  I can

17   comfortably tell you that --

18             MS. ARCE:  I don't want you to guess.

19             THE WITNESS:  Okay.

20   BY MR. PERRY:

21       Q.    Was your response going to be a guess; or what

22   can you comfortably tell me?

23       A.    I can comfortably tell you it was numerous

24   times.  I just can't give you a number.

25       Q.    Was there a certain process Officer Warren was

31

1    supposed to go through in order to set up a meeting with

2    you while he -- in his capacity as POA president?

3        A.    If my understanding is correct, yes, there was.

4        Q.    What process was that?

5        A.    The process, he should have went through his

6    sergeant, lieutenant and to me; because when he's

7    working, his -- he has to be accounted for by his

8    immediate supervisor, which would be a sergeant.

9        Q.    In what form can this request be to the

10   sergeant?

11       A.    "Going to see the Chief."

12       Q.    And then the sergeant would then tell him to go

13   to the lieutenant first, or would the sergeant go to the

14   lieutenant?

15       A.    You know, that's where it's a little unclear.

16   And I know how it occurred most of the time.  Whether or

17   not there's any actual written guidelines on how he

18   should go about that, I don't know if there is any

19   written guidelines.  I use the chain of command for --

20   because when you're working, again, you know, your

21   supervisor -- your immediate supervisor has to know

22   where you're at.  What happened in reality, Ray just

23   came walking into my office unannounced.

24       Q.    Was there ever a time that, when he did that,

25   that you told him he needed to go through the chain of

STEARNS WILLIAMS REPORTING
(909) 803-0091

32

1    command, or were you okay with him just coming to your

2    office?

3        A.    Depending on what the issue was, I would ask

4    him, "Have you talked to sergeant about this?  Have you

5    talked to the lieutenant about this before it came to my

6    level?  Could this be resolved at a lower level?  Do you

7    really need to come in and talk to me and have me solve

8    this issue or comment on this issue, or could it have

9    been started down below and then maybe come up?"

10       Q.    Well, I'm trying to stay focused on POA issues.

11   So I don't know if there's -- is there a way that you

12   can separate out the times he came to see you on

13   something other than POA-related issues; or let me ask

14   you this:

15            Did he come to you for POA-related issues and

16   his own personal issues as well?

17       A.    I believe he did, yes.

18       Q.    When he came to you for POA issues, did you

19   tell him that he needs to go to a lower level of

20   supervision to handle the POA-type issues?

21       A.    It would depend on what the issue was.

22       Q.    Well, let's talk about some of the issues then.

23            Do you recall just before -- do you recall,

24   sometime in 2006, that the city council was

25   reconsidering implementing the corporal program?

33

1      A.    I remember the city council approved the

2  corporal program.

3      Q.    Do you recall Officer Warren attempting to

4  contact you regarding the corporal program during that

5  year?

6      A.    I vaguely remember some discussion on that.

7  But what the discussion was and the exact content of the

8  discussion, I couldn't tell you.  It's over three years

9  ago.

10      Q.    That's with Officer Warren, correct, the

11  discussions you're referring to?

12      A.    Yes.

13      Q.    You couldn't tell me how many occasions you had

14  the discussions with Officer Warren?

15      A.    No, I couldn't.

16      Q.    Were the discussions always held at the same

17  place?

18      A.    Usually he would come walking into my office

19  and sit down.

20      Q.    Do you recall having a discussion with him

21  regarding the corporal program anywhere other than your

22  office?

23      A.    Not that I recall.

24      Q.    Are you able to separate out each one of these

25  discussions in your memory today?

34

1      A.   No.   No.   And I don't have a clear recollection

2   of any of those conversations.

3      Q.   Do you recall whether or not Officer Warren

4   thought the implementation of the corporal program was a

5   good idea?

6      A.   You know, I don't recall having that specific

7   conversation with him.

8      Q.   Do you recall whether or not there was an issue

9   on which union the corporals would belong to, whether it

10  would be the Barstow POA or the Barstow PMA?  Do you

11  remember that being an issue?

12     A.   I remember that issue, but not a clear

13  recollection of anything associated with that.

14     Q.   Before you left as Chief in 2007, did the

15  corporal program get implemented?

16     A.   Before I left?

17     Q.   Yes.

18     A.   No.

19     Q.   Did you ever blame Officer Warren for the fact

20  that the corporal program never got implemented?

21     A.   I don't think that's the correct statement.

22     Q.   What statement would be the correct statement?

23     A.   From what I recall, to the best of my memory,

24  is the fact that Officer Warren had issues within his

25  own association.  And he was going straight to the city

35

1   manager, which was Hector Rodriguez, discussing these

2   issues.  And the information that came to me was that

3   Ray was not necessarily communicating to the city

4   manager and to others on what it was that the

5   Association wanted.  The Association felt that Ray

6   was -- Ray had his own agenda and not necessarily that

7   of the POA.

8       Q.   When you say, "the Association felt," can you

9   identify one member of the Association that felt the way

10  you're describing?

11      A.   Because it's been three years, and I knew you

12  were going to ask that question, I have really, really

13  tried to go back in my memory.  And I would have to

14  guess.  I think I know, but I'd be guessing.  But it was

15  members of the POA, the board.

16      Q.   It was more than -- it was more than one

17  member?

18      A.   Yes.

19      Q.   Was it Officer Toro?

20      A.   That's not the name that I'm comfortable with

21  saying, was it Officer Toro.  No, I'm not comfortable

22  with that.

23      Q.   So you -- as you sit here today, you know it

24  was a board member, but you don't know --

25      A.   Board members.

36

1        Q.    Board members.   How many board members were

2    there?

3        A.    I'm not sure, but I know, because of what was

4    going on with Ray and the Association, that they made up

5    a rule that no one could discuss POA business without

6    there being at least two members present.

7        Q.    The board members you're referring to came up

8    with that rule?

9        A.    Yes.

10       Q.    How was that relayed to you?

11       A.    Through them.

12       Q.    Did you have meetings with the board members

13   outside the presence of Officer Warren?

14       A.    I didn't have meetings.   I had people just

15   come, like Ray did most of the time, walking right into

16   my office and sitting down, start talking.   I had an

17   open-door policy, but it was to the point that it was

18   getting really irritating.

19       Q.    So if I understand your testimony correctly,

20   there was a written rule that the POA board came up

21   with?

22       A.    I don't know if it was written or not.

23           MS. ARCE:   I'm just going to object.   Misstates

24   testimony.   But he just clarified his testimony if there

25   was a written rule.

000198

37

1    BY MR. PERRY:

2        Q.    It was just a rule that two board members had

3    to be present during any talks with the city manager, or

4    was it with you; or who was -- what was the rule about?

5        A.    The way it was explained to me, that because of

6    the issues Ray had with the POA, that the Association

7    would not discuss anything with anybody unless there was

8    two members present.

9        Q.    Do you recall when you were told this?

10       A.    No.

11       Q.    Do you recall that it was in 2006?

12       A.    May have been, but it may have been 2007.  I'm

13   not sure.

14       Q.    Do you recall when, what month and year it was,

15   that Officer Warren was accused of committing the felony

16   that he was subsequently terminated for?

17       A.    If my memory serves me correctly, it was in

18   January of 2007.

19       Q.    With that in mind, you still think it's

20   possible it could be in 2007, as far as the discussions

21   with -- that you had with those POA board members?

22       A.    Again, it could have been, you know,

23   December 2006.  It could have been January 2007.  I'm

24   not sure.  I'm really not clear on that.

25       Q.    Do you know what conflicting information

38

1      Officer Warren had given to the Association or what

2      specifically he was misinterpreting or whatever it is

3      that they were concerned about?

4           A.   I know there was more than one issue.

5           Q.   Not just the corporal issue, but a different

6      issue or issues with the way he is as a POA president?

7                MS. ARCE:  Objection.  Calls for speculation.

8                If you know, you can answer.

9                THE WITNESS:  I just have a clear recollection

10     of this:  That they weren't comfortable with Ray and his

11     POA activities as president.  They didn't feel that he

12     was representing the desires and the wants of the

13     Association.  They felt that his agenda was personal,

14     and that's why they wanted two members present at any

15     meeting.  And that's the only clear recollection that I

16     have.

17     BY MR. PERRY:

18          Q.   After you were given that information, was

19     there ever a time that Officer Warren attempted to

20     contact you to set up a meeting just by himself?

21          A.   Not that I recall.

22          Q.   Do you recall ever telling Officer Warren that

23     you could not meet with him individually; that he would

24     have to have another board member with him pursuant to

25     the request of the board members that you're referring

39

1    to?

2        A.   I don't recall that.

3        Q.   Do you know how long the tenure is for the POA

4    president?

5            MS. ARCE:   Objection.  Calls for speculation.

6            THE WITNESS:  No.  No.

7    BY MR. PERRY:

8        Q.   To your knowledge, why didn't the corporal

9    program get instituted before you retired?

10           MS. ARCE:   Objection.  Calls for speculation.

11           If you know, you can answer it.

12           THE WITNESS:  That decision was up to the city

13   manager, Hector Rodriguez.

14   BY MR. PERRY:

15       Q.   Did you recommend the implementation of the

16   corporal program to Hector Rodriguez?

17       A.   Yes, I did.

18       Q.   Did he give you a determination that -- before

19   your retirement, that he was not going to implement the

20   corporal program?

21       A.   The only thing that I can tell you that I have

22   a clear recollection of is that the reason the corporal

23   program was not implemented was because of the city

24   manager, and I don't recall his specific reasons.

25       Q.   Did it have anything to do with Ray Warren as

40

1     POA president?

2              MS. ARCE:   Objection.   Calls for speculation as

3     to what Mr. Rodriguez could have been thinking.

4              THE WITNESS:   I'm not sure what he was

5     thinking.

6     BY MR. PERRY:

7         Q.   What about shift schedule changes during the

8     year of 2006?  Do you recall switching from an

9     eight-hour shift to a 3/12 shift that year?

10        A.   In what year?

11        Q.   2006.

12        A.   Switching from an 8 to a 12?

13        Q.   Yeah.

14        A.   I'm not clear when we changed schedules because

15    there were several different changes over a short period

16    of time due to a lack of manpower.

17        Q.   Do you recall what the shift schedules were

18    like when you were first promoted to Chief of Police?

19        A.   No.

20        Q.   During the time you were Chief of Police, did

21    the shift schedules change before your retirement?

22        A.   Well, again, the shift would change depending

23    on the level of manpower and different things that were

24    going on.  I mean, they changed, I guess, several times

25    while I was Chief, but I can't tell you exactly when

000202

41

1    they changed or what schedule we were on in any

2    particular time.

3        Q.   Do you recall Officer Warren attempting to

4    speak with you regarding the shift-change hours a few

5    months before his January 2007 incident?

6        A.   Yes.

7        Q.   Did you -- let me ask you, what do you recall?

8        A.   Again, the best I can recall, I think we

9    were -- we had been working a 12-hour shift, and then we

10   went to an eight-hour shift.

11       Q.   I'm going to have you take a look at an

12   exhibit.  It was previously entered into as

13   Defendant's Exhibit No. 4.  I'm going to give you a

14   moment to take a look at it and let me know when you're

15   all done.  It's a two-page document Bates stamped on the

16   bottom 400 and, it looks like, 398.  There's one for --

17       MS. ARCE:  I think these are two -- actually,

18   they go together.

19       THE WITNESS:  Oh, okay.

20       MS. ARCE:  Thank you.

21       THE WITNESS:  Okay.

22       (Defendant's Exhibit 4, previously

23       marked in the deposition of Ray Warren,

24       is attached for reference.)

25   ///

STEARNS WILLIAMS REPORTING
(909) 803-0091

000203

42

BY MR. PERRY:

    Q.   Do you recall receiving the e-mail that's in this document from Ray Warren?

    A.   Vaguely.

    Q.   Looking on the dates on these, on the string of e-mails, it appears they were exchanged in the month of November 2006.

    Does that sound about right to you?

    A.   Well, that's the dates that are on these e-mails.

    Q.   Other than what's on these e-mails, you don't have an independent recollection of the exchange of these e-mails?

    A.   No.

    Q.   Do you recall whether or not you switched from the eight-hour shift schedule to the 12-hour shift schedule after these e-mails?

    A.   After these e-mails?  I -- again, the only way I could be sure of what shift schedule was in place at what particular time would be to see the shift schedules for that particular time that you're referring to.

    Q.   Did you feel strongly about your officers working the eight-hour shift as opposed to the 3/12 shift?

    A.   Yes.

000204

43

1      Q.    What was your preference?

2      A.    My preference, because of the manpower issue,

3   was the eight-hour shift because it provided better

4   coverage.

5      Q.    Have you -- was that a consistent position for

6   you as Chief?

7      A.    Pretty much.

8      Q.    Did it bother you to have Officer Warren

9   indicate that it might be better to have a different

10  shift than the eight-hour shift?

11     A.    No, because that wasn't just Officer Warren's

12  issue.  It was the POA's issue.  It was a

13  department-wide issue.

14     Q.    Do you understand -- do you have an

15  understanding of what the POA members preferred as far

16  as the shift schedule?

17     A.    Yeah.

18     Q.    What's that?

19     A.    They wanted to be on the 12-hour shifts.

20     Q.    Was that communicated to you by Officer Warren

21  or from somebody else?

22     A.    It was communicated to me by everybody.

23     Q.    Did they explain why they wanted to have the

24  12-hour shift?

25     A.    Yeah, morale.

000205

44

1      Q.    Did they explain how that came into play?

2      A.    They wanted more time off.

3      Q.    The change in schedule, officers still work the

4   same amount of hours every week; correct?

5      A.    Correct.

6      Q.    So it's not additional time off, per se, is it?

7   Is it just lumping more hours together in the week?  Is

8   that what we're talking about?

9      A.    Right.

10     Q.    Do you recall switching to the 3/12 shift after

11  Officer Warren was transferred to SRO?

12     A.    Vaguely.  But, again, I don't know exactly when

13  we made the shift changes.  I would have to see the

14  schedules with the dates on them.

15     Q.    But you do recall switching to the 3/12 shift?

16     A.    I believe that we did, if I recall correctly.

17  100 percent, sitting here today, I couldn't tell you,

18  yeah, we switched to 12 hours.  I believe we did, but I

19  can't be 100 percent sure.

20     Q.    Do you recall what shift Officer Warren had to

21  work as the school resource officer?

22     A.    Day shift.

23     Q.    What hours does that entail?  Is that 8-hour or

24  12-hour?  What's that?

25     A.    That would be Monday through Friday.  But I

000206

45

1    believe -- and, again, I -- I'd have to see the

2    schedule.  But I think that we even made a change to

3    that.  So they were working four-tens, so they would

4    have a three-day weekend, and they alternated.  In other

5    words, when one SRO was on, the other one would be off.

6    There was always supposed to be one SRO on.  That's, to

7    the best of my recollection, what I remember.

8         Q.   Now, when we use the term "SRO," we mean school

9    resource officer; correct?

10        A.   Yes, school resource officer.

11        Q.   Okay.  Do you know whether or not the 4/10

12   schedule was implemented before Ray was placed on

13   administrative leave in January of 2007?

14             MS. ARCE:  Do you mean with respect to just the

15   school resource officer position?

16             MR. PERRY:  Yeah.  That's my understanding,

17   that was his testimony.

18             THE WITNESS:  I don't recall.

19   BY MR. PERRY:

20        Q.   Do you recall telling Officer Warren that you

21   were going to check with the city manager about

22   switching to a 4/10 schedule during a phone call in

23   January 2007?

24        A.   No.

25        Q.   Did you ever talk to -- or let me rephrase it.

46

1          Changing the schedule to a 4/10 schedule, is

2    that something you would have to talk to a city manager

3    about?

4       A.   No.

5       Q.   Is that an issue that you needed to discuss

6    with your command staff before you switched over?

7       A.   Yes, I would have had discussion with the two

8    lieutenants.

9       Q.   When I say, "command staff," I just want to

10   make sure I have the same understanding that you have.

11         Would that include anybody other than the two

12   lieutenants that are under your command, or would it

13   just be the three of you?

14       A.   For the most part, it would be two lieutenants.

15       Q.   Do you recall having a meeting with the two

16   lieutenants, prior to the switch to the three-twelves,

17   during the time period we were discussing in 2006?

18       A.   A specific meeting, no.

19       Q.   Who were the two lieutenants in your command

20   staff in December 2006, if you can recall?

21       A.   Lieutenant Alcantara and Rich Harpole.

22       Q.   Were you the one that promoted

23   Lieutenant Alcantara to lieutenant?

24       A.   Yes.

25       Q.   Were you the one that promoted

47

1       Lieutenant Harpole to lieutenant?

2           A.   No.

3           Q.   Do you know which chief did that?

4           A.   Yes.

5           Q.   Who's that?

6           A.   Ken Becknell.

7           Q.   Are you -- outside of work, do you have a

8       personal relationship with Lieutenant Alcantara?

9               MS. ARCE:  Objection.  Relevance.

10              You can answer.

11              THE WITNESS:  Yes.

12      BY MR. PERRY:

13          Q.   And I want to talk about just in 2006, if

14      you're able to isolate that.

15              What kind of functions or events would you

16      see -- let me ask you, did you see Lieutenant Alcantara

17      outside of work in 2006?

18              MS. ARCE:  Objection.  Relevance.

19      BY MR. PERRY:

20          Q.   You can answer.

21          A.   Yes.

22          Q.   What kinds of functions or events would you see

23      Lieutenant Alcantara outside of work?

24              MS. ARCE:  Same objection.

25              THE WITNESS:  On occasion, we may go out to

48

1    dinner.  If there were social functions connected with

2    the City that we were required to go -- I mean, it

3    wasn't a written requirement.  It's like, yeah, the

4    police department needs to be represented -- then we

5    would go to those.

6    BY MR. PERRY:

7        Q.   Do you know whether or not Lieutenant Alcantara

8    has since retired from the Barstow Police Department?

9        A.   Yes.

10       Q.   Has he?

11       A.   Yes.

12       Q.   Do you still see him now?

13       A.   Yes.

14            MS. ARCE:   Objection.  Relevance.

15   BY MR. PERRY:

16       Q.   How often do you see him now?

17            MS. ARCE:   Same objection.

18            THE WITNESS:  Yeah?

19            MS. ARCE:   Yes.

20            THE WITNESS:  It depends, but frequently.

21   BY MR. PERRY:

22       Q.   How frequently?

23       A.   I might see him one week.  I might not see him

24   the next week.  Then I might see him the next week two

25   times.  See, there's no set, okay, every day.  No,

49

1    that's not it.  You know, whenever we get together, we

2    get together.

3        Q.    Would you consider him a good friend?

4        A.    Yes.

5        Q.    When's the last time you saw him?

6        A.    Yesterday.

7        Q.    Did you discuss with him this case?

8              MS. ARCE:  Well, objection.  Relevance.

9              But you can answer as long as you don't --

10             THE WITNESS:  Yes.

11   BY MR. PERRY:

12       Q.    What did you talk to Lieutenant Alcantara -- or

13   the former Lieutenant Alcantara about this case?

14             MS. ARCE:  Objection.  Relevance.

15             And I'm also going to assert an objection to

16   the extent it asks you to disclose attorney/client

17   communications.

18   BY MR. PERRY:

19       Q.    You can answer.

20             THE WITNESS:  Well, I'm not sure if I'm

21   supposed to answer or not.  Is it attorney/client

22   privilege or --

23             MS. ARCE:  Well, you can answer -- you can

24   answer.  But if you had discussed what you had discussed

25   with your lawyers, then I would tell you not to answer.

000211

50

1    But, for example, like if you told Mr. Alcantara that

2    you were showing up here today, like, that would be fine

3    because you're not disclosing any attorney/client

4    communications.  But if you discussed with him what you

5    had spoken to with your counsel, then I would direct you

6    not to answer.

7           Do you want to take a break and talk?

8           THE WITNESS:  On the advice of my attorney, I

9    can't answer that question.

10   BY MR. PERRY:

11   Q.   So you're saying that your discussion,

12   everything you said to Lieutenant -- or former

13   Lieutenant Alcantara is all attorney/client privilege?

14   Is that my understanding?

15   A.   No, not all of it.

16   Q.   Okay.  Well, separating what your attorneys

17   have explained to you -- those kinds of communications

18   are privileged, but what you say to Alcantara is not

19   privileged.  And I'm entitled to understand what you

20   guys discussed regarding this case.  So I understand

21   your attorney's position, but I am entitled to your best

22   testimony today.

23          So with that in mind, can you tell me what you

24   guys discussed?

25          MS. ARCE:  Why don't we take just a

51

1    couple-minute break because I think he's a little

2    confused.  I don't disagree with your position, but I

3    just want to make sure he knows, in his mind, what the

4    difference is.

5              MR. PERRY:  That's fine.  You guys can take as

6    long as --

7              (Brief recess taken.)

8              MR. PERRY:  We're back on the record.

9    BY MR. PERRY:

10     Q.   Chief Gibson, you've had a chance to speak with

11   your attorney during the break.

12             Would you like a read-back of the question that

13   was pending?

14     A.   Yes, please.

15             (Last question was read.)

16             THE WITNESS:  I asked him about the letter from

17   San Diego that was in the lawsuit because, you know,

18   again, I read over the lawsuit, and I looked at that

19   and, man, I had totally forgot about it.  And I didn't

20   have a clear recollection of it.  And so I asked him --

21   I said, "You remember about this?"

22             And he said, "Well," he said -- and I don't

23   think he really had a clear understanding of it, but

24   that's what happens when three years go by.  You know,

25   there's been a lot of time that's gone by in this case.

STEARNS WILLIAMS REPORTING
(909) 803-0091

52

1    And you want to answer as truthfully as you can and make

2    sure that the answers that you give are true and to the

3    best of your recollection.

4         Q.   What do you recall from this letter?

5         A.   Again, I -- until I read that, I thought, how

6    did this completely slip my mind about this letter?  And

7    I don't really have a clear recollection of the letter

8    and everything that involved around that letter.

9         Q.   Was this a letter that talked about having a

10   no-confidence vote for you as Chief?

11        A.   According to the lawsuit, that's the way it

12   reads.

13        Q.   Did you ever receive a letter from San Diego

14   that had that content on there?

15        A.   To be honest with you, I can't remember if I

16   received the letter or if someone gave me the letter.

17   When I say, "someone," in the lawsuit, it says that it

18   was sent to the mayor and to the city manager.  So I'm

19   not sure -- was the letter sent to them and then they

20   showed me a copy of it?  I don't have a clear memory of

21   that.

22        Q.   At some point, did you look at a letter that

23   you received from either the mayor or the city manager

24   that had the content that I just mentioned?

25        A.   Honestly, I would be guessing because I

000214

53

1    don't -- I don't remember hardly anything about that

2    letter.

3        Q.   Do you remember an accusation that

4    Officer Warren was the one that drafted that letter?

5        A.   And that was what was confusing; because I

6    didn't associate that letter with the accusation that he

7    was making, that that letter was generated by him for a

8    vote of no confidence.

9        Q.   When you said, "the accusation that he was

10   making," what accusation are you specifically referring

11   to?

12       A.   The one in the lawsuit, his accusation.

13       Q.   The accusation that a letter was sent from

14   San Diego?  I'm just trying to get -- I want to be clear

15   on what you're saying the accusation is.

16       A.   Yes, what it says in the lawsuit, that

17   according to Officer Warren, there was a letter sent --

18   post stamped from San Diego sent to the City about a

19   vote of no confidence on me.

20       Q.   What did you do with the letter after you

21   reviewed it?

22       A.   I can't even tell you if I got the letter.

23   That's what I'm telling you.  I mean, it's like a total

24   blank spot.  I couldn't sit here today and tell you,

25   "Yep, I got that letter in the mail."  I can't tell you

000215

54

1    that.

2        Q.   Can you tell me you did get it at some point,

3    whether it's from someone from the City's side or

4    whatever?

5        A.   I can say that I probably did.  I must have.

6    But I don't have any clear memory of all the dealings

7    with that letter, whether or not it came to my office,

8    whether or not it was given to me by the mayor, the city

9    manager, whether I had a copy of it.  I'm sure I had to

10   read it, but I don't have a clear memory of it.

11        Q.   Well, do you remember being angered about the

12   letter in any way?

13        A.   No.

14        Q.   Did it bother you in any way?

15        A.   Oh, I'm sure it did.  I mean, you know -- the

16   answer's, I'm sure it did.

17        Q.   But you don't remember doing anything in

18   response to receiving the letter?

19        A.   No.

20        Q.   Do you recall whether it was before or after

21   you made the decision to transfer Officer Warren to the

22   SRO position?

23        A.   I can't tell you when I got it or if I got it.

24        Q.   What else did you speak with

25   Lieutenant Alcantara -- former Lieutenant Alcantara

55

1    about?

2        A.    Well, we talked about his pear tree and whether

3    or not the wind was going to blow all the blossoms off,

4    because the wind was blowing so bad up there.

5        Q.    What about anything related to this case?

6        A.    How much it stood out to me of how much bull

7    shit was in there.  And I hadn't really got that sense

8    when I read it the first time.  But for some reason, it

9    just -- all that stuff just really jumped out at me.

10       Q.    Well, what's the first thing that you -- that

11   jumped out at you, that you've called bull shit?

12       A.    I think the entire thing.

13       Q.    The entire --

14       A.    The allegations -- the allegations.

15       Q.    So everything in there?  That's your answer,

16   the whole complaint or the whole lawsuit?

17       A.    Basically, yes.

18       Q.    Did you guys talk about everything in the whole

19   lawsuit?

20       A.    No.

21       Q.    Were there specific items of the bull shit you

22   guys talked about?

23       A.    Well, I just told you what we talked about.

24   Specific --

25       Q.    Other than the letter?

000217

56

1      A.   That was it.

2      Q.   You didn't talk about the corporal program?

3           MS. ARCE:   Objection.   Asked and answered.

4  BY MR. PERRY:

5      Q.   The Officer-in-Charge issues?

6           MS. ARCE:   Objection.   Asked and answered.

7           MR. PERRY:   I believe that's the first time

8  I've mentioned the word "Officer in Charge."   I'm trying

9  to prod his memory here.

10          MS. ARCE:   He also just said that all they

11 spoke about was the letter.   So I'll assert the same

12 objection.

13 BY MR. PERRY:

14     Q.   Nothing else?

15     A.   That's it.

16     Q.   Had you spoke about the lawsuit with former

17 Lieutenant Alcantara on other occasions as well besides

18 the one we were just discussing?

19     A.   Yes.

20     Q.   When was the time before yesterday?

21     A.   I'm not sure.

22     Q.   What do you recall, from that other time,

23 talking to former Lieutenant Alcantara?

24          MS. ARCE:   Objection.   Vague and ambiguous,

25 overbroad.

000218

57

1          THE WITNESS:  I don't recall.

2     BY MR. PERRY:

3          Q.    Any other times that you spoke about this case

4     with Lieutenant Alcantara that you can recall?

5          A.    I can tell you that I spoke to him on numerous

6     occasions about it.

7          Q.    Numerous occasions since the time --

8          A.    That it was filed.

9          Q.    Do you have an understanding of when the case

10    was filed?

11         A.    Three years ago.

12         Q.    Prior to Officer Warren's dismissal, do you

13    recall taking him off as Officer in Charge?

14         A.    Me, personally, no.

15         Q.    Do you have an understanding that someone

16    took -- stopped allowing him to be Officer in Charge?

17         A.    Yes.

18         Q.    Who is that?

19         A.    Lieutenant Alcantara.

20         Q.    Did Lieutenant Alcantara tell you he was going

21    to remove Officer Warren from the Officer-in-Charge

22    position or opportunities to do that, or did he request

23    your permission?

24         MS. ARCE:  Objection.  Compound.  Can you break

25    that into two -- or separate questions?

000219

58

1    BY MR. PERRY:

2         Q.   Do you have an understanding of my question?

3         A.   No one asked for my permission.  And my

4    understanding, it was a decision of Lieutenant Alcantara

5    to remove Officer Warren from the OIC position.

6         Q.   I'm going to have you take a look at an exhibit

7    that's been previously marked as Defendant's Exhibit

8    No. 8 in Plaintiff's deposition.

9              Does this document refresh your recollection

10   regarding the Officer-in-Charge issue?

11        A.   Yes.

12             (Defendant's Exhibit 8, previously

13             marked in the deposition of Ray Warren,

14             is attached for reference.)

15   BY MR. PERRY:

16        Q.   There's -- on the first page, the page that's

17   labeled "402" at the bottom, there's an e-mail response

18   to Officer Warren that looks like it came from you that

19   starts out "Refer to Policy No. 124."

20             Do you see that paragraph?

21        A.   Yes.

22        Q.   Do you recall typing this e-mail out to

23   Officer Warren?

24        A.   I don't recall it, but I guess I did.

25        Q.   Were these your reasons for preventing

59

1    Officer Warren from the Officer-in-Charge position, or

2    are these the reasons that Lieutenant Alcantara gave

3    you?

4         A.   The OIC position was not something that the

5    Chief made the decision on.  That was pretty much left

6    up to the sergeants and the patrol lieutenant.  They're

7    the ones that usually handle that.  And I think that's

8    why I've referred him back.  I put, "Please talk to

9    them, and hopefully they will be honest with you."

10        Q.   It also says, "You were not recommended by your

11   or any other sergeant."

12             Do you recall asking all the sergeants whether

13   or not Officer Warren should be an OIC?

14        A.   I don't recall that, no.

15        Q.   Do you recall having any command-staff meeting

16   regarding Officer Warren's complaint that he is no

17   longer being considered for OIC?

18        A.   No, I don't recall any specific meeting.

19        Q.   You indicated, in your response, that he had

20   received a "meets standard" on his last two evaluations.

21             Can you tell me why he was not removed from

22   consideration for OIC when he received the first "meets

23   standards" overall evaluation?

24             MS. ARCE:  Objection.  Calls for speculation.

25             If you know.

60

1          THE WITNESS:  I'm not sure what you're

2     referring to.

3     BY MR. PERRY:

4          Q.   Why did you wait for a second evaluation of

5     "meets standards" to come through before removing him

6     from the consideration for OIC?

7          MS. ARCE:  Objection.  It assumes facts not in

8     evidence.  Calls for speculation.

9          If you can answer.

10          THE WITNESS:  I don't know that I did.

11     BY MR. PERRY:

12          Q.   You don't know that you did what?

13          A.   What you just asked.

14          Q.   Well, it says here that he received a "meets

15     standards" on his last two evaluations.

16          So accordingly, he should have -- at the first

17     one, he should have not been allowed to continue on

18     Officer in Charge.  Would that be accurate?

19          A.   Again, I'm not sure what your question is.

20          Q.   An employee cannot be Officer in Charge if he

21     has a "meets standards" evaluation; is that correct?

22          A.   No, I don't think that is correct.

23          Q.   Let's take a look at exhibit previously marked

24     Exhibit No. 9 in Plaintiff's deposition.

25          Without having to look at every last word on

61

1     this document, Chief, do you recognize, in general, what

2     this document is?

3         A.    Yes.

4                (Defendant's Exhibit 9, previously

5                marked in the deposition of Ray Warren,

6                is attached for reference.)

7     BY MR. PERRY:

8         Q.    What is it?

9         A.    Policy and Procedures Manual.

10        Q.    It says, "Section 124" on the bottom right

11    corner, and it's four pages long; correct?

12        A.    Yes.

13        Q.    In your e-mail, regarding the prior exhibit,

14    Defendant's Exhibit No. 8, that paragraph we were

15    talking about, appears you wrote "Refer to Policy 124

16    under qualifications, OIC."

17                Do you recall that from the prior exhibit?

18        A.    Yes.

19        Q.    Is this the policy that you were referring to

20    in the e-mail?

21        A.    Yes.

22        Q.    On "Qualifications" for OIC listed on Bates

23    stamp 456, there on the bottom, do you see that

24    underneath "Qualifications," it says, "To qualify for a

25    special assignment, officers shall meet the following

000223

1     standards"?

2             Do you see that sentence in the middle of the

3     page?

4        A.   Yes.

5        Q.   And under "OIC," do you see the bullet point

6     that says, "Most recent annual appraisal, overall rating

7     of exceeds standards or better"?

8             Do you see that?

9        A.   Yes.

10       Q.   With that in mind, does that refresh your

11    recollection as far as what's required for employee

12    evaluations for the Officer-in-Charge position?

13       A.   I think what you're getting at, and just to

14    clarify, is when a selection is made by the staff -- the

15    lieutenants, the sergeants and whatever -- for a

16    permanent OIC, somebody's going to be doing that job on

17    a regular basis, yeah, these guidelines would be

18    followed or should be followed.

19       Q.   Sometimes they're not followed?

20       A.   There could be a time where they might not be

21    followed.  If you're shorthanded and you don't have

22    anybody available at that particular time and you have

23    to have someone that's in charge, yeah, you're going to

24    put in somebody on a temporary basis that you feel --

25    and that person is going to most likely be the sergeant,

63

1    sometimes the lieutenant -- that he feels can run the

2    shift -- has the ability to run that shift, but not on a

3    permanent basis to be an OIC.

4        Q.   How long was Officer Warren an OIC before he

5    was terminated?

6        A.   I don't know.

7        Q.   I mean, he was a 20-year officer; correct?

8        A.   Yes.

9        Q.   How many years had he been -- had it been less

10   than five; or how many years had he been an OIC?

11       A.   I don't know how many times he had been used as

12   an OIC.  I don't know if he had ever been selected as an

13   OIC.

14       Q.   You don't know whether or not he had ever been

15   an OIC?

16       A.   No.  I know he acted as OIC before, during his

17   career.  But whether or not he was actually selected to

18   be a permanent OIC, I don't know that he was.

19       Q.   So there are permanent OIC's and non-permanent

20   OIC's?

21       A.   OIC's that you use on a regular basis that will

22   recognize that a sergeant's not there, this guy's going

23   to be the OIC.  And then you have times to where you

24   have to make an OIC because of staffing issues.

25       Q.   So is there some sort of selection process

64

1    where someone's deemed a permanent OIC?

2        A.    I don't know if they'd be deemed a permanent

3    OIC, with the title and pay and all that.  I don't think

4    so.  OIC's, the history of it is they're pretty much

5    picked by the sergeant, the watch commander.

6        Q.    You had made a distinction earlier about there

7    being a permanent OIC.  That's what I'm trying to

8    explore.

9        A.    Maybe "permanent" was not a good word to use.

10       Q.    Then what would be --

11       A.    Maybe a regular recognized officer who,

12   recognized, would be OIC on that particular shift.  And

13   a shift changes.  I mean, you know, the shift could be

14   made up this way today and tomorrow could be completely

15   different.

16       Q.    Was Officer Warren a regularly-recognized OIC?

17       A.    No, I don't think he was.

18       Q.    But you're saying this was a decision that's

19   made below your level; is that correct?

20       A.    Normally, it's made by the sergeants of a

21   particular shift with input from the patrol lieutenant.

22       Q.    So are you always aware when an officer is an

23   OIC?

24       A.    No.

25       Q.    So it's possible Officer Warren could have been

000226

65

1     an OIC many more times than you're aware of; is that

2     correct?

3         A.   Possibly.

4         Q.   And as you sit here today, you don't recall

5     having a conversation with any of his sergeants

6     regarding their recommendation for him for OIC?

7         A.   No.

8         Q.   Do you have any idea why he was removed from

9     consideration for OIC in November of 2006?

10            MS. ARCE:   Objection.   Calls for speculation.

11            If you know, you can answer.

12            THE WITNESS:   You know, I remember

13    Lieutenant Alcantara had said something to me about

14    that, but I'm not comfortable in -- because I don't have

15    a clear recollection of it.

16    BY MR. PERRY:

17        Q.   Well, what do you recall?

18        A.   That he removed him as OIC from the shift.

19        Q.   Why did he do that?

20        A.   His specific reasons, I'm not clear.

21        Q.   Isn't it true that management -- meaning,

22    lieutenants and yourself -- really didn't particularly

23    care for Officer Warren around this time?

24            MS. ARCE:   Objection.   Calls for speculation.

25            THE WITNESS:   No, that's not true.

66

BY MR. PERRY:

Q.   He, as POA president, had been trying to set up

meetings with you or discuss various issues, and you had

been avoiding him, hadn't you?

A.   No, I hadn't been avoiding him because he just

felt comfortable kind of walking in my office and

sitting down whenever he felt like it.

Q.   Did that bother you when he did that?

A.   It irritated me at times.

Q.   Was it a lack of disrespect for you -- was it a

disrespect for you; or how were you taking it?

A.   You know, again, I think that he should have

taken a lot of these issues up with his sergeant or his

lieutenant, and they could have been handled at that

level before coming to me.  And that's why, you know, it

irritated me at times.  But I don't remember ever

telling Ray, "Ray, you're not to come into my office

anymore."  I don't remember telling him that.  So, I

mean, Ray felt pretty comfortable with me, always felt

comfortable with me, had no problem coming and walking

right in my office.

Q.   But you were getting tired of seeing him come

into your office; is that correct?

MS. ARCE:   Objection.  Mischaracterizes his

testimony.

000228

67

1          THE WITNESS:  It was part of the job.

2     BY MR. PERRY:

3          Q.    Part of the job of being Chief?

4          A.    Being Chief of Police.

5          Q.    Was the Officer in Charge someone that was

6     usually more -- someone that's more senior than other

7     officers?

8          A.    Yes.

9          Q.    Do you remember who Officer Chris Kirby was?

10         A.    Yes.

11         Q.    To your knowledge, do you know whether or not

12    Chris Kirby is still with the police department?

13         A.    Yes.

14         Q.    To your knowledge, do you know how many more

15    years of experience Officer Warren had over

16    Officer Chris Kirby?

17              MS. ARCE:  Objection.  Calls for speculation.

18              THE WITNESS:  No.

19    BY MR. PERRY:

20         Q.    Would you agree that Officer Kirby is less

21    senior than Officer Warren?

22         A.    Yes.

23         Q.    And people that are selected as OIC, there's no

24    problem having someone like Officer Kirby Officer in

25    Charge over Officer Warren?

000229

68

1      A.   Ask that again.

2      Q.   There's no problem having someone with less

3   seniority, like Officer Kirby, selected as an OIC over

4   someone who's more senior, like Officer Warren?

5      A.   I hate to ask you one more time, please.

6      Q.   Let's do a read back, if we can.

7           (Last question was read.)

8           THE WITNESS:  No.

9   BY MR. PERRY:

10      Q.   Why not?

11      A.   Because your Officers in Charge, even though he

12   may not have the same years on the job, he may be a

13   better police officer, the better critical-thinking

14   skills and absolutely does a better job than the guy

15   that's above him.

16      Q.   Same with Dante Caliboso?  Do you know who that

17   is?

18      A.   Yes.

19      Q.   Is he an officer that's less senior than

20   Officer Warren?

21      A.   Yes.

22      Q.   And based on what you stated in your two --

23   about two questions earlier, you had no problems -- you

24   would have no problems having a less-senior officer like

25   Officer Caliboso as an OIC rather than

69

1    Officer Ray Warren who's more senior; correct?

2       A.   You're asking me to speculate.

3       Q.   I'm asking you, for someone who has less

4    seniority, like Officer Caliboso, you have no problem

5    with them being an OIC over someone who's more senior,

6    like Officer Warren, based on what you just indicated as

7    far as the ability to do police work; correct?

8       A.   I think what you're asking is, do I feel that

9    Officer Caliboso is more qualified to be an OIC over

10   Officer Warren.  And, again, you're putting me in a

11   hypothetical situation.  You're asking me a hypothetical

12   question.

13      Q.   Well, you don't have any knowledge, one way or

14   the other, of Officer Caliboso's ability to perform as

15   an OIC?

16      A.   I wouldn't want either one of them as an OIC,

17   if you want my honest answer.

18      Q.   I always want your honest answer, so --

19      A.   Yes.

20      Q.   But you don't recall the reason, the sudden

21   change for Officer Warren being removed for

22   consideration from OIC around November of 2006; is that

23   correct?

24         MS. ARCE:  Objection.  Calls for speculation.

25         If you know.

000231

70

1          THE WITNESS:  Again, I think that's a question

2     you need to ask Alcantara.

3     BY MR. PERRY:

4          Q.   I'm asking -- well, if you have an

5     understanding, I'm entitled to your understanding.  Even

6     if it's something Alcantara has explained to you, I'm

7     entitled to that.

8          A.   The only thing I can tell you is he was not

9     comfortable with having Ray as OIC.

10         Q.   Was there an occasion that Officer Warren

11    performed below standard as OIC?

12         A.   Possibly, but I don't have a clear

13    understanding.  And rather than guessing -- you don't

14    want me to guess -- I would rather you ask that from

15    Lieutenant Alcantara because I don't have a clear

16    understanding.  It was not my decision.  It was not

17    something that I told him to do.  It was not something

18    that I said, "Oh."  You know, that was his decision.  He

19    did that on his own.

20         Q.   But you're the Chief, so you could have stopped

21    him; right?

22              MS. ARCE:  Objection.

23              THE WITNESS:  Again, you're asking me to

24    speculate.

25    ///

000232

71

1    BY MR. PERRY:

2        Q.   No.  You are the Chief of Police, so things

3    that happen, decisions underneath you, you can change

4    them; is that correct?

5        A.   I could.

6        Q.   So if you disagreed with Lieutenant Alcantara

7    about that issue or if you wanted to look into it more,

8    you could have done something more as Chief; correct?

9        A.   Correct.

10       Q.   Do you recall, that same month in November of

11   2006, Officer Warren being prevented from having

12   ride-alongs with him?

13       A.   I remember one particular incident.

14       Q.   Around that time?

15       A.   What was the date again?

16       Q.   I said November of 2006.

17       A.   I'm not clear on the date.  But I think it was

18   probably around that time.

19       Q.   Well, what do you recall?

20       A.   If I'm recalling the incident that you're

21   referring to, it would have been a ride-along with

22   Roger Martin with Officer Warren.

23       Q.   Who's Roger Martin?

24       A.   Roger Martin, probably 30 years ago, I believe,

25   he said he used to be a reserve with the police

000233

72

1    department.  And he also had two kids -- a boy and a

2    girl -- who were explorers on the department.  But I'm

3    not sure, at that particular time, whether or not they

4    were still explorers or not.  His daughter might have

5    been, but I know his son went in the Air Force.

6         Q.   What do you recall -- or was there an issue

7    with Roger Martin being a ride-along with

8    Officer Warren?

9         A.   The issue had to do with Roger Martin.  It had

10   nothing to do with Officer Warren.

11        Q.   What was the issue with Roger Martin?

12        A.   Roger Martin had become a pest.  He would come

13   to the department almost on a daily basis, and the girls

14   would just buzz him in the front door; because we have a

15   security door.  You can't get to -- outside the lobby of

16   the police department unless they buzz you in.  And he

17   had a bad habit of just coming in and walking around and

18   visiting with people, walking in my office, going back

19   in the kitchen, making himself a cup of coffee.

20             He was also on a board, I believe, that wanted

21   to know more about the police department and some issues

22   that may be occurring; just a number of things.  In

23   other words, the guy was a distraction, in my opinion.

24   And I had given instructions to the girls at the front

25   counter, "You do not buzz him in.  He comes in the

73

1    lobby, you ask him who he's here to see, and they are to

2    meet him in the lobby.  He is not to come back into the

3    police department."

4        Q.   And this is sometime prior to -- this directive

5    you're referring to, was this sometime prior to the

6    request for a ride-along?

7        A.   I think it was all probably before, but in that

8    general time.

9        Q.   Do you know whether or not Officer Warren was

10   told that the problem with the request for a ride-along

11   by Roger Martin was because of Roger Martin; or do you

12   recall anything other than that?

13       MS. ARCE:  Objection.  Calls for speculation;

14   lacks foundation.

15       THE WITNESS:  I don't think it was discussed

16   with Ray.

17   BY MR. PERRY:

18       Q.   Do you know whether or not Lieutenant Alcantara

19   had a discussion with Ray regarding the ride-along with

20   Roger Martin?

21       MS. ARCE:  Objection.  Calls for speculation;

22   lacks foundation.

23       THE WITNESS:  I don't know if he did or not;

24   probably did.

25   ///

000235

74

1    BY MR. PERRY:

2        Q.    Besides that -- let me ask you this:

3              Is that everything that you recall from the

4    incident, the ride-along with Officer Warren regarding

5    Roger Martin, that you can recall?

6        A.    Yes.

7        Q.    Was there any other issues with ride-alongs

8    with Officer Warren that you can recall?

9        A.    Not that I'm aware of.

10       Q.    Do you recall assigning Officer Warren to the

11   SRO position in December 2006?

12       A.    Yes.

13       Q.    Isn't it true your department had issued a memo

14   out to the department for officers to put in a request

15   for that position?  Is that accurate?

16       A.    Yes.

17       Q.    Do you recall what kind of response you

18   received from the department regarding the --

19       A.    No one applied for it.

20       Q.    Who was the -- was there more than one SRO at

21   the time?

22       A.    Two.

23       Q.    Who were the two SRO's at the time?

24       A.    It was vacant.

25       Q.    So it's my -- so is it true that it was just

000236

75

1    Officer Toro -- or let me ask you, was Officer Toro the

2    SRO at the time before Officer Warren went over there?

3         A.   Well, I think that particular time, if memory

4    serves me correctly, there wasn't an SRO assigned.  But

5    prior to that, when there was an SRO, I believe it was

6    Officer Toro.

7         Q.   There were two vacancies or one vacancy?

8         A.   Two.

9         Q.   And were there two -- can you tell me who the

10   two SRO's were before Officer Warren and

11   Officer Jackson?

12        MS. ARCE:  Objection.  Misstates testimony.

13   BY MR. PERRY:

14        Q.   Were there two officers in that position at one

15   time?

16        A.   I believe there was, but I -- I can't recall.

17   See, we had a contract with the school district for the

18   SRO's, and I believe the contract called for two.

19        Q.   How long -- did you get the contract with the

20   school district while you were Chief of Police?

21        A.   I want to say that it was -- the contract was

22   revisited, maybe rewritten, but I'm not sure of that.

23        Q.   You don't recall an SRO position when you were

24   lieutenant?

25        A.   Yeah.  And that's why I'm not sure if it was --

000237

76

1    if it was when I was Chief or when I was a lieutenant,

2    whether or not that contract was revisited, because it

3    involved how much the school district was going to pay

4    for the two positions or one position.

5        Q.   As you sit here today, do you recall a time

6    when there were two officers assigned to the SRO

7    positions that you're referring to?

8        A.   Yeah.   I believe -- I believe that

9    Officer Heiden and Officer Maulidon -- those are the two

10   that pop up into my mind right now, that they used to be

11   the SRO's.

12       Q.   How do you spell Heiden?

13       A.   Heiden is H-e-i-d-e-n.

14       Q.   And the second one?   I'm sorry.

15       A.   Maulidon, M-a-u-l-i-d-o-n.   I'm not sure if I'm

16   spelling that right or not.

17       Q.   You selected -- was the decision to select

18   Officer Warren yours or somebody else's?

19       A.   It was mine.

20       Q.   Did you have a meeting with Lieutenant Harpole

21   and Lieutenant Alcantara regarding the selection of the

22   officers to SRO?

23       A.   I don't recall the specific meeting, but I'm

24   sure I did.

25       Q.   Do you recall who Officer Warren's direct

000238

77

1    supervisor was at the time?

2       A.   No.

3       Q.   Could it have been Sergeant Libby?

4       A.   I was thinking it could be either Libby or

5    Ramirez.  I'm not sure.

6       Q.   Do you recall talking to either Libby or

7    Ramirez about selecting Officer Warren for the SRO

8    position?

9       A.   I may have, but I don't recall.

10      Q.   When the memo came out to the officers, was

11   there a deadline for them to respond by or --

12      A.   Yes.

13      Q.   When you didn't get any responses, how long --

14   or did you have the meeting with the lieutenants after

15   you didn't receive any responses from the line staff?

16      A.   I'm sure after that, the cutoff date expired,

17   I'm sure we probably sat down and had a meeting.

18      Q.   During the meeting, who's the one that brought

19   up Officer Warren's name?

20      A.   I don't know.

21      Q.   What about Officer Jackson?  Who's the one that

22   brought up her name?

23      A.   I did.

24      Q.   You specifically recall her name, but not

25   Officer Warren's name?

000239

78

1      A.    Right.

2      Q.    Why did you select Officer Warren for that

3  position?

4      A.    Why did I select Officer Warren to the

5  position?

6      Q.    Yeah.

7      A.    He was on day shift.  Ray had indicated that he

8  wanted to be more than just a police officer.  He wanted

9  to be an OIC.  He wanted to be a sergeant.  He wanted to

10  promote.  I felt that this was a good opportunity for

11  Ray to show us that he had potential.

12          Now, what's the most important criteria for the

13  school resource officer?  Not what's written down in the

14  Policy and Procedure, but in reality.  And in reality, a

15  person who's a school resource officer, that's an

16  extremely important job.  And I don't think I need to

17  explain why it's an extremely important job.  You're

18  talking about schools.  You're talking about children.

19  You're talking about educators.  That's an extremely

20  important job.  Ray had the personality.  He had the

21  smarts to do a very good job as the SRO.

22      Q.    Well, you'd already said that Ray had always

23  done the bare minimum; isn't that correct?

24      A.    Correct.

25      Q.    So what made -- what changed your mind in

000240

79

1    December of 2006 to put him in that very important

2    position you're describing?

3         A.    Because that job fit Ray.

4              MS. ARCE:   Objection.   Assumes facts not in

5    evidence.

6              Go ahead.

7              THE WITNESS:   That job fit Ray; okay?   And what

8    I mean by that is, it wasn't a job that demanded, "Okay,

9    you know, you need to arrest so many people.   You need

10   to write so many citations," you know, the normal stuff

11   that patrol is usually evaluated by.

12             Okay.   That job requires -- no one cares if he

13   ever makes an arrest.   Why?   We don't care about

14   arrests.   We don't care about citations with the SRO.

15   We care about the protection of those kids.   We care

16   about how that SRO is going to relate to the school

17   administration, to the school teachers, to those campus

18   monitors.   Ray possesses all those skills.   As far as I

19   was concerned, Ray was a perfect person for that

20   position, and it was an opportunity.   It was an

21   opportunity for him to go in there and do a good job and

22   say, "Hey, look."

23        Q.    Your agency had just removed him from

24   consideration from OIC the month before, in November of

25   2006, and now he's being selected as a good candidate

000241

80

1      for SRO.

2              Does that make sense to you?

3      A.    Yeah, it sure does, for the reasons I just

4      explained to you.  Patrol Division and the issues that

5      patrol has to deal with is totally different from the

6      SRO position.  I have officers that are outstanding -- I

7      had officers who were outstanding in Patrol Division

8      that I would not have put in the SRO position.

9      Q.    Wasn't it true -- or wouldn't it have been

10     better to pick someone -- if you were going to force

11     someone into a spot, that you could force someone in

12     that's less senior than Officer Warren?

13             MS. ARCE:  Objection.  Calls for speculation;

14     incomplete hypothetical.  Excuse me.

15             THE WITNESS:  As the Chief of Police, I'm

16     responsible for assigning personnel for the benefit of

17     the City of Barstow and the protection of its citizens,

18     which includes the school.  And I have to make those

19     decisions based on what I'm comfortable with because, as

20     you, everyone else knows, the Chief is ultimately

21     responsible for everything in his organization.

22     BY MR. PERRY:

23     Q.    Isn't it true that you want people to be in

24     positions that want to be there?  Does that factor in at

25     all?

000242

81

1      A.    True.

2      Q.    I mean, that's why you have the memo inviting

3   people to apply, because you would want people to want

4   to be there; isn't that correct?

5      A.    True.   True.

6      Q.    So in instances when people don't put in for a

7   position, is it fair to say that nobody wanted that

8   position at the time?

9      A.    Maybe.

10         MS. ARCE:   Objection.   Calls for speculation.

11   BY MR. PERRY:

12     Q.    Well --

13     A.    I can explain it to you like this:

14         When I worked for Bob Sessions, he wanted me to

15   go to the FBI Academy in Quantico, Virginia.   I didn't

16   want to go to Quantico, Virginia.   I didn't want to go

17   back there for three months; didn't want to do it;

18   didn't want to leave my family.

19         Came up to me one day and he said, "Lee, you're

20   going to work for me, you're going to go to the FBI

21   Academy."

22         I said, "Okay."   And I went to the FBI Academy.

23         Did I want to go?   No.   After I graduated, was

24   I very proud that I attended the FBI Academy?   Did it

25   help me get the Chief of Police job?   Yeah, sure did.

000243

82

1     Q.    So are you --

2     A.    And I tell you that to say that sometimes

3   people who are in a slump, people that may not be doing

4   well, sometimes you have to kind of push them along,

5   even though it may not be something, at the time, that

6   they think that they want to do.

7     Q.    So you're saying that Officer Warren was in a

8   slump?

9     A.    Yeah, I think he was.

10    Q.    Based on what?

11    A.    Based on his career.

12    Q.    A slump in his whole career?

13    A.    He had highs and lows, but more lows than I

14  would say highs.

15    Q.    And it's your testimony that you were trying to

16  help him; that's why you put him there?

17    A.    That was an opportunity that I gave him.

18    Q.    It was an opportunity that he didn't want,

19  though; correct?

20    A.    Right.

21    Q.    Do you recall him telling you he didn't want

22  this position that you had selected him for?

23    A.    Oh, yeah.  Would you like me to tell you about

24  that conversation?

25    Q.    Well, I'm sure -- do you recall more than one

000244

83

1  conversation?

2      A.   Well, I recall one specific conversation that

3  made me second-guess my decision to put him in the

4  schools.

5      Q.   When did you have this conversation with him

6  that you're referring to?

7      A.   Sometime after he was assigned the position.

8  It could have been in December.  It could have been in

9  January.  I'm not sure of the exact time.

10     Q.   Where was this conversation at that you recall?

11     A.   In my office.

12     Q.   Was this another time that he just came into

13 your office, or did you invite him there?

14     A.   He just came walking in and sat down.

15     Q.   Was this the first conversation you were having

16 with him following his selection for SRO?

17     A.   I believe it was the second one.  The first one

18 was advising him that he was being put in that position.

19     Q.   How did that conversation go?

20         MS. ARCE:  Which conversation?

21         MR. PERRY:  The one he just now referenced when

22 he told him that he was being selected for that

23 position.

24         MS. ARCE:  Okay.

25         THE WITNESS:  Ray -- real quiet; didn't say

000245

84

1    much.  And I could tell he was not happy with me putting

2    him in that position.

3    BY MR. PERRY:

4        Q.    So you don't recall him saying anything during

5    that first conversation?

6        A.    I don't recall anything.  The only thing I

7    recall is how quiet he was.  I knew he was upset.

8        Q.    Who else was with you when you notified him?

9        A.    I think that was Officer Toro and

10   Lieutenant Alcantara.

11       Q.    Do you know that it was later discovered that

12   Officer Toro had said that Ray would have never been

13   transferred to that spot if he would have just kept his

14   fucking mouth shut?  Did you ever hear that?

15       A.    No.

16       Q.    If Ray just kept his mouth quiet on some of

17   these POA issues, would he have avoided having to go to

18   the SRO position?

19           MS. ARCE:   Objection.  Calls for speculation.

20           THE WITNESS:  Had nothing to do with that.

21   BY MR. PERRY:

22       Q.    What do you recall from the second conversation

23   you're referring to?

24       A.    He came into my office, sat down, said that he

25   didn't care about kids, didn't care about schools.  He

1    just wanted to come in and do his job.

2        Q.   What else do you -- how did you respond to

3    that?

4        A.   Well, I was floored by it.  I couldn't believe

5    that he had made that statement.  And it caused me to

6    second-guess my decision to put him in there.  And the

7    last thing in the world I wanted was somebody to cause

8    the department issues over at that school.  I didn't

9    need that headache.

10        So I told Ray -- I said, "Ray, you know, I'm

11   not making any promises but, you know, maybe if you

12   could find somebody who's willing to go over there," I

13   said, "I may consider it.  Again, I'm not making any

14   promises, but I might consider it."

15       Q.   Why make Ray find someone else to replace him?

16       A.   I thought him being, you know, in Patrol

17   Division with the guys, maybe he would know somebody

18   that would want to go over there that hadn't thought

19   about it before.

20       Q.   Why not just select somebody else with this

21   new-found knowledge you had from this meeting?

22       A.   I seriously thought about that.  I went to the

23   lieutenant and I told him.  I said, "Man, I've got a

24   problem.  I've got a guy who just came into my office

25   and told me he doesn't care about the kids, he doesn't

000247